**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------x
                          :

In re                        :    Chapter 11
                          :

HARRY & DAVID HOLDINGS, INC, *et al.*,[1]   :    Case No. 11-10884 (MFW)
                          :

         Debtors.           :    (Jointly Administered)
                          :

------------------------------------------------------------x   **Hearing Date:  April 27, 2011 at 9:30 a.m.**
                                           **Obj. Deadline:  April 19, 2011 at 4:00 p.m.**

### MOTION OF THE DEBTORS FOR AN ORDER APPROVING AND ASSUMING BACKSTOP STOCK PURCHASE AGREEMENT AND FEE AND INDEMNIFICATION PROVISIONS RELATED THERETO

        The above-captioned debtors (collectively, the "Debtors") hereby move the Court

for the entry of an order, pursuant to sections 105(a), and 363(b) and 365(a) of title 11 of the

United States Code (the "Bankruptcy Code"), approving and assuming, as set forth herein, the

terms of that certain rights offering Backstop Stock Purchase Agreement (the "Backstop

Agreement"), dated as of March 27, 2011, between the Debtors and the Backstop Providers (as

defined below), a copy of which is attached hereto as Exhibit A.  In support of this Motion, the

Debtors respectfully state as follows:

### Background

        1.      On March 28, 2011 (the "Petition Date"), each of the Debtors commenced

a case under chapter 11 of the Bankruptcy Code.[2]  The Debtors are operating their businesses

and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of

---

[1]    The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Harry & David Holdings, Inc. (4389); Harry and David (1765); Harry & David Operations, Inc. (1427); Bear Creek Orchards, Inc. (7216).  The address of each of the Debtors is 2500 South Pacific Highway, Medford, Oregon 97501.

[2]    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.

the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are administered jointly.

2.      The Debtors are a vertically integrated, multi-channel specialty retailer

and producer of branded premium gift-quality fruit, food products, and gifts marketed under the

Harry and David®, Wolferman's®, and Cushman's® brands.  The Debtors market their products

through catalogs distributed through the mail, the Internet, business-to-business, consumer

telemarketing, Harry and David Stores, Cushman's seasonal stores, and wholesale distribution to

other retailers.  For the twelve months ending December 25, 2010, the Debtors generated

approximately $416 million in revenue.

### The Backstop Agreement and the Backstop Fees Provided Thereunder

3.      Prior to the Petition Date, the Debtors executed a plan support agreement

(the "Plan Support Agreement") with approximately 81% of the holders (the "Noteholders") of

the Debtors' Senior Floating Rate Notes due 2012 and 9.0% Senior Notes due 2013 (collectively,

the "Public Notes").  The Plan Support Agreement contemplates the reorganization of the

Debtors through a chapter 11 plan, the term sheet for which is attached to the Plan Support

Agreement (the "Plan"), that will be funded primarily with the proceeds of a rights offering (the

"Rights Offering") to purchase stock of the reorganized Debtors in connection with their

emergence from chapter 11.  The proceeds of the Rights Offering will repay the Debtors' second

lien, $55 million debtor-in-possession financing facility (the "DIP Term Loan"), thereby

permitting the Debtors to exit chapter 11.

4.      In connection with the anticipated Plan, and as contemplated by the Plan

Support Agreement, the Debtors expect that the ability to participate in the Rights Offering will

generally be granted to all of the Debtors' non-priority, unsecured creditors (other than creditors

who may be in a convenience class), including certain eligible holders of the Public Notes and

certain eligible holders of general unsecured claims against the Debtors' estates (collectively, the "Rights Offering Participants").  Each such creditor will be entitled, as part of the Rights Offering, to purchase stock in the reorganized Debtors at the price specified in the Plan, which will be at a discount to the assumed "plan value" for such stock under the Plan.

5.      Under the anticipated Plan, creditors, however, are not required to purchase such stock.  As such, to ensure that the Debtors will have at confirmation the full $55 million to repay amounts owing under the DIP Term Loan, the Debtors prior to the Petition Date also entered into the Backstop Agreement with certain holders of the Public Notes (collectively, the "Backstop Providers").  Subject to, and on the terms of, the Backstop Agreement, the Backstop Providers have committed to purchase, at the same purchase price, stock in the reorganized Debtors to the extent that the Rights Offering does not raise the full $55 million to repay amounts owing under the DIP Term Loan.

