# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HARRY & DAVID HOLDINGS, INC., *et al.*[1] | Case No. 11-10884 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: April 27, 2011 at 9:30 a.m.**<br>**Objection Deadline: April 21, 2011 at 4:00 p.m.**<br>**(for the Committee)** |
| | **Related Docket No. 17** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 AND 507 AND RULES 2002, 4001, 9014 AND 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCINGS, (B) OBTAIN EXIT FINANCING, (C) USE CASH COLLATERAL; AND (D) FILE RELATED FEE LETTERS UNDER SEAL; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF

The official committee of unsecured creditors (the "Committee") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), through their proposed undersigned counsel, submit this objection (the "Objection") to the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Obtain Exit Financing, (C) Use Cash Collateral; and (D) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (the "DIP Financing Motion") [Docket No. 17] and in support thereof, respectfully state as follows:

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Harry & David Holdings, Inc. (4389); Harry and David (1765); Harry & David Operations, Inc. (1427); Bear Creek Orchards, Inc. (7216). The address of each of the Debtors is 2500 South Pacific Highway, Medford, Oregon 97501.

## PRELIMINARY STATEMENT

1.      Wasserstein & Company, LP, or affiliates thereof (collectively, "Wasserstein") wear nearly every hat possible in connection with these cases, including post-petition lender. Wasserstein owns 63 percent of the Debtors' prepetition equity. Wasserstein is the largest prepetition holder of the Debtors' Senior Notes (defined below). Wasserstein is providing the largest portion of the Debtors' DIP Note Purchase Facility (defined below) and the backstop of the rights offering contemplated to occur under the Debtors' (as yet unfiled) plan of reorganization. Wasserstein is slated to provide post-emergence management services to the Debtors, in exchange for an exorbitant fee significantly larger than its prepetition fee for such services.

2.      In fact, Wasserstein appears to be the primary beneficiary of these cases. In addition to its distribution as an unsecured creditor, Wasserstein is slated to receive, among other benefits: (a) approximately $600,000 as its portion of the fee relating to the DIP Note Purchase Facility, (b) shares valued at approximately $2 million in the reorganized Debtors as its portion of the commitment fee related to the rights offering backstop, (c) shares valued at $5 million as a down payment for future management services (which fee appears to be a significant increase from Wasserstein's prepetition management fee), (d) the right to select two (2) members of the five (5) member board of directors of the reorganized Debtors, and (e) reimbursement of its fees and expenses relating to the chapter 11 cases (notwithstanding that its prepetition holdings consist of equity and unsecured debt).

3.      Notwithstanding (or as a result of) its dominion and control of the Debtors, the Debtors propose to grant Wasserstein a release of potential estate claims pursuant to the DIP Financing Motion. The release would be granted following an exceedingly brief period for the Committee to determine whether such estate claims exist against Wasserstein.

4.      In addition to the unconscionable benefits sought to be provided to Wasserstein, the relief sought in the DIP Financing Motion also includes (a) excessive fees payable to the other lenders under the DIP Note Purchase Facility and the DIP Revolving Facility,

(b) premature approval of an exit facility and related commitment fee that acts as a disguised breakup fee, (c) budgetary and other restrictions on the Committee's ability to effectively serve its constituency, and (d) a grant of liens on chapter 5 avoidance actions.

## BACKGROUND

5.      On March 28, 2011 (the "Petition Date"), the Debtors commenced these bankruptcy cases pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases have been consolidated for procedural purposes only and are being administered jointly. On April 7, 2011, the Office of the United States Trustee appointed the Committee. The Committee selected Lowenstein Sandler PC and Pachulski Stang Ziehl and Jones LLP as its co-counsel and FTI as its financial advisors (collectively, the "Committee Professionals").

### A.      The Debtors' Prepetition Debt Structure

6.      As of the Petition Date, the Debtors' primary liabilities consisted of: (a) two series of senior unsecured notes; (b) pension obligations; (c) unsecured trade debt: and (d) lease obligations. (DIP Financing Motion ¶ 6.)

7.      The Debtors are party to a credit agreement dated as of March 20, 2006, (as amended from time to time, the "Prepetition Revolving Credit Agreement") with UBS AG, Stamford Branch, as issuing bank, administrative collateral agent and administrative agent (in such capacity, the "Prepetition Revolving Agent"), GMAC Commercial Finance LLC (n/k/a Ally Commercial Finance LLC) as collateral and documentation agent, UBS Securities LLC as arranger, and UBS Loan Finance LLC as swingline lender (collectively, the "Prepetition Secured Entities"), that provided the Debtors with a $105 million revolving credit facility (the "Prepetition Revolving Credit Facility"). (DIP Financing Motion ¶ 7.)

8.      As of the Petition Date, the Debtors had *de minimis* outstanding borrowings under the Prepetition Revolving Credit Facility. While the Debtors issued approximately $1 million of

letters of credit under the Prepetition Revolving Credit Facility, the Letters of Credit outstanding as of the Petition Date were fully collateralized. (Id.)

9.   The Debtors had approximately $58 million of Senior Floating Rate Notes due March 1, 2012 and $140 million of Senior Fixed Rate Notes due March 1, 2013 (collectively, the "Prepetition Notes" and the holders thereof, in their capacity as such, the "Prepetition Noteholders") outstanding as of the Petition Date (the "Prepetition Note Obligations"). A single indenture, dated February 25, 2005, governs both series of Prepetition Notes and Wells Fargo Bank, N.A. is the indenture trustee (the "Indenture Trustee" and together with the Prepetition Noteholders, the "Noteholder Parties"). (DIP Financing Motion ¶ 8.)

10.   The Prepetition Notes represent senior unsecured obligations of Debtor, Harry and David and are guaranteed by the other Debtors. The Senior Floating Rate Notes accrue interest at a rate per annum equal to LIBOR plus five percent calculated and paid quarterly. The Senior Fixed Rate Notes accrue interest at an annual fixed rate of nine percent, with semiannual interest payments. (DIP Financing Motion ¶ 9.)

11.   In fiscal 2008 and fiscal 2009, the Debtors repurchased approximately $34.8 million of then outstanding Senior Fixed Rate Notes and $11.8 million of the then outstanding Senior Floating Rate Notes. The Debtors officially cancelled $22.2 million of the repurchased Senior Fixed Rate Notes and $2 million of the repurchased Senior Floating Rate Notes, and the Debtors hold the remaining repurchased notes. The amounts listed in this paragraph are in addition to the $198 million of outstanding Prepetition Notes described above. (DIP Financing Motion ¶ 10.)

**B.      The DIP Financing Motion**

12.   By the DIP Financing Motion, the Debtors seek the entry of an interim order (the "Interim Order") and final order (the "Final Order") authorizing Debtor, Harry and David (the "Borrower"), to obtain secured post-petition financing in the form of a senior secured, super-priority revolving asset-based credit facility (the "DIP Revolving Facility") with commitments in

an aggregate principal amount up to $100 million, inclusive of letters of credit issued and outstanding under the Prepetition Revolving Loan Documents (as defined below), pursuant to that certain $100 Million Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "DIP Revolving Loan Agreement", and together with any related notes, certificates, agreements, security agreements, documents and instruments related to or executed in connection therewith, the "DIP Revolving Loan Documents"), by and among the Borrower, Harry & David Holdings, Inc., Bear Creek Orchards, Inc., and Harry & David Operations, Inc., as guarantors, the lenders party thereto, UBS Securities LLC, as lead arranger, UBS Loan Finance LLC, as a lender and as a swingline lender, UBS AG, Stamford Branch ("UBS"), as issuing bank, administrative collateral agent and administrative agent for the lenders (in such capacities, together with its successors and permitted assigns, the "Revolving DIP Agent"), and Ally Commercial Finance LLC ("Ally"), as collateral agent for the lenders, as documentation agent, and as a lender (in such capacities, and together with UBS Loan Finance LLC, the "Revolving DIP Lenders"), and for each other Debtor to jointly and severally guarantee the payment and performance of the obligations under the DIP Revolving Loan Facility, in each case, pursuant to the terms of the DIP Revolving Loan Documents.

13. In addition, the Debtors request authorization to grant security interests, liens and superpriority claims (including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 64(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code, to the Revolving DIP Agent, for the benefit of the Revolving DIP Agent and the Revolving DIP Lenders, to secure all of the Debtors' obligations under the DIP Revolving Facility, as more fully set forth in the Interim Order, in each case, subject to the terms of that certain Intercreditor Agreement, substantially in the form attached to the Interim Order as Exhibit B (the "DIP

Intercreditor Agreement"), by and between the Revolving DIP Agent and the DIP Notes Agent (defined below).

14.     The Debtors also request authorization for Harry and David, one of the Debtors, to obtain secured post-petition financing, consisting of a super-priority junior debtor-in-possession notes facility in an aggregate principal amount not to exceed $55 million (the "DIP Note Purchase Facility" and together with the DIP Revolving Facility, the "DIP Facilities"), pursuant to that certain Junior Secured Super-Priority Debtor-in-Possession Note Purchase Agreement (the "DIP Note Purchase Agreement" and together with any related notes, certificates, agreements, security agreements, documents and instruments related to or executed in connection therewith, the "DIP Note Documents" and together with the DIP Revolving Loan Documents, the "DIP Documents"), by and among the Debtors, Wilmington Trust FSB, as administrative agent (in such capacities, together with its successors and permitted assigns, the "DIP Notes Agent", and together with the Revolving DIP Agent, the "DIP Agents"), and each of the note purchasers party thereto (the "DIP Note Purchasers"),[2] and for each other Debtor to jointly and severally guarantee the payment and performance of the Issuer's obligations under the DIP Notes Facility on a secured and super-priority basis, as more fully set forth in the Interim Order (subject to the terms of the DIP Intercreditor Agreement).

15.     The Debtors also request authorization to make non-refundable payments of the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents to the respective DIP Agents, the Revolving DIP Lenders and the DIP Note Purchasers (collectively, the "DIP Lenders"), in each case, as they become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, servicing fees, audit fees, structuring fees, administrative agent's

---

[2]     The DIP Note Purchasers are (a) the initial note purchasers that have severally and not jointly committed to their respective amount of the Aggregate Commitment (as defined in the DIP Note Purchase Agreement), and (b) those eligible holders that, on or prior to the Syndication Deadline (as defined in the DIP Note Purchase Agreement), validly elect to participate in the DIP Note Purchase Facility in accordance with the syndication procedures.

fees, the fees and disbursements of attorneys, advisers, accountants, and other consultants, and the legal expenses of the respective DIP Agents and DIP Lenders, all to the extent provided by and in accordance with the terms of the respective DIP Documents.

16.     The Debtors further request authorization to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), in which the Prepetition Secured Entities under the Prepetition Revolving Loan Agreement and the DIP Lenders under the DIP Documents have an interest, subject to the terms and conditions set forth in the Interim Order.

17.     Finally, the Debtors request authorization to enter into an exit financing facility (the "Exit Facility" and together with the DIP Facilities, the "Facilities") with UBS AG, Stamford Branch, as issuing bank, administrative collateral agent and administrative agent.

18.     On March 29, 2011, the Court entered the Interim Order [Docket No. 60] and scheduled a final hearing (the "Final Hearing") for April 27, 2011 at 9:30 a.m.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## OBJECTION

20.     As a preliminary matter, several of the items submitted in this Objection stem from the recently formed Committee's inability to conduct a full review of the Debtors' financial and operational information and prepetition debt documentation in the time available. The Committee has recently been given access to a data room containing some of the information necessary to conduct its review and has requested additional information from the Debtors. Upon receipt and review of additional information, the Committee may determine that further grounds exist to object to the proposed terms governing the Facilities and the Debtors' use of cash collateral. Accordingly, the Committee respectfully requests that the Court defer

consideration of the DIP Financing Motion on a final basis until the Debtors have provided the Committee with such information. To the extent that the Court is inclined to consider granting the DIP Financing Motion on a final basis, the Committee respectfully requests that the Final Order address the objections raised herein.

21. Furthermore, while approval of the Facilities remains within the Court's "informed discretion," the Court must balance the interests of the DIP Lenders with those of general unsecured creditors. Striking this balance requires that a debtor seeking post-petition financing on a superpriority basis demonstrate that the proposed financing comports with basic notions of fairness and equity and that it would ultimately inure to the benefit of the Debtors' estates. See In re Aqua Associates, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); In re Ames Department Stores, Inc., 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). The Debtors, for the sake of obtaining post-petition financing promptly, cannot abrogate their fiduciary duties to their estates and creditors. Ames Department Stores, 115 B.R. at 38.

22. Section 364 of the Bankruptcy Code is not a "secured lenders act" allowing a creditor to undo the more level "playing field" contemplated by the Bankruptcy Code. The Court in Ames Department Stores stated:

> Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits.

Ames Department Stores 115 B.R. at 37. See also In re Tenney Village Co., Inc., 104 B.R. 562, 568 (Bankr. D. N.H. 1989).

23. In keeping with the principles annunciated in the foregoing case law, the Committee submits that certain provisions of the Interim Order and the proposed Final Order are prejudicial to the rights of unsecured creditors. Accordingly, to the extent that the Court is

inclined to consider granting the DIP Financing Motion on a final basis, the DIP Financing Motion must be denied unless and until the proposed Final Order is significantly modified as described herein.

**A.    Certain Fee-Related Provisions of the Facilities Must Be Modified.**

24.    The DIP Revolving Facility requires the Debtors to pay to the DIP Lenders (i) an unused line fee of 1% calculated and paid per the terms of the Prepetition Revolving Credit Agreement; (ii) letters of credit fronting fees equal to 0.25% per annum on the undrawn amount of all outstanding letter of credit, and (iii) letter of credit participation fees equal to 3.75% per annum on the issued and outstanding letters of credit.    (DIP Credit Agreement § 2.05).    In addition, although the Debtors have not yet executed an agreement with respect to the Exit Facility, the DIP Credit Agreement provides that the Exit Facility shall be on substantially the similar terms as the Prepetition Revolving Credit Agreement, including each of the fees listed in (i)-(iii) of this paragraph. (DIP Credit Agreement §§ 2.05, 4.04; DIP Financing Motion p. 19-20).

25.    In addition, pursuant to the fee letter dated March 25, 2011 (the "Revolving DIP Fee Letter") by and between the Debtors and the Revolving DIP Lenders, the Debtors are required to pay the following fees:



26.     Furthermore, pursuant to the fee letter dated March 27, 2011 (the "Arrangement Fee Letter") by and between the Debtors and the commitment parties named therein (the "Commitment Parties"), the Debtors are required to pay

In addition, pursuant to the Arrangement Fee Letter, the Debtors are required to pay

Finally, pursuant to the fee letter dated March 27, 2011 (the "Amended and Restated Collateral Agent Fee Letter" and together with the Revolving DIP Fee Letter and the Arrangement Fee Letter, the "Fee Letters") by and between the Debtors and the DIP Notes Agent, the Debtors are required to pay

27. According to the Budget, there will be $4.1 million of fees paid during the Budget period in connection with the Facilities. These fees are neither reasonable nor necessary under the circumstances of the Debtors' cases. In certain circumstances, fees may be necessary to induce a disinterested post-petition lender to extend credit to a chapter 11 debtor. Here, however, the DIP Lenders are not new, disinterested lenders and do not need inducement in the form of excessive fees as set forth in the DIP Revolving Facility and in the Fee Letters.

28. Specifically, the Committee submits that the unused line fee of 1% under the DIP Revolving Facility is excessive in light of the projected amount to be drawn thereunder. Furthermore, the Committee objects to the closing fees imposed by the Revolving DIP Fee Letter

29. It is inappropriate for the Final Order to provide that fees in connection with the Exit Facility be fully earned upon final approval of the DIP Revolving Facility. Such allowance would essentially act as a break-up fee and severely limit the ability of the Debtors to negotiate better terms for exit financing. As discussed below, the Committee believes that it is premature to approve exit financing at this time, thus it would be detrimental to the Debtors' estates to approve excessive fees in connection with the Exit Facility at this time.

30. Finally, ████████████████ in connection with the DIP Note Purchase Facility is excessive in light of the relationship between the Debtors and Wasserstein. Wasserstein is not a typical lender. Rather, Wasserstein owns 63 percent of the Debtors' prepetition equity and is the largest prepetition holder of the Debtors' Prepetition Notes.

31. Thus, the fees attributable to Wasserstein in connection with the DIP Note Purchase Facility are inappropriate because Wasserstein should not be entitled to pay itself sizable fees at the expense of unsecured creditors for lending money to the Debtors solely to protect its own interests.

32. In addition, the Committee requests that the Debtors provide the Committee with full access to the Fee Letters. The Debtors provided the Fee Letters to the Committee Professionals under the designation "For Professional Eyes Only," which precludes the Committee Professionals from sharing the Fee Letters or the specific contents thereof with Committee members. While the Committee Professionals can recommend a course of action to the Committee, it is ultimately the Committee—not the Committee Professionals—that serves as the fiduciary representative of the Debtors' unsecured creditors. Accordingly, any Final Order should permit the Committee Professionals to share the Fee Letters with Committee members, and require the Debtors to notify the Committee of any future revisions or supplements to the Fee Letters.

**B.** **Numerous Provisions in the Interim Order and Proposed Final Order Would Preclude the Committee from Performing its Statutory Fiduciary Role.**

33. The Interim Order restrains the Committee from bringing claims against the Prepetition Secured Entities and the Prepetition Note Parties[3] by (a) limiting the time within which the Committee must complete its review of the Prepetition Revolving Liens, the Prepetition Revolving Obligations or the Prepetition Note Obligations and (b) requiring the Committee to file a motion seeking standing to assert any claim or cause of action against the Prepetition Secured Entities or the Prepetition Note Parties. Furthermore, the Carve-Out (defined below), the budgeted amounts for professionals retained by the Committee, and the Lien Investigation Cap (defined below) collectively prevent the Committee from having any meaningful ability to investigate and commence an adversary proceeding to challenge the validity, priority, perfection or enforceability of the Prepetition Revolving Liens, the Prepetition Revolving Obligations or the Prepetition Note Obligations, or to assert any claim or cause of

---

[3] Prepetition Note Parties, although used throughout the Interim Order, is not defined therein. The Interim Order, at footnote 2, provides that undefined terms shall have the meanings ascribed to such terms in the DIP Documents. However, Prepetition Note Parties does not appear to be defined in any of the DIP Documents either. For the purposes of this Objection, the Committee will assume that Prepetition Note Parties, as used in the Interim Order, means the Prepetition Noteholders together with the Indenture Trustee.

action against the Prepetition Secured Entities or the Prepetition Note Parties arising under or in connection with the Prepetition Revolving Obligations or the Prepetition Note Obligations, thereby frustrating the Committee's ability to fulfill its role as the fiduciary representative of the Debtors' entire body of unsecured creditors. Any Final DIP Order must remedy each of these conditions.

**(i)**      **The Interim Order Restrains the Committee from Bringing Claims Against the DIP Lenders and the Prepetition Lenders.**

34.      Paragraph 17 of the Interim Order provides a 60-day period (the "Investigation Period") for the Committee to investigate and commence an adversary proceeding to challenge the validity, priority, perfection or enforceability of the Prepetition Revolving Liens, the Prepetition Revolving Obligations or the Prepetition Note Obligations, or to assert any claim or cause of action against the Prepetition Secured Entities or the Prepetition Note Parties arising under or in connection with the Prepetition Revolving Obligations or the Prepetition Note Obligations. The Committee is also required to file and successfully prosecute a motion seeking standing if it determines to pursue any such challenge prior to the expiration of the Investigation Period. The Debtors have abdicated their right to prosecute any such claims. To the extent the Committee determines that claims exist, they are the only party capable of prosecuting those claims and should be granted sufficient time to perform this investigation and standing to prosecute any such claims.

35.      First, the Committee's right to assert or prosecute any claims and causes of action against the Prepetition Secured Entities or the Prepetition Note Parties arising under or in connection with the Prepetition Revolving Obligations or the Prepetition Note Obligations should not be restricted at all. At an absolute minimum, the Committee must have 180 days to assert any claim or cause of action against the Prepetition Secured Entities or the Prepetition Note Parties arising under or in connection with the Prepetition Revolving Obligations or the Prepetition Note Obligations, including, without limitation, equitable subordination, recharacterization or money damage claims.

36.     Second, the Committee respectfully requests that the Final Order expressly grant the Committee standing to challenge the prepetition liens or bring other claims and causes of action against the Prepetition Secured Entities or the Prepetition Note Parties without the need to file a motion for standing at a later date. The Prepetition Secured Entities or the Prepetition Note Parties should not be permitted to hinder the Committee's ability to fully investigate potential claims by imposing upon the Committee the double burden of seeking standing and investigating and initiating an adversary proceeding during a single time period. In the alternative, in the event the Final Order requires Committee to file a motion to seek standing to challenge the asserted prepetition liens and security interests of the Prepetition Secured Entities and the Prepetition Note Parties, or to assert affirmative claims against the Prepetition Secured Entities or the Prepetition Note Parties, the filing of such a motion should automatically extend the Investigation Period to accommodate the motion practice involved in seeking such standing.[4]

37.     Third, the Committee requests that the Final Order permit extension of the Investigation Period (i) by consent of the Committee and the applicable party (i.e., the party that the Committee seeks to further investigate), without further order of the Court, or (ii) upon motion by the Committee for cause if such consent is withheld, provided that the filing of such a motion by the Committee before the expiration of the Investigation Period shall serve to automatically extend the Investigation Period until such time as the Court may hear the motion.

38.     The foregoing objection applies equally to any documentation pertaining to the Facilities that may require the Court to enter a Final Order containing restrictions on the Committee's lien review similar to those set forth in paragraph 17 of the Interim Order.

---

[4]     Courts have routinely approved DIP financing agreements that grant standing to the creditors' committee without the need for a standing motion. See, e.g., In re Am. Safety Razor, LLC, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010); In re PCAA Parent LLC, Case No. 10-10250 (Bankr. D. Del. Mar. 2, 2010); In re Pliant Corp., Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009); see also In re Quebecor World (USA) Inc., Case No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008); In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006). Alternatively, courts also frequently approve DIP orders providing that the filing of a standing motion satisfies the requirement of commencing an adversary proceeding within a specified time period. See, e.g., In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009); In re Delta Air Lines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005).

**(ii)     The Carve-Out Imposes an Unreasonably Low Cap on the Committee's Lien Investigation Expenses.**

39.     The Interim Orders attempt to restrain the Committee's ability to investigate the liens and security interests of the Prepetition Secured Entities and the Prepetition Note Parties by imposing a $50,000 expense cap on lien investigation efforts. Specifically, the Interim Order prohibits the use of Cash Collateral, DIP Collateral, proceeds from the issuance of the DIP Notes under the DIP Notes Facility or borrowings under the DIP Revolving Loan Facility, or any portion of the $1.75 million post-default carve-out provided under the Interim Order (the "Carve-Out") to assert any action against any of the DIP Agents, DIP Lenders, the Prepetition Revolving Lenders, the Prepetition Revolving Agent or the Prepetition Note Parties (the "Released Parties") with respect to any transaction, occurrence, omission, action or other matter, including but not limited to, (i) claims or causes of action under chapter 5 of the Bankruptcy Code, (ii) lender liability causes of action, (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Super-Priority Claims, the DIP Liens, the DIP Documents, the Prepetition Revolving Obligations, the Prepetition Note Obligations, the Prepetition Note Documents or the Prepetition Revolving Documents; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, DIP Obligations, the Prepetition Revolving Obligations or the Prepetition Note Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the DIP Agents or DIP Lenders hereunder or under any of the DIP Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agents' or DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Documents and this Interim Order); or (vi) objecting to, contesting, or interfering with, in any way, the DIP Agents' and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred. The only exception to this prohibition is a $50,000 cap (the "Investigation Cap) allocated to fund an investigation by the Committee

into the existence of any causes of action against the Released Parties with respect to the Prepetition Revolving Obligations or the Prepetition Note Obligations, subject to the terms and limitations of the Carve-Out.

40. The Investigation Cap serves as a deterrent preventing the Committee from pursuing any potential claims against the Released Parties. Cf. Tenney Vil., 104 B.R. at 568-69 (refusing to approve post-petition financing because a fee cap unacceptably limited the right of debtor's counsel to payment for bringing actions against the Prepetition Lenders, creating an economic incentive for the debtor to avoid bringing such actions in disregard of its fiduciary duties to the estate). Given the complexity of the Debtors' capital structure, the Investigation Cap is woefully inadequate and would preclude the Committee from doing much more than obtaining UCC filing searches on the Debtors—much less investigating the extent, validity, priority, and perfection of the Prepetition Lenders' purported liens and security interests or affirmative claims against the Prepetition Lenders. Any Final Order should raise the Lien Investigation Cap to no less than $150,000 to ensure the Committee's ability to satisfy its fiduciary obligations to creditors by conducting a full and fair investigation.

**(iii)     The Interim Budget Provides Inadequate Resources for the Committee.**

41. The Budget attached to the Interim Order allots approximately $3.6 million for the fees of the Debtors' professionals in the first 13 weeks. In contrast, only $120,000 is allotted for the Committee's professionals in the thirteenth week. This allotment is disproportionate to say the least and must be modified to at least $1.5 million in order to provide the Committee with the ability to fulfill its crucial oversight role in these cases. See In re Channel Master Holdings, Inc., 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (holding that a cap on an official committee's professional fees was unreasonable relative to the larger budgets for other professionals in the case, and determining that the cap on the committee's fees provided for inadequate compensation). The amount budgeted for Committee professionals must be proportionate to the amount budgeted for the Debtors' professionals in order to ensure the

Committee is adequately equipped to fulfill its fiduciary role. Alternatively, all professionals should be combined into the same line item for budgeting purposes.

42.     Further troubling, the Committee Professional Fees covenant contained in DIP Note Purchase Agreement triggers a covenant default on events that is almost a certainty. The covenant is triggered if the Committee's professional fees exceed the proposed Variance ("Variance" means (x) with respect to the calculation of Cumulative Net Operating Cash Flow, actual being less than the amount set forth in the Budget, and (y) with respect to the Debtors' or the Committee's professional fees, post-petition professional fees being greater than the amount in the Budget) of greater than: 20% of the projected amounts in the Initial Budget in the 5th, 6th, 7th and 8th weeks, 15% of the projected amounts in the 9th, 10th, 11th, 12th and 13th weeks, 15% of the projected amounts in the 14th week and each week thereafter. Triggering the covenant appears a virtual certainty as it assumes only $120,000 will be paid to Committee advisors by week 13.

**C.      The Releases Contained in the Interim Order Are Vague and Overly Broad and Must Be Limited.**

43.     Paragraph 17 of the Interim Order provides that upon the expiration of the Investigation Period, except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, *inter alia*, the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Entities and the Prepetition Note Parties (in each case, whether in their prepetition or post-petition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Revolving Obligations or the Prepetition Note Obligations.

44.     As noted in footnote 3, *supra*, Prepetition Note Parties is not defined. To the extent Prepetition Note Parties includes Wasserstein, such release under the terms of the Interim Order or any Final Order is wholly inappropriate. As noted above, Wasserstein is not a typical

lender.    Rather, Wasserstein wears nearly every hat possible in connection with these cases. Wasserstein owns 63 percent of the Debtors' prepetition equity.    Wasserstein is the largest prepetition holder of the Debtors' Prepetition Notes.    Wasserstein is also providing the largest portion of the backstop of the Debtor's proposed rights offering.    In addition, Wasserstein is slated to provide post-emergence management services to the Debtors, in exchange for an exorbitant fee significantly larger than its prepetition fee for such services.    Thus, the Committee should be afforded the full opportunity to investigate the conduct and roles of the Wasserstein and Wasserstein should not be entitled to any releases under the Interim Order or any Final Order.

**D.    The Financial Covenants Contained in the DIP Revolving Loan Agreement Are Overly Restrictive.**

45.    Section 6.08(c) of the DIP Revolving Loan Agreement prohibits the Debtors from allowing "Total Liquidity", which consists of the Debtors' "Excess Availability" plus cash and cash equivalents, from being less than 80% of the projected amount for the last day of each fiscal month.    This negative covenant is particularly restrictive during the summer months.    Looking beyond the period covered by the Budget, the Debtors' Total Liquidity is likely to decline at the end of July to approximately $1 million.    If that is the case, even a $200,000 variance would permit the Revolving DIP Lenders to declare a default.    That covenant must be replaced with a more reasonable one that is not likely to put the Debtors in default for an immaterial variance. The Committee would suggest the covenant be modified to one that is triggered by a negative variance in Total Liquidity of "greater than the higher of (a) 20% of the sum of (i) the Cash Forecast for such fiscal month and (ii) the Availability Forecast for such fiscal month or (b) $5 million."

**E.    Exit Financing Should Not Be Approved at this Premature Stage in the Debtors' Cases**

46.    It is premature to approve exit financing.    There is no plan or disclosure statement on file and it is not clear at this time when the Debtors will exit.    At a minimum, the Debtors

should have the option of negotiating better terms for exit financing at a later date and should not be locked in to the Exit Facility at this time. The Exit Facility imposes substantial fees upon the Debtors are fully earned upon final approval of the DIP Revolving Facility. Thus, even to the extent this Court finds that it is appropriate to approve the Exit Facility at this time, for the reasons discussed above, the Committee urges this Court not to approve any fees in connection with the proposed Exit Facility.

**F.     Additional Provisions of the Facilities Warrant Scrutiny**

47.     In addition to the objections set forth above, the Committee objects to those provisions of the Interim Order, the proposed Final Order, and any Facilities documentation set forth below:

**(i)     Avoidance Power Actions Belong to the Debtors' Estates for the Benefit of Unsecured Creditors and Cannot Be Encumbered by Security Interests Granted Under the Facilities.**

48.     The Committee objects to the inclusion of the proceeds of avoidance actions under paragraph 12 of the Interim Order as a means to satisfy super-priority claims granted as adequate protection. No analysis has been provided of the value of the avoidance actions and it is doubtful that the avoidance actions were considered by the DIP Lenders in determining whether to provide such financing to the Debtors (particularly in light of the $45 million equity cushion the DIP Lenders will enjoy during the case).

49.     Avoidance power actions, a distinct creature of bankruptcy law designed to facilitate equality of distribution among a debtor's general unsecured creditors, are not truly property of a debtor's estate, but instead are rights that the estate holds in trust for the benefit of creditors. See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.), 330 F.3d 548, 567 (3d Cir. 2000) (noting that the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); In re Sweetwater, 55 B.R. 724, 731 (D. Utah 1985), rev'd on other grounds, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property.").

50.     Accordingly, bankruptcy courts customarily restrict the ability of debtors-in-possession to pledge avoidance power actions as security.  See, e.g., Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.), 1993 WL 408366, *3-4 (N.D. Ill., Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions).

51.     Because of the unique nature of avoidance power actions, courts have recognized that, at least with respect to proceeds recovered pursuant to section 544(b) of the Bankruptcy Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." Cybergenics, 226 F.3d at 244; see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under § 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer."); Bear Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 194 (S.D.N.Y. 2002) ("[T]he purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors."); In re Integrated Testing Prods. Corp., 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all the creditors, has a right to recover payments made as preferences); In re Sweetwater, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . . .").

52.     Because Chapter 5 causes of action are not property of the Debtors' estates, there is no legal basis for the Court to grant the DIP Lenders any interest in such actions or the proceeds thereof.  More fundamentally, it is inequitable to grant the DIP Lenders first-priority liens in one of the unsecured creditors' potential sources of recovery in these cases.  Granting the DIP Lenders security interests and superpriority claims in avoidance power actions and the proceeds thereof would place the bulk of that risk on unsecured creditors, solely to provide

additional monetary reward to the DIP Lenders. Accordingly, avoidance power actions and the proceeds thereof should not be subject to the super-priority claims granted to the DIP Lenders.

### (ii) The Waiver of Parties' Statutory Rights under Sections 506(c) and 552(b) of the Bankruptcy Code is Inappropriate.

53.     Paragraph 19 of the Interim Order provides that upon entry of the Final Order, to the extent such order provides, the Debtor shall irrevocably waive and shall be prohibited from asserting any surcharge claim under section 506(c) of the Bankruptcy Code, the enhancement collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Secured Lending Entities upon the DIP Collateral or the Prepetition Collateral. The Committee objects to the inclusion of such a waiver in the Final Order. Paragraph 19 of the Interim Orders further provides that the Secured Lending Entities shall not be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of marshaling or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

54.     The section 506(c) waiver included in the Interim Orders serves no purpose, other than to eliminate a potential avenue of recovery for the Debtors' estates by ensuring that the costs of the Debtors' restructuring will be borne by the unsecured creditors alone—even if the unsecured creditors receive no value. Moreover, the waiver contravenes the intent behind section 506(c) of the Bankruptcy Code. In re Codesco, Inc., 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

55.     Courts routinely reject attempted waivers of surcharge rights under Section 506(c). In re The Colad Group, Inc., 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve DIP financing with a section 506(c) waiver intact); In re Willingham Invs., Inc., 203 B.R. 75, 80 (Bankr. M.D. Tenn. 1996); In re Visual Indus., Inc., 57 F.3d 321, 325 (3d Cir. 1995)

("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . .") (internal citation omitted); Kivitz v. CIT Group/Sales Fin., Inc., 272 B.R. 332, 334 (D. Md. 2000) (a secured party, and not other creditors, must bear the cost of preserving or disposing of its own collateral.); In re AFCO Enters., Inc., 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors."); see also In re Motor Coach Indus. Intl, Inc., Case No. 08-12136 (Bankr. D. Del. Oct. 22, 2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (Docket No. 244) (removing a section 506(c) waiver from the final postpetition financing order after the creditors' committee objected to its inclusion); In re Fedders North America, Inc., Case No. 07-11176 (Bankr. D. Del. Oct. 5, 2007) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (Docket No. 272) (a section 506(c) waiver in the interim postpetition financing order was removed from the final postpetition financing order after the creditors' committee objected to its inclusion).

56.     Furthermore, any provision in the Interim Order or any Final Order that would infringe upon the Bankruptcy Court's power to marshal the Debtors' assets, or to apply any other similar equitable principles to the disposition of the Debtors' assets, is inapproprate. Insulating the DIP Lenders from the equitable doctrine of marshaling would improperly restrain the Court's ability to fulfill the purpose of the Bankruptcy Code in the event of a default under the Facilities.

57.     Following a default under the DIP Facilities, it may be appropriate for the Court to apply the equitable doctrine of marshaling (or any similar equitable doctrine) to prevent a piecemeal dismantling of the Debtors. The appropriateness of marshaling is a determination for the Court, and not the DIP Lenders, to make. The Debtors cannot revoke the Court's equitable power to invoke such doctrines simply because the DIP Lenders wish to avoid these consequences.

58.    Accordingly, any provisions in the Interim Order and any Final DIP Order that would infringe upon the Bankruptcy Court's power to marshal the Debtors' assets, or to apply any other similar equitable principles to the disposition of the Debtors' assets, must be stricken.

### (iii)    Relief From The Automatic Stay

59.    The DIP Agents and DIP Lenders should not be entitled to relief from the automatic stay merely upon a showing that one or more of the Events of Default, regardless of the significance of such defaults, have occurred and are continuing.  The estate should reserve the right, and a meaningful opportunity, to oppose any stay relief application by the DIP Agents and DIP Lenders on any legitimate grounds.

### (iv)    Prohibition on Use of Cash Collateral

60.    The Interim Order provides that the DIP Lenders have no obligation to provide financing under the DIP Documents and the authorization for the Debtors to use Cash Collateral shall automatically terminate upon the occurrence and during the continuance of an Event of Default.  The Interim Order further provides that the Debtors may not seek to use Cash Collateral without the consent of the DIP Agents for so long as either of the DIP Agents (as applicable) or DIP Lenders (as applicable) have commitments which have not terminated under the DIP Documents.  The Committee objects to the inclusion of such restrictions in the Final Order.

### RESERVATION OF RIGHTS

61.    The Committee and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, to raise additional objections to the DIP Financing Motion during the Final Hearing, and to negotiate and document alternative debtor-in-possession financing terms.

WHEREFORE, the Committee respectfully requests that the Court (i) sustain this Objection, (ii) deny the DIP Financing Motion, absent the modifications to the Facilities and

Interim and Final Orders as discussed herein, and (iii) grant to the Committee such other and further relief as this Court deems appropriate.

Dated: April 21, 2011

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (Bar No. 2436)
Bradford J. Sandler (Bar No. 4142)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
      bsandler@pszjlaw.com
      pkeane@pszjlaw.com

and

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Thomas A. Pitta, Esq.
Nicole Stefanelli, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
Email: krosen@lowenstein.com
      slevine@lowenstein.com
      tpitta@lowenstein.com
      nstefanelli@lowenstein.com

[Proposed] Counsel to the Official Committee of Unsecured Creditors