**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| HARRY & DAVID HOLDINGS, INC, *et al.*,[1] | : | Case No. 11-10884 (MFW) |
| Debtors. | : | (Jointly Administered) |
| | : | **Re: Docket Nos. 17, 60 & 166** |

**DEBTORS' REPLY TO OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING POST-PETITION FINANCING**

The above-captioned debtors (the "Debtors") submit this reply to the Objection of the Official Committee of Unsecured Creditors to the Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105,107,361,362,363,364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Obtain Exit Financings, (C) Use Cash Collateral, and (D) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief (Docket No. 166) (the "Objection"). In support of this reply, the Debtors respectfully represent as follows:

## Preliminary Statement

1. A severe liquidity crisis caused the Debtors to file these chapter 11 cases. As a result of this liquidity crisis, the Debtors, with the assistance of their professional advisors, performed a comprehensive search to find additional financing that would provide the capital needed to support the Debtors' continued operations. After conducting this search, the Debtors

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Harry & David Holdings, Inc. (4389); Harry and David (1765); Harry & David Operations, Inc. (1427); Bear Creek Orchards, Inc. (7216). The address of each of the Debtors is 2500 South Pacific Highway, Medford, Oregon 97501.

accepted the best available proposals from the provider of their prepetition first lien revolving credit facility (the "First Lien DIP Credit Facility") and a group of holders of their prepetiton public debt (the "Second Lien DIP Credit Facility", and together with the First Lien DIP Credit Facility, the "DIP Credit Facilities").

2. The Objection of the Official Committee of Unsecured Creditors (the "Committee") does not refute any of the facts set forth in the above paragraph. Instead, the Committee spends 24 pages attempting to pick at various aspects of the DIP Credit Facilities that the Committee would like to change. Importantly, the Committee has failed to provide any empirical evidence (i.e. a comparative analysis of DIP financing provided under similar circumstances in other cases) with respect to why the terms of the DIP Credit Facilities are inappropriate. As such, the Committee's preferences on the economic and other terms of the DIP Credit Facilities fail to provide a substantive legal basis to support their Objection.

3. In some instances, the Debtors (like the vast majority, if not all, entities seeking bankruptcy financing) also would prefer more advantageous terms in the DIP Credit Facilities. The lending market, however, dictated what was and was not available to the Debtors in terms of postpetition financing, and the DIP Credit Facilities represent the best financing options available to the Debtors. Further, the DIP Credit Facilities are necessary to allow the Debtors to continue as a going concern and to maximize the value of their estates. This result inures to the direct benefit of the unsecured creditors in these cases.

**Background**

4. The Debtors commenced each of their respective cases on March 28, 2011 (the "Petition Date"). Prior to the Petition Date, the Debtors contacted approximately 47 different financial institutions, hedge funds and other potential lenders to determine these entities' interest in providing postpetition financing to the Debtors. Approximately 23 of these

entities signed confidentiality agreements with the Debtors, and the Debtors provided a management presentation to approximately 15 potential lenders.

5. In addition, the Debtors reached out to existing holders of their public notes (the "Noteholders") to gauge their interest in providing postpetition financing. A group of the Noteholders (the "Ad Hoc Committee") expressed interest and signed confidentiality agreements with the Debtors. The Debtors also provided the Ad Hoc Committee with a business and management presentation that was substantially similar to the presentation provided to the other potential lenders. The Ad Hoc Committee represented a natural source of potential postpetition financing, because its members already possessed a vested interest in the Debtors and their future viability.

6. Similarly, the holder of the majority of the Debtors' stock and a significant holder of the Debtors' public notes ("Wasserstein") determined that it would like to participate with the Ad Hoc Committee in providing postpetition financing to the Debtors. Wasserstein's participation with the Ad Hoc Committee in proposing postpetition financing to the Debtors was in Wasserstein's capacity as a Noteholder. Wasserstein is one of the largest Noteholders of the Debtors as a result of having purchased public notes of the Debtors in open market transactions during 2008 and 2009.

7. After receiving proposals from five different potential lenders, including the Ad Hoc Committee's and Wasserstein's joint proposal, the Debtors, with guidance from their investment bankers, decided to further pursue three of the proposals. The Debtors decided to move forward with these three proposals because the other proposals did not, among other things, provide the Debtors with an adequate level of liquidity or borrowing base availability. The first proposal was from a financial institution that had no prior lending relationship with the

Debtors. The second proposal was from the Debtors' prepetition secured lenders (the "First Lien DIP Lenders"), and the third proposal was from a combination of the Ad Hoc Committee and Wasserstein (collectively, the "Second Lien Lenders"). Ultimately, the proposal from the First Lien DIP Lenders and the Second Lien DIP Lenders proved the most attractive to the Debtors, in terms of both economics and the ability to complete in the necessary timeframe.

8. As a result, the Debtors entered into the DIP Credit Facilities, which consist of: (a) a $100 million dollar revolving first lien credit facility; and (b) a $55 million term loan. In addition, the First Lien DIP Lenders agreed to provide exit financing (the "Exit Facility") to the Debtors. The willingness to extend exit financing was vital to the Debtors, as the Second Lien Lenders' commitment was contingent upon the Debtors obtaining exit financing.

**Reply**

9. The DIP Credit Facilities are necessary to allow the Debtors to continue operations and preserve the going concern value of their estates. Despite this reality, and the fact that their constituency ultimately will receive considerable benefit from the DIP Credit Facilities, the Committee has decided to file the Objection and attempt to pick at certain terms in the DIP Credit Facilities of which the Committee does not favor. While the Committee may not like certain of the DIP Credit Facilities' terms, the DIP Credit Facilities represent the product of significant negotiations between the Debtors and the First Lien DIP Lenders and Second Lien DIP Lenders (collectively, the "DIP Lenders"). The terms and conditions of the DIP Credit Facilities represent market terms when compared with other financing transactions completed under circumstances similar to those of the Debtors..

***The Timing of the Final Hearing is Appropriate***

10. It appears the Committee's preferred strategy is to delay the final hearing, so that the Committee has time to review "additional information." Unfortunately, the

Committee fails to indicate what "additional information" it needs to evaluate the DIP Credit Facilities. In an attempt to apparently bolster its position in this respect, the Committee, despite being appointed on April 7, 2011, waited until the end of the day on Friday, April 22, 2011 to serve a myriad of broad discovery requests on the Debtors, the Ad Hoc Committee and Wasserstein.[2] The Committee demanded that their broad document requests be fully answered within one-half of a single business day. It states the obvious to point out that these discovery requests are patently unreasonable and simply a ploy by the Committee to make it appear they lack the necessary information. Reality, however, demonstrates the Committee has had sufficient information and time to evaluate the DIP Credit Facilities.

11. The Debtors have provided the Committee with large amounts of information through informal requests, including access to a data room that various potential lenders and other parties used to conduct diligence. Further, the Debtors have been in constant communication with the Committee regarding their information requests, including a meeting on April 21, 2011 and various telephone conferences since the Committee's appointment. There exists no reason to delay the final hearing, as the Committee has had sufficient time and information to examine the DIP Credit Facilities and form their own conclusions, as their lengthy Objection makes quite apparent.

***The Fees Associated with the DIP Credit Facilities are Reasonable***

12. As described above, the DIP Credit Facilities are the product of significant negotiation between the Debtors and the DIP Lenders. And while most, if not all, borrowers would prefer to pay less fees, the reality is the fees associated with the DIP Credit Facilities are market terms given the Debtors' circumstances just prior to the Petition Date. Moreover, as is

---

2 The Committee's discovery requests to the Debtors are attached hereto as Exhibit A.

lacking throughout the Objection, the Committee fails to cite any evidence as to what fees would be appropriate in the instant circumstances.

13. The Committee asserts that, because the DIP Lenders already had a financial interest in the Debtors, the DIP Lenders should not need inducement in the form of "excessive fees." This argument completely ignores that the Second Lien DIP Lenders are providing new capital to the Debtors on a subordinated basis. Given the inherent uncertainty in all bankruptcy cases, it follows logically that lenders in a similar position to the Second Lien DIP Lenders would require a market fee to correspond to the level of risk associated with providing new money to a chapter 11 debtor on a subordinated basis. This was confirmed when the Debtors explored their financing options prior to the Petition Date. As such, the Second Lien Lenders' status as Noteholders (including Wasserstein) is irrelevant to the amount of the fees associated with the Second Lien DIP Credit Facility because the Second Lien DIP Lenders are providing new money to the Debtors on a subordinated basis.

14. The Committee also takes issue with the fees associated with the First Lien DIP Credit Facility and the Exit Facility. Similar to the Second Lien DIP Credit Facility, the fees associated with the First Lien DIP Credit Facility and the Exit Facility are reasonable and market terms, as established when the Debtors explored the financing marketplace prior to the Petition Date. In fact, the fees associated with the First Lien DIP Credit Facility are similar to the fees associated with the Debtors' prepetition revolving credit facility. Further, the Committee's argument that approval of the Exit Facility is unnecessary ignores the requirements of the Second Lien DIP Credit Facility. The Second Lien DIP Lenders required that the Debtors have exit financing in place within 35 days of the Petition Date as a condition to providing the Second Lien DIP Credit Facility . This mandate provided the Second Lien Lenders with the

comfort that the Debtors would have the necessary financing in place to exit these cases in a relatively short timeframe. As such, even if the Debtors ultimately decide to use an alternative financing source, the option value of having the Exit Facility in place now justifies the fees associated with the Exit Facility.

15. In summary, the fees associated with the DIP Credit Facilities are representative of the lending market for companies in similar situations to the Debtors. The DIP Credit Facilities are necessary for the Debtors to continue operations and preserve their going concern value. One of the primary beneficiaries of the Debtors' ability to preserve their going concern value is the Committee's constituents, and it would make little sense to prevent the Debtors from obtaining the necessary financing because the Committee believes (without any empirical support) the associated fees are too high.

***The DIP Credit Facilities Allow the Committee to Fulfill Its Fiduciary Obligations***

16. While the Committee complains about the length of its 60 day "investigation period" in the proposed DIP order, such period complies with the local rules in this jurisdiction and would appear to afford to the Committee sufficient time to conduct any investigation subject to that period. The two primary areas subject to the investigation period are (a) prepetition liens and (b) the propriety of the Debtors' release of the DIP Lenders solely in their capacity as prepetition lenders or Noteholders. As the Committee is well aware, the Debtors had no outstanding obligations to their prepetition secured lenders (the "Prepetition Secured Lenders") under the Debtors' prepetition secured revolving credit facility (the "Prepetition Credit Facility"), except approximately $260,000 in unpaid fees and approximately one million dollars in outstanding letters of credit that the Debtors fully collateralized with cash prior to the Petition Date. Further, the Debtors issued their public notes (the "Notes") in 2005,

and the Notes are unsecured. As a result, it is unclear what "liens" the Committee believes it needs additional time to investigate.

17. It is also unclear why the Committee would need more than 60 days to determine that the Noteholders hold valid debt in the Debtors. While presumably the Committee will want to understand the facts and circumstances associated with Wasserstein's acquisition of Notes, the fact is that Wasserstein's purchases of Notes were done as open market transactions well before the Petition Date and were disclosed in the Debtors' SEC filings. In any case, the Committee's proposal that its investigation period be 180 days is unrealistic, as it is expected that these chapter 11 cases will be completed prior to that time.

18. The Committee also argues that the projected disbursements to the Committee's professionals, as set forth in the initial 13 week budget pursuant to the DIP Credit Facilities (the "DIP Budget"), are insufficient. The Committee advances this argument despite repeated explanations from the Debtors and their professionals that such DIP Budget reflects only anticipated cash expenditures during the relevant period. Given that the Committee's professionals may not be retained until the May 24, 2011 omnibus hearing, and given the interim professional compensation procedures that are expected to be in place for these cases, the Debtors do not expect to make material cash expenditures to the Committee's professionals until just after the first 13 weeks of these cases. In fact, on April 22, 2011, the Debtors delivered to the DIP Lenders an updated DIP Budget that reflects much higher anticipated expenditures for the Committee's professionals starting in the 14-17th$^{th}$ week of these cases.

***Other Terms of the DIP Credit Facilities Are Appropriate***

19. The Committee asserts various other miscellaneous objections to the DIP Credit Facilities as well. Similar to the above, these other objections simply reflect the Committee's preferences with respect to the terms of the DIP Credit Facility and fail to provide

any substantive legal basis to object to the DIP Credit Facilities as a whole.

20. As an example, the Committee believes the lien granted on avoidance actions is inappropriate. The DIP Lenders, however, are essentially new lenders that come into these chapter 11 cases with no outstanding secured debt. As such, this is not the typical circumstance where a pre-existing secured lender is attempting to improve its position by adding avoidance actions to its existing collateral package. Similarly, the waiver of the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code granted under the DIP Credit Facilities is a standard market provision for debtor-in-possession financing.

## Conclusion

21. The Committee's Objection largely ignores the Debtors' economic realities in the months leading up to the Petition Date. The Debtors were in the midst of a liquidity crisis that necessitated the pursuit of financing to continue their operations. The result of this pursuit was the DIP Credit Facilities and the Exit Facility, all of which provide significant value to the Debtors and their various constituencies in the form of preservation of going concern value. The terms of the DIP Credit Facilities reflect the extensive negotiations that occurred between the Debtors and the DIP Lenders and are representative of the general market place for similar loans. As such, the Committee's Objection, which reads simply as a wish list of potential amendments to the DIP Credit Facilities, is unrealistic and provides no substantive legal basis to prevent final approval of the DIP Credit Facilities.

Dated: April 26, 2011
Wilmington, Delaware

Respectfully submitted,

/s/ *Zachary I. Shapiro*
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

Brad B. Erens
Timothy W. Hoffmann
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939

PROPOSED ATTORNEYS FOR DEBTORS