**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>HARRY & DAVID HOLDINGS, INC., *et al.*[1]<br>Debtors. | Chapter 11<br>Case No. 11-10884 (MFW)<br>(Jointly Administered)<br>**Hearing Date: May 2, 2011 at 10:30 a.m.**<br>**Re: Docket Nos. 17, 60 & 166** |

**REPLY OF THE AD HOC COMMITTEE
TO THE OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO THE DEBTORS' DIP FINANCING MOTION**

The ad hoc committee (the "Ad Hoc Committee")[2] of certain holders of the Prepetition Notes (defined below) hereby submits this reply (this "Reply") to the objection [Docket No. 166] (the "Objection") of the Official Committee of Unsecured Creditors (the "Committee") to the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Obtain Exit Financing, (C) Use Cash Collateral, and (D) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV)*

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Harry & David Holdings, Inc. (4389); Harry and David (1765); Harry & David Operations, Inc. (1427); Bear Creek Orchards, Inc. (7216). The address of each of the Debtors is 2500 South Pacific Highway, Medford, Oregon 97501.

[2] None of the members of the Ad Hoc Committee are affiliates of any of the Debtors.

*Granting Related Relief* [Docket No. 17] (the "<u>DIP Financing Motion</u>").[3]  In support of this Reply, the Ad Hoc Committee respectfully states as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. The Committee does not dispute the need for the DIP Facilities, which the Debtors desperately require in order to sustain their operations (after nearly exhausting their liquidity prior to the commencement of these cases), instill vendor confidence and enable the Debtors to implement a pre-arranged restructuring prior to their upcoming sale season.  Instead, in a kitchen sink Objection, and without any regard to the economic realities confronting the Debtors prior to the commencement of these cases or to the potential collateral damage to the Debtors' estates, the Committee asks the Court to modify the DIP Facilities on terms that are commercially unreasonable under the facts of theses cases and, in any event, unacceptable to the DIP Lenders.

2. As a threshold matter, the terms of the DIP Facilities were extensively negotiated in good faith and at arm's length by the Debtors, the Initial Note Purchasers and the Revolving DIP Lenders, following a comprehensive search by the Debtors for alternative financing.  As will be demonstrated at the hearing, not only did the DIP Facilities offer comparable pricing, but the DIP Facilities offered global resolution to these cases.  Specifically, the Initial Note Purchasers have each agreed to the terms of a comprehensive restructuring ("<u>Pre-Arranged Plan</u>") negotiated among the Debtors, the Ad Hoc Committee and Wasserstein & Company, LP (together with its affiliates, "<u>Wasserstein</u>") in its capacity as one of the largest, if not the largest, holder of the Notes.  As discussed in pleadings filed contemporaneously herewith, the Initial Note Purchasers have provided $55 million in equity financing, and have agreed to backstop a rights offering for

---

[3] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the DIP Financing Motion or the DIP Documents (as defined in the DIP Financing Motion), as applicable.

the purchase of new shares of the reorganized Debtors. The new equity infusion would allow the Debtors to repay the DIP Facilities, avoid a liquidation, and would offer all unsecured creditors the opportunity to invest new capital and acquire additional equity alongside the Prepetition Noteholders. The DIP Facilities were an integral pre-condition to the Pre-Arranged Plan and avoided a value-destructive free-fall into bankruptcy (or worse).

3. The Committee disregards the economic realities facing these Debtors and the demonstrable benefits associated with the DIP Facilities coupled with the Pre-Arranged Plan, and devotes much of its objection to mischaracterizing the $55 million term loan facility provided *on a junior basis* by the Ad Hoc Committee and Wasserstein (the "DIP Notes Facility") as inordinately inuring to the benefit of Wasserstein and the other Prepetition Noteholders. As will be demonstrated at the Final Hearing, the terms of the DIP Facilities were negotiated at arm's length by the Debtors' Chief Restructuring Officer, as advised by sophisticated counsel and renowned financial advisor, the Ad Hoc Committee and Wasserstein, each of whom retained separate counsel. Any benefits inuring to Wasserstein arise solely in its capacity as a holder of the Prepetition Notes.

4. Ultimately, the Committee appears to have ignored the fact that the Debtors require significant financing to consummate the Pre-Arranged Plan (or an alternative plan) and avoid a liquidation. The DIP Notes Facility provides the Debtors with up to $55 million in incremental liquidity on competitive pricing, has a one-year scheduled maturity date and will allow the Debtors to reorganize in a controlled and deliberate manner to the benefit of all creditors. Moreover, in the near term, the Debtors' customers, their employees and all of the Debtors' constituents are depending on this necessary postpetition financing so that the Debtors can continue to operate. As discussed in detail below, the terms of the DIP Notes Facility are

reasonable under the circumstances of these cases. Accordingly, the relief requested in the DIP Financing Motion should be approved.

## REPLY

5. Having conceded that the need for the DIP Facilities is critical, the Committee cannot now seek to re-negotiate the terms of the DIP Facilities, which were negotiated as a package deal due to the current risk profile of these Debtors. The Committee's attempt to isolate terms that it deems unfavorable, without offering an alternative proposal of its own, belies the Committee's apparent lack of appreciation of the economic realities of these cases or the demonstrable benefits of the DIP Facilities and the Pre-Arranged Plan. For the reasons described below, the Objection should be overruled in its entirety, and the DIP Facilities should be approved on the terms provided in the form of proposed order filed with this Court (the "Proposed Order")[4].

### A. The Fees Under DIP Notes Facility Are Reasonable Under the Circumstances.

6. The fees and expenses associated with the DIP Notes Facility are fair, reasonable and relate to financing commitments that have conferred and will confer substantial benefit upon the Debtors' estates. The pricing of the DIP Notes Facility was highly negotiated among the Debtors and the Initial Note Purchasers and is the basis upon which the Initial Note Purchasers were and are willing to extend credit.[5] Those fees are well within market.

7. The Committee argues that the fees proposed are not necessary here because "the DIP Lenders are not new, disinterested lenders and do not need inducement in the form of

---

[4] Certain landlords filed objections to the DIP Financing Motion [Docket Nos. 161 & 162]. The proposed form of final order now includes new language intended to address these concerns. The Ad Hoc Committee will attempt to resolve any further concerns, if any, prior to the May 2 hearing.

[5] Any advances of credit extended at the interim closing date are subject to the good faith protections of section 364(e) of the Bankruptcy Code.

4

excessive fees…." *See* Objection ¶11.  However, the Committee offers no replacement financing and glosses over the fact that the DIP Note Purchasers have agreed to provide $55 million in fresh capital on terms, according to the Debtors, that were superior to any other third party lender (due in part to the fact that the Initial Note Purchasers have also presented the Debtors with $55 million in equity financing to be used to pay down the DIP Notes Facility upon exit).  While it is true that the Initial Note Purchasers are holders of the Debtors' prepetition debt, the lenders are unwilling to provide financing at any discount below the current pricing.

8. In addition, the Committee's attack on the proposed fees associated with the DIP Note Purchase Agreement fails to take into account the attendant risks particular to the Debtors and the type of financing provided.  *First*, the DIP Notes Facility is both lien and payment subordinated to the Revolving DIP Facility.  *Second*, as discussed below, given the seasonal nature of the Debtors' businesses, the Debtors' business plan is based on a number of assumptions that may not be realized until after the end of the upcoming holiday season, thereby increasing the credit risk to the DIP Lenders. *Third*, the Debtors' assets that secure the DIP Facilities, including orchards in Oregon and Ohio, may be difficult to liquidate and may impair the security of the DIP Note Purchasers' claims.  Given the relative risk attributable to the DIP Notes Facility, the proposed fees are more than reasonable.

### B. The Committee's Rights With Respect to A Challenge Are Appropriate.

9. The Debtor devotes much of its Objection to what appear to be confirmation-related issues.  The Committee focuses at length upon its ability to challenge certain prepetition transactions, including Wasserstein's purchase of the Notes, and insists on unnecessary changes to the proposed form of order that are inappropriate, would result in undue fees being charged to the estate and would only serve to delay these proceedings to the detriment of all creditors.  As discussed below, each of the Committee's requested changes should be denied.

5

### 1. *The Investigation Period Is Reasonable.*

10. Consistent with the local rules of this Court, the proposed order affords the Committee 60 days from the date of its appointment to conduct its investigation. Del. Bankr. L.R. 4001-2(a)(i)(B).

11. Nevertheless, the Committee requests that this Court amend the order to provide the Committee at least 180 days to conduct an investigation. *See* Objection ¶13. This request is inappropriate for several reasons. *First*, 60 days provides adequate time for investigation of available causes of action in these cases. To the extent that Wasserstein is the focus of the Committee's attention, the mere purchase of prepetition debt by an equity sponsor, standing alone, can hardly be characterized as an extraordinary circumstance, warranting deviation from the period described in the local rules. *Second*, no traditional "lien review" is necessary because the only amounts outstanding under the Prepetition Revolving Loan Agreement as of the Petition Date were cash collateralized letters of credit in an aggregate face amount of less than $1 million and approximately $260,000 in certain fees. *Third*, although the Debtors have a demonstrated need to emerge from chapter 11 in August prior to their ramp-up to the 2011 holiday season, the Committee's 180 day request would extend these cases by months and jeopardize the Debtors' prospects for a successful sale season, which would devastate the Debtors' estates. The fact that the Committee would suggest such a timeframe, and subject the Debtors' estates to such risk, is troubling, and evinces a desire by the Committee to slow the process and hold the estate hostage in an attempt to extract concessions from the lenders. For the foregoing reasons, an extension of the investigation period is not only unnecessary, but detrimental to these chapter 11 cases, and should be denied.

### 2. *Granting the Committee Standing to Bring a Challenge Without Evidence of A Colorable Claims Would Be Inappropriate and Premature.*

12. In its Objection, the Committee requests that it be granted automatic standing to pursue causes of action against the Prepetition Secured Entities and the Noteholder Parties. *See* Objection ¶14. This request is inappropriate and premature.

13. Under the law of this circuit, a committee has no independent authority to prosecute litigation on behalf of the estate. Instead, in order to obtain standing, a committee must obtain permission of this Court based on the Committee's demonstration (1) of the existence of a colorable claim beneficial the estate and (2) that the debtors have unjustifiably refused to pursue the claim. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics)*, 330 F.3d 548 (3d Cir. 2003) (authorizing bankruptcy courts to allow official committees to sue derivatively); *In re Centaur, LLC,* Case No. 10-10799 (KJC), 2010 WL 4624910, at * (Bankr. D. Del. Nov. 5, 2010) (describing elements required for a committee to obtain derivative standing) (citing *In re Yes! Entertainment Corp.,* 316 B.R. 141, 145 (D. Del. 2004)); *In re National Forge Co. v. Clark*, 326 B.R. 532 (Bankr. W.D. Penn. 2005), (granting standing to the official committee to bring colorable avoidance claims); *In re G-I Holdings, Inc.*, 313 B.R. 612, 619 (Bankr. D.N.J. 2004) (granting the official creditors' committee derivative standing to bring colorable fraudulent transfer claims).

14. The Committee has made no attempt to address the relevant legal standards. Arguing merely that a motion for standing will increase costs, the Committee ignores the obvious--a motion seeking approval to prosecute an estate claim will require very little cost ancillary to the costs incurred in connection with the Committee's investigation and the drafting and prosecution of its complaint. Indeed, if the Committee is granted derivative standing to pursue estate claims now, without satisfying the legal requirements to obtain such standing, there

7

is a significant risk of substantial, unwarranted costs being borne on the Debtors' estates to defend against an ultimately meritless action. If and when the Committee is prepared to meet the standards set forth above, it should file a motion on notice to the parties in interest. As the Committee has not met and cannot meet the standards for derivative standing espoused by this Circuit, the request for standing should be denied.[6]

### 3. *The Investigation Cap Is Appropriate.*

15. The Committee also seeks a threefold increase of the proposed investigation budget to $150,000. Given the nature of these cases, the proposed $50,000 investigation cap is reasonable. Despite the Committee's statements to the contrary, the Debtors' capital structure is not complex. As of the Petition Date, the Debtors' primary liabilities consisted of: (a) approximately $58 million in principal amount of Senior Floating Rate Notes due March 1, 2012 and approximately $140 million in principal amount of Senior Fixed Rate Notes due March 1, 2013, each as issued by Harry and David and guaranteed on a joint and several basis by all of the other Debtors; (b) pension obligations scheduled by the Debtors in the amount of approximately $30 million; (c) unsecured trade debt in the approximate amount of $37 million (which amount likely includes critical trade claims and 503(b)(9) claims); and (d) lease obligations (prior to the Petition Date, the Debtors' annual expense for leased properties was approximately $19 million). *See Declaration of Kay Hong In Support of First Day Pleadings* dated March 28, 2011 [Docket No. 3] ¶¶ 16-22. Additionally, the Debtors were party to a revolving credit facility, which, as of the Petition Date, had less than $1 million outstanding in

---

[6] The Committee's request that it be entitled to extend the challenge period solely with the consent of the proposed defendant is similarly inappropriate. As provided in the proposed order, the consent of the Requisite Note Purchasers (or an order of this Court) is necessary to ensure that the Committee is not engaged in meritless litigation.

fully cash collateralized letters of credit, approximately $260,000 in fees owed and no availability for working capital.

16. Moreover, given that the Committee's Objection appears to target Wasserstein, the Court should take comfort from the fact that the Ad Hoc Committee, the Debtors' largest creditor constituency, is supportive of Wassertstein's involvement in the DIP Facilities and the Pre-Arranged Plan. In any event, a thorough investigation of Wasserstein's relevant prepetition purchases of Notes should not be exceedingly complex for sophisticated professionals such as Committee counsel and should be able to be completed within the allocated cap and timeframe.

*4.    The Proposed Budget is Adequate Under the Circumstances*

17. By the Objection, the Committee attempts to make professional fees, not creditor recoveries, the gating issue on approval of the Debtors' necessary financing. In connection with its unreasonable demand for an increased budget of $1.5 million, the Committee cites *In re Channel Master Holdings, Inc.*, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (MFW) for the proposition that the Committee's budget must be commensurate with those of the DIP Lenders and the Debtors. However, a closer examination of *Channel Master* reveals that this Court approved an order budgeting the committee at $75,000 and re-examined the reasonableness of the committee's fees upon its review of the final fee applications of the debtor and committee professionals. In that case, the Court determined that increased fees were appropriate for, among other reasons, the value added by the committee during the course of the cases and the fact that the committee professionals were disproportionately bearing the burden of the estates' administrative insolvency. Committee counsel should employ the same theory here; in the event the Committee believes its professionals' services are appropriate, the professionals can apply for compensation in connection with their final fee applications. Indeed, short of any actions taken by the Committee that might otherwise jeopardize the Debtors' prospects for a

9

successful reorganization (as reflected in the Pre-Arranged Plan), the Debtors will emerge from chapter 11 in a few short months and allowed professional fees will be paid.

18. The Committee correctly notes that the Approved Budget attached to the Interim Order allots approximately $3.6 million for the fees of the Debtors' professionals in the first 13 weeks. However, this figure includes amounts accrued as of the Petition Date for the Debtors' professionals, which include Jones Day, local counsel, Rothschild, McKinsey and A&M. It is also true that an amount for Committee professional fees is not allotted until the thirteenth week. This is because the Approved Budget is a cash budget that reflects actual cash receipts and disbursements. Due to (i) the need of the Committee's professionals to submit formal retention applications which are not expected to be heard until the omnibus hearing on May 17, 2011 (at the earliest) and (ii) the compensation procedures proposed in these cases, it is unlikely that the Committee professionals will receive their first actual payment until the thirteenth week. And the payment of $120,000 is expected to cover only the first month of work. Given the fact that a Pre-Arranged Plan has already been negotiated by the Debtors with its largest creditor constituency—one that benefits all unsecured creditors alike—an amount of $120,000 for the Committee for its first month of work is reasonable.[7]

19. Lastly, the Committee requests that this Court amend the professional fee budget to group together the Committee's professionals and the Debtors' professionals for the purpose of the variance tests. The Ad Hoc Committee believes that maintaining a separate Committee professional fee line item, subject to the 15% - 20% variance test, constitutes an important

---

[7] These cases are not complex and the Committee's role in monitoring the process simply does not require the $1.5 million requested by the Committee. Nevertheless, the Ad Hoc Committee remains willing to entertain a more reasonable request from the Committee.

safeguard that will protect against wasteful spending. The Ad Hoc Committee submits that the professional fee budget should be approved without modification.

> 5. *The Scope of the Releases Have Been Clarified.*

20. The Proposed Order has been revised to correct a typographical error in the interim order, and replaces the term "Prepetition Note Parties" with the term "Noteholder Parties". The term "Noteholder Parties" is expressly defined in the Final Order to include each of the holders of the Notes "solely in their capacity as holders of Prepetition Notes". Thus, any release offered to Wasserstein in its capacity as one of the Noteholder Parties would be limited to its capacity as a holder of the Prepetition Notes. To the extent that Wasserstein is providing new money in its capacity as noteholder under a DIP Notes Facility that all parties agree is critical, and that was negotiated on an arm's length basis, Wasserstein should be entitled to release of claims arising in connection with its bond holdings.

## C. **Exit Financing Is a Necessary Component to the Debtors' Restructuring Efforts.**

21. The Committee offers no credible basis to challenge the exit financing fee, particularly, in light of the favorable interest rate provided under the exit facility. Though the Committee styles the exit facility commitment fee as a "break up fee", this argument is misguided. The Initial Note Purchasers were not prepared to fund a DIP Notes Facility and commit to equity financing under the Pre-Arranged Plan without an assurance that such DIP Notes Facility could be repaid in full in cash and that the Pre-Arranged Plan was in fact feasible. With the exit facility in place, the Debtors have an improved chance of confirming the Pre-Arranged Plan and exiting chapter 11 on a timeline consistent with the Debtors' attempts to restructure before their next winter holiday selling season. Consequently, this Court's approval of the DIP Revolving Loan Facility, as well as the Court's approval of the exit facility

commitment, were each a condition precedent to funding under the DIP Notes Facility and should be viewed as imperative to the success of these cases.

### D. Liens on Proceeds of Avoidance Actions Are Appropriate Under the Facts of these Cases.

22. Due to the risk profile of the Debtors, it is appropriate to grant the DIP Lenders a lien on the proceeds of avoidance actions. Although the Committee suggests that avoidance actions cannot be encumbered for the benefit of new money lenders, courts in this district have provided this protection to secured creditors on a postpetition basis. *See In re Thompson Publishing Holding Co., Inc., et al.*, Case No. 10-13070 (PJW) (Bankr. D. Del. Oct. 12, 2010) (collateral for DIP Obligations included avoidance actions); *In re Urban Brands, Inc.*, et al., Case No. 10-13005 (KJC) (Bankr. D. Del. Oct. 10, 2010) (same); *In re FormTech Indus., LLC and FormTech Indus. Holdings, LLC*, Case No. 09-12964 (MFW) (Bankr. D. Del. Sept. 15, 2009) (same); *In re Stant Parent Corp., et al.*, Case No. 09-12647 (BLS) (Bankr. D. Del. Aug. 17, 2009) (same); *In re Interlake Material Handling, Inc., et al.*, Case No. 09-10019 (KJC) (Bankr. D. Del. Feb. 11, 2009) (same).

23. In this case, the numerous factors favor the granting of liens on avoidance actions. *First and foremost*, the DIP Notes Facility represents a new money loan to the Debtors, intended to bridge the Debtors' working capital needs through these chapter 11 cases. *Second*, the DIP Facilities are subject to substantial credit risk due to the inherent risks and uncertainties underlying the Debtors' business plan, which was prepared by recently-installed turnaround consultants after several weeks of analysis. That business plan projects a significant increase in Adjusted EBITDA based upon certain assumptions regarding cost-savings initiatives. By way of illustration, the Debtors reported *negative* $17.3 million in Adjusted EBITDA for FY 2011 but are projecting a significant swing to positive $21.03 million in Adjusted EBITDA for FY 2012,

12

even though total net sales for FY 2012 are expected to be *lower* ($364.2 million for FY 2012 compared with $405.5 million for FY 2011). Thus, the expected swing in EBITDA is attributable primarily to untested price and cost rationalization efforts currently being undertaken by the Debtors' turnaround professionals. It is uncertain whether the Debtors will be able to capture those savings, and whether they do may not be determined until after the Debtors are well into their selling season due to the sharp seasonal curve experienced by these Debtors. *Third*, the DIP Notes Facility is both lien and payment subordinated to the DIP Revolving Loan Facility, and is secured primarily by illiquid assets including orchards and certain other facilities in Oregon and Ohio. Consequently, the DIP Lenders face inordinate risk and should be afforded downside protection in the event that those risks are realized.

### E. The Additional Objections Are Meritless.

#### 1. *The 506(c) and 552 Waivers are Appropriate.*

24. Other than the de minimis amount outstanding under the prepetition revolving credit facility, there was no prepetition secured debt outstanding as of the Petition Date. Accordingly, any waivers under sections 506(c) and 552(b) of the Bankruptcy Code should not have any material impact upon the Debtors' estates. With respect to the collateral securing the DIP Notes Facility, the DIP Notes Facility represents a new money loan, the DIP Budget provides for the payment of all ordinary course expenses, and, absent this waiver, the DIP Note Purchasers would need to impose more restrictive postpetition lending terms to take into account any risk of being subjected to unquantifiable 506(c) claims.

#### 2. *The Proposed Order Appropriately Limits the Issues That Can Be Contested Following a Default.*

25. The Committee expresses concern over the provisions in the DIP Facilities that limit the ability of parties in interest to defend against an exercise of the DIP Lenders' remedies

during the 5 business day notice period following the occurrence of a default. *See* Objection ¶23. This Court had the opportunity to consider these provisions at the interim hearing and observed that (with limited exception) the defaults and milestones contained in the DIP Facilities are reasonable and afford the Debtors the necessary leeway within which to file their plan and seek its confirmation. *See Transcript of First Day Hearing*, 21:14-29:23 March 29, 2011, attached as **Exhibit A** hereto. The milestones were set in coordination with the Debtors—who believe the dates to be workable—as a means of ensuring that the Debtors emerge from chapter 11 bankruptcy protection prior to their upcoming holiday season. The milestones do not require the Debtors to file the Pre-Arranged Plan, thus allowing the Debtors to move forward with an alternative transaction, if appropriate. However, the DIP Lenders have an interest in ensuring that the Debtors do not linger in bankruptcy and the milestones provide a minimal level of comfort that the Debtors will work expeditiously. Thus, the DIP Lenders should be entitled to rely upon the remedies provided for in the DIP Documents to preserve the benefit of their bargain.

### 3. *The Restrictions on Use of Cash Collateral Are Reasonable.*

26. Contrary to the Committee's arguments, the Debtors' authorization to use Cash Collateral does not automatically terminate upon the occurrence and during the continuance of an Event of Default, but rather, the Debtors are authorized to continue to use Cash Collateral as necessary to preserve DIP Collateral. Proposed Order at 36. Moreover, as is the case with nearly every DIP financing, the DIP Lenders are not willing to extend funding unless the use of Cash Collateral is consistent with the expectations of the DIP Lenders. Here, however, the DIP Lenders provided that the Debtors may not seek to use Cash Collateral without the consent of the DIP Agents for so long as either of the DIP Agents (as applicable) or DIP Lenders (as applicable) have commitments which have not terminated their commitments under the DIP

14

Documents. *Id*. This provision is standard fare and commercially reasonable under the circumstances.

## CONCLUSION

27. It appears that the Committee has undertaken a "negotiation by litigation" tactic, a value destructive proposition to say the least. Prior to the Petition Date, the Debtors' liquidity was nearly exhausted and the Debtors faced an uncertain future. Now, the Debtors have lined up DIP financing, a comprehensive restructuring in the form of equity and debt financing upon exit, and a business plan that they hope will revitalize the Debtors' operations. The Committee's hold up tactics jeopardize those restructuring efforts and should not be countenanced. Accordingly, the Ad Hoc Committee respectfully requests that the Court overrule the Objection and approve the DIP Financing Motion on the terms set forth in the proposed form of final order.

**WHEREFORE**, the Ad Hoc Committee respectfully requests that the Court (i) overrule the Objection in its entirety, (ii) approve the DIP Financing Motion, and (iii) grant the Ad Hoc Committee such other and further relief as this Court deems just, equitable and proper.

Dated: April 27, 2011
Wilmington, Delaware

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Erez E. Gilad
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

-and-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Andrew R. Remming*
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Andrew Remming (No. 5120)
1201 North Market Street, 18th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Co-Counsel for Ad Hoc Committee of the Holders of the Senior Floating Rate Notes Due 2012 and the 9.0% Senior Notes Due 2013*