6.      The Backstop Providers have required, as a condition to their commitment under the Backstop Agreement, that the Backstop Agreement, including, without limitation, the issuance by the Debtors of the Commitment Fee Shares, the payment of the Break-Up Fee and certain Transaction Expenses (all as defined in and as conditioned in the Backstop Agreement) (collectively, the "Backstop Fees"), be approved by this Court no later than May 2, 2011 and assumed by the Debtors.  *Backstop Agreement*, §§ 4.1, 6.1(w).  Accordingly, by this Motion, the Debtors are seeking Court approval and assumption, on the terms herein, of the Backstop Agreement, including the indemnification provisions thereof and the Backstop Fees.  While the Backstop Fees and the indemnification provisions of the Backstop Agreement will be binding on the Debtors' estates upon Court approval of this Motion and will be entitled to administrative expense priority, the Backstop Providers will have no other administrative claims under the

agreement.  In addition, as described below, the Debtors retain at all times a "Fiduciary Out," such that they can terminate the Backstop Agreement at any time and only be liable, as a result thereof, for payment of the Backstop Fees and indemnities, on the terms and subject to the conditions set forth in the Backstop Agreement.  *Backstop Agreement*, § 7(c).

7.      Approval of the Backstop Fees and assumption of the Backstop Agreement now provides the Backstop Providers with comfort that they will be compensated — in the form of payment of the Break-Up Fee, the Commitment Fee Shares, reimbursement of any unpaid and outstanding fees and expenses and indemnification, on the terms and conditions set forth in the Backstop Agreement — for the risks that have agreed to take in committing to backstop the Rights Offering some five months before such obligation likely will be first called.

8.      The composition of each of the Backstop Fees is described below:[3]

a.      <u>Commitment Fee Shares</u>.  50,000 shares of common stock in the reorganized Debtors' holding company, to be issued to and allocated among to the Backstop Providers in accordance with their respective Backstop Commitments.  *Backstop Agreement*, § 1.3.  Such shares will be issued to the Backstop Providers under the Plan, should it be confirmed by the Court and become effective.

b.      <u>Break-Up Fee</u>.  $1.1 million payable in cash to the Backstop Providers (pro rata in accordance with their respective Backstop Commitments) within five business days if any of the following events occur (1) at a time when the Backstop Agreement has not been terminated and (2) not as a result of a breach of the Backstop Agreement by the Backstop Providers:

(i)      a "Competing Transaction Event" occurs prior to the Closing;[4]

---

[3]      The following description of the Backstop Agreement and the Backstop Fees is intended for the convenience of the Court and does not supersede the terms of the Backstop Agreement attached hereto as <u>Exhibit A</u>.  To the extent of any inconsistency between the description herein and the Backstop Agreement, the terms of the Backstop Agreement shall control.  Capitalized terms not otherwise defined in this summary have the meanings given to them in the Backstop Agreement.

[4]      A "Competing Transaction Event" means the entry into by any of the Debtors of a binding agreement providing for, or the filing by the Debtors of a motion with the Court seeking approval to pursue, a Competing Transaction.  *Backstop Agreement*, § 13.1.  The Backstop Agreement refers to the definition of a "Competing Transaction" under the Plan Support Agreement, which is attached hereto as <u>Exhibit B</u>, and is defined therein as "if the Debtors directly or indirectly, through another person or entity, seek, solicit,

[Footnote continued on next page]

      (ii)     an order, in form and substance reasonably satisfactory to Requisite Backstop Providers, confirming the Plan is not entered by the Court on or before September 12, 2011;

      (iii)    the effective date of the Plan has not occurred by the earlier of (A) October 1, 2011 and (B) the fifteenth (15th) calendar day following the entry of an order confirming the Plan, in each case unless the order confirming the Plan has not become a Final Order[5] prior to such date; or

      (iv)    the Debtors terminate the Backstop Agreement pursuant to the exercise of their Fiduciary Out.[6]

*Backstop Agreement*, § 1.5.  The Break-Up Fee shall constitute an allowed administrative expense of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.  *Id.*

c.     <u>Fee and Expense Reimbursement</u>.  Whether or not the transactions contemplated by the Backstop Agreement are consummated, the Debtors are required to pay all "Transaction Expenses" of the Backstop Providers, defined in the Backstop Agreement as:

        "the reasonable and documented fees (other than the Commitment Fee [Shares] and the Break-Up Fee), costs, expenses, disbursements and charges of each of the Backstop Providers incurred in connection with or relating to the diligence, negotiation, preparation and/or implementation of the [Plan] Term Sheets, the Backstop Commitments, the Rights Offering, this Agreement and/or any of the transactions contemplated by any of the foregoing or by the Plan (without duplication of any amounts paid or payable thereunder), and the enforcement, attempted enforcement or

---

negotiate, support or encourage the formulation, preparation, filing or prosecution of any plan, plan proposal, restructuring proposal or offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring, or take any other action that could reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement (as defined therein), the solicitation of votes on the Plan or the implementation or consummation of the Plan.  *Plan Support Agreement*, § 4(b).

[5]     "Final Order" is defined as an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending..  *Backstop Agreement*, § 13.1.

[6]     Pursuant to section 7(c) of the Backstop Agreement, that agreement "and the Backstop Commitments contemplated hereby may be terminated at any time by the Debtors upon written notice to the Backstop Providers if the Debtors determine in good faith after consultation with counsel that doing so is necessary to comply with their, or their directors' or officers' fiduciary obligations under applicable Law (the "<u>Fiduciary Out</u>").

preservation of any rights or remedies under this Agreement, including but not limited to, the reasonable and documented out-of-pocket fees, costs and expenses of the advisors to the Backstop Providers."

*Backstop Agreement*, § 1.4(a) and Definition of "Transaction Expenses."  Subject to the terms of any order approving the Motion, postpetition Transaction Expenses would be paid by the Debtors as follows:

(1)    Transaction Expenses incurred from the Petition Date through the date of entry of an order approving this Motion would be paid within two business days of entry of such order.

(2)    Transactions Expenses incurred after entry of such order through the effective date of the Plan would be paid within five business days of presentation of invoices to the Debtors.

(3)    Upon termination of the Backstop Agreement by either party, accrued but unpaid Transaction Expenses would be paid within five business days of presentation of invoices to the Debtors.

*Backstop Agreement*, § 1.4(a).  In the event that the transactions contemplated by the Backstop Agreement are not consummated as a result of a material breach by a Backstop Provider, such Backstop Provider will not be entitled to incurred but unreimbursed Transaction Expenses.  *Backstop Agreement*, § 1.4(b).

The Backstop Providers have requested that the Debtors be authorized to pay all of the above Transaction Expenses without further notice, hearing or order of the Court.  It is expected that the Transaction Expenses of the Backstop Providers will include (1) a $125,000 per month flat fee for Moelis & Company, the financial advisor for the Backstop Providers and (2) all Backstop Agreement, Rights Offering, and Plan related attorneys fees and expenses of the following firms that have been actively involved in these chapter 11 cases to date: (i)  Stroock & Stroock & Lavan LLP (and its local counsel), (ii) Munger, Tolles & Olson LLP (and its local counsel), and (iii) Akin Gump Strauss Hauer & Feld LLP.

9.    The Debtors are also indemnifying the Backstop Providers for certain losses as set forth in section 8 of the Backstop Agreement (the "Indemnification Provisions").  Although the Backstop Providers would dispute that they face any third party liability in

connection with the Rights Offering, it is appropriate for the Backstop Providers to be protected against any asserted liability, and the cost incident thereto, should any claims or litigation arise in connection with the Rights Offering.  The Backstop Providers have also requested that the Debtors be authorized to provide such indemnification to the Backstop Providers without further notice, hearing or order of the Court.

10.    The obligations of the Backstop Providers to purchase stock of the Reorganized Debtors not purchased in the Rights Offering is subject to a variety of conditions precedent as set forth in Section 6.1 of the Backstop Agreement, including the following:

a.    <u>Plan Support Agreement</u>.  The Plan Support Agreement shall remain in effect (pursuant to section 7(a) of the Backstop Agreement, the Backstop Agreement terminates automatically if the Plan Support Agreement is terminated);

b.    <u>Plan</u>.  The Plan, as confirmed by a Final Order of the Court, shall be consistent in all material respects with the Plan Support Agreement, the Plan Term Sheet and with the Backstop Agreement and otherwise reasonably acceptable to the Debtors and the Requisite Backstop Providers;

c.    <u>Disclosure Statement</u>.  The Disclosure Statement shall be consistent in all material respects with the terms set forth in the Plan Support Agreement and the Backstop Agreement and otherwise reasonably acceptable to the Requisite Backstop Providers.

d.    <u>Disclosure Statement Order</u>.  The Court shall have entered the order approving the Disclosure Statement (the "<u>Disclosure Statement Order</u>"), the Disclosure Statement Order shall be in form and substance reasonably acceptable to the Requisite Backstop Providers, and the Disclosure Statement Order shall be a Final Order.

e.    <u>Agreement Order</u>.  The Bankruptcy Court shall have entered an order approving this Motion, and such order shall be consistent in all material respects with the Backstop Agreement and otherwise be in form and substance reasonably acceptable to the Requisite Backstop Providers, and shall be a Final Order.

f.    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Order shall be in form and substance consistent in all material respects with this Agreement and the Plan Support Agreement and otherwise reasonably acceptable to the Requisite Backstop Providers, the Confirmation Order shall be a Final Order, and the Confirmation Order shall contain various findings of fact and conclusions of law set forth in section 6.1(f)

of the Backstop Agreement;

g.   <u>DIP Facilities</u>.  None of the Debtors shall have breached the DIP Term Loan facility (without giving effect to any amendment, modification or supplement after the date hereof) and each of the representations and warranties of the Debtors in DIP Term Loan facility shall be true and correct in all material respects (other than those representations and warranties that are qualified by "materiality" or "Material Adverse Effect", which shall be true and correct in all respects) at and as of the Plan Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date);

h.   <u>Conditions to Confirmation</u>.  The conditions to confirmation of the Plan and the conditions to the Plan Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Plan Effective Date shall have occurred or shall occur simultaneously with the Closing, which Effective Date shall not be later than the earlier of (i) October 1, 2011, and (ii) the fifteenth (15th) calendar day following the entry of an order confirming the Plan;

i.   <u>Rights Offering</u>.   The Rights Offering shall have been conducted and consummated in accordance with the Backstop Agreement;

j.   <u>Definitive Documents</u>.   All documents relating to the Debtors' "Exit ABL Facility" and the organizational documents of the Reorganized Debtors, and all documents related to the Plan, shall have been executed and delivered by the parties thereto, and such documents shall be consistent in all material respects with the terms set forth in the Backstop Agreement and otherwise reasonably acceptable to the Requisite Backstop Providers;

k.   <u>Representations and Warranties</u>.  Each of the representations and warranties of the Debtors in the Backstop Agreement (mostly contained in section 2 thereof) shall be true and correct in all material respects (other than those representations and warranties that are qualified by "materiality" or "Material Adverse Effect", which shall be true and correct in all respects) at and as of the Plan Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date);

l.   <u>Covenants</u>.  Each of the Debtors shall have complied in all material respects with all covenants in the Backstop Agreement (mostly contained in section 4 thereof), including, without limitation, complying with all of the covenants and provisions contained in the Plan Support Agreement (*Backstop Agreement*, § 4.8) and using the proceeds of the Rights Offering and the purchase of the Backstop Shares solely as provided for in the Plan (*Backstop Agreement*, § 4.5);

m.   <u>Commitment Fee Shares</u>.  No portion of the Commitment Fee Shares shall have been required to be repaid or otherwise subject to disgorgement to the Debtors or any other person;

n.    <u>Transaction Expenses</u>.  The Debtors shall have paid all Transaction Expenses that have accrued and remain unpaid as of the Plan Effective Date in accordance with the terms of the Backstop Agreement, and no Transaction Expenses shall be required to be repaid or otherwise subject to disgorgement to the Debtors or any other person;

o.    <u>Material Adverse Effect</u>.  Since the date of the Backstop Agreement, there shall not have occurred any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a Material Adverse Effect; <u>provided</u>, <u>however</u>, that the Debtors shall have three (3) Business Days after delivery of written notice from the Backstop Providers or their counsel to remedy such event, change, effect, occurrence, development, circumstance or change of fact so that it no longer has or would reasonably be expected to have a Material Adverse Effect;

p.    <u>No Registration; Compliance with Securities Laws</u>.  No proceeding shall be pending or threatened by any governmental body that alleges that the issuance of the Backstop Shares and Commitment Fee Shares are not exempt from the registration requirements of Section 5 of the Securities Act;

q.    <u>Valid Issuance</u>.  The Backstop Shares and the Commitment Fee Shares shall be, upon payment of the aggregate purchase price as provided herein, validly issued, fully paid, non-assessable and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights;

r.    <u>Exit ABL Facility</u>.  The Debtors shall have entered into and consummated the transactions contemplated by the Exit ABL Facility and the Exit Facility documentation shall contain terms and conditions materially consistent with the Plan and shall otherwise be in form and substance reasonably satisfactory to the Requisite Backstop Providers;

s.    <u>Assumption of Agreement</u>.  The Debtors shall have assumed the Backstop Agreement pursuant to section 365 of the Bankruptcy Code;

t.    <u>Pension Plan</u>.  Either (i) the Debtors shall have obtained a Final Order of the Bankruptcy Court terminating their qualified pension plan (the "<u>Pension Plan</u>"), which order shall be reasonably satisfactory to the Debtors and the Requisite Backstop Providers, or (ii) the treatment of the Pension Plan shall otherwise be reasonably satisfactory to the Requisite Backstop Providers; and

u.    Approval of this Motion by May 2, 2011. *Backstop Agreement*, § 4.1.

11.    Section 7 of the Backstop Agreement provides various rights of the

Backstop Providers to terminate their backstop commitments, to some extent tracking the

conditions precedent to such obligations listed above, but also including upon the occurrence of

the following events:

> a.  termination of the Plan Support Agreement (*Backstop Agreement*, § 7(a)(i));
>
> b.  failure by the Court to approve this Motion by May 2, 2011 (*Backstop Agreement*, § 7(a)(ii));
>
> c.  an outside termination date of October 1, 2011 if the Plan has not become effective, and the Rights Offering consummated, prior to that time (*Backstop Agreement*, § 7(a)(i));
>
> d.  the occurrence of an "Agreement Termination Event," as defined in the Plan Support Agreement (*Backstop Agreement*, § 7(b)(ii));
>
> e.  the entry into by any of the Debtors of a binding agreement providing for, or the filing by the Debtors of a motion with the Bankruptcy Court seeking approval to pursue, a Competing Transaction, or approval by the Board of Directors of the Debtors of the entry into a binding agreement providing for, or the filing by the Debtors of a motion with the Bankruptcy Court seeking approval to pursue, a Competing Transaction (*Backstop Agreement*, § 7(e)(i) and (ii)); and
>
> f.  if immediately prior to the Effective Date of the Plan there is a default by a Backstop Provider of its obligations to purchase shares pursuant to its Backstop Commitment and those shares are not purchased by the non-defaulting Backstop Providers or a third party (*Backstop Agreement*, § 7(e)(iii));

In addition, Wasserstein & Co, currently the 63% owner of the Debtors and a significant

noteholder and Backstop Provider, has certain individual termination rights as set forth in section

7(d) of the Backstop Agreement.

## Relief Requested

12.    By this Motion, the Debtors request the entry of an order, pursuant to

sections 105(a), 363(b) and 365(a) of the Bankruptcy Code, approving and assuming, on the

terms hereof, the Backstop Agreement, including the Indemnification Provisions, and the

Debtors' payment of the Backstop Fees on the terms and subject to the conditions set forth in the

Backstop Agreement.

-10-

## Legal Basis for Relief Requested

13.    Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is
> necessary or appropriate to carry out the provisions of this title.

11 U.S.C. § 105(a).  Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code under equitable common law principles.

14.    In addition, section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a); see also Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1075 (3d Cir. 1992).  Courts routinely approve motions to assume or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action is an exercise of sound business judgment.  See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts under section 365 of the Bankruptcy Code is that of "business judgment"); In re Armstrong World Indus., Inc., 348 B.R. 136, 162 (D. Del. 2007) (stating that "[u]nder section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if . . . the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications.") (citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989)); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) (stating that the business judgment standard governs decisions to assume or reject).

15.     The Debtors and the Backstop Providers extensively negotiated the terms of the Backstop Fees in good faith and at arms'-length in the days leading up to the commencement of these chapter 11 cases.  As a result, the Debtors believe that the Backstop Fees are fair and represent an exercise of the Debtors' sound business judgment.

16.     Specifically, the Commitment Fee Shares, which are payable only if the Rights Offering is effectuated, is a reasonable, yet essential, inducement to the Backstop Providers to make the Backstop Commitments and involve no outlay of cash by the Debtors' estates since the Commitment Fee Shares are paid only in shares of the reorganized Debtors.

17.     The Break-Up Fee likewise is reasonable and customary, and is an actual and necessary cost of preserving the Debtors' estates.  As with the Commitment Fee Shares, the Break-Up Fee was essential to inducing the Backstop Providers to engage in a transaction that will facilitate the Debtors' successful reorganization.  The Break-Up Fee also constitutes a fair and reasonable percentage of the aggregate amount of the Backstop Commitments, and is reasonably related to the risk that the Backstop Providers must assume.  The Break-Up Fee is approximately 2% of the total Backstop Commitments, which is less than many other rights offering break-up fees seen in this District and elsewhere.  See, e.g., In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Sep. 30, 2010) ($11.1 million, or 6.0%, break-up fee in connection with $185 million rights offering); In re Visteon Corp., No. 09-11786 (CSS) (Bankr. D. Del. Jun. 17, 2010) ($43.8 million, or 3.5%, break-up fee in connection with $1.25 billion rights offering); In re Old AII, Inc., No. 09-10478 (BLS) (Bankr. D. Del. March 15, 2010) ($19.2 million, or 2.8%, break-up fee in connection with $690 million rights offering); In re Spansion Inc., No. 09-10690 (KJC) (Bankr. D. Del. Jan. 7, 2010) ($3 million, or 2.7%, break-up fee in connection with $109 million rights offering); In re Accuride Corp., No. 09-13449 (BLS) (Bankr. D. Del. Dec. 18,

2009) ($10 million, or 7.1%, break-up fee in connection with $140 million rights offering); <u>In re Premier Int'l Holdings Inc.</u>, No. 09-12019 (CSS) (Bankr. D. Del. Dec. 18, 2009) ($11.3 million, or 2.5%, break-up fee in connection with $450 million rights offering).  Moreover, the Break-Up Fee is approximately 1.1% of the assumed total net equity value of the Debtors post-emergence, which is well within the standard market range.

18.     When reasonable in relation to the counterparty's efforts and to the magnitude of the transaction, break-up fees are generally permissible as administrative expenses because such fees provide a postpetition benefit to the bankruptcy estate.  <u>See</u> <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)</u>, 181 F.3d 527, 533 (3d Cir. 1999).

19.     Reimbursement of the Transaction Expenses, as well as the Indemnification Provisions, is also customary, reasonable and designed to compensate the Backstop Providers for their efforts to conduct their diligence, document the Backstop Commitments, formulate and undertake other transactions in support of the Rights Offering and the Plan.  By agreeing to the Indemnification Provisions and to pay the Backstop Providers' Transaction Expenses, the Debtors have the assurance that, so long as the Rights Offering is effectuated, it will yield the full $55 million in equity financing required under the Plan regardless of how many Rights Offering Participants decide to participate.  This assurance is an integral component of the Debtors' successful reorganization, as it will ensure the achievement of the objectives of the Rights Offering.

20.     Thus, the Debtors respectfully submit that the relief sought herein is reasonable, fairly compensate the Backstop Providers for the financial risk they must assume, and is the product of the Debtors' sound business judgment.

RLF1 3970498v. 1

## <u>Notice</u>

21.    Notice of this Motion shall be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (iii) counsel to the Debtors' postpetition secured lenders and to the Backstop Providers; and (v) all parties that filed a request for notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice of this Motion is required.

RLF1 3970498v. 1

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit C: (i) granting the relief sought herein; and (ii) granting to the Debtors such other and further relief as the Court may deem proper.


Dated:  April 5, 2011                          Respectfully submitted,
        Wilmington, Delaware


                                     /s/ Zachary I. Shapiro
                                    Daniel J. DeFranceschi (No. 2732)
                                    Paul N. Heath (No. 3704)
                                    Zachary I. Shapiro (No. 5103)
                                    RICHARDS, LAYTON & FINGER, P.A.
                                    920 N. King Street
                                    Wilmington, Delaware 19801
                                    Telephone:  (302) 651-7700

                                         -and-

                                    David G. Heiman
                                    JONES DAY
                                    North Point
                                    901 Lakeside Avenue
                                    Cleveland, Ohio  44114
                                    Telephone:  (216) 586-3939

                                    Brad B. Erens
                                    Timothy W. Hoffmann
                                    JONES DAY
                                    77 West Wacker
                                    Chicago, Illinois 60601
                                    Telephone:  (312) 782-3939

                                    PROPOSED ATTORNEYS FOR DEBTORS