# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | **Case No. 11-10884 (MFW)** |
| **HARRY & DAVID HOLDINGS, INC.,** *et al*,[1] | ) | |
| | ) | **Jointly Administered** |
| Debtors. | ) | **Related to Docket Nos. 17, 60, 166 and 181** |
| | ) | |

**REVOLVING DIP AGENT'S JOINDER TO THE DEBTORS' REPLY AND REPLY TO OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 AND 507 AND RULES 2002, 4001, 9014 AND 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCINGS, (B) OBTAIN EXIT FINANCING, (C) USE CASH COLLATERAL; AND (D) FILE RELATED FEE LETTERS UNDER SEAL; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Harry & David Holdings, Inc. (4389); Harry and David (1765); Harry & David Operations, Inc. (1427); Bear Creek Orchards, Inc. (7216). The address of each of the Debtors is 2500 South Pacific Highway, Medford, Oregon 97501.

UBS AG, Stamford Branch ("UBS"), as Revolving DIP Agent on behalf of the Revolving DIP Lenders, as Prepetition Revolving Agent on behalf of the Prepetition Revolving Lenders,[2] and as a creditor in the above-captioned proceedings, hereby files this *Joinder to Debtors' Reply and Reply to Objection of the Official Committee of Unsecured Creditors and to the Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Obtain Exit Financing, (C) Use Cash Collateral; and (D) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (the "Reply"). In support of this Reply, UBS respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this Reply pursuant to 28 U.S.C. §§ 157 and 1334. The Reply before the Court is a core matter under 28 U.S.C. § 157(b)(2). Venue of these cases and this Reply is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2. On March 28, 2011 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief (the "Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. On the Petition Date, the Debtors filed their *Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 and 507 and*

---

[2] Each of the foregoing terms as defined in the Interim Order (defined below).

2

*Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Obtain Exit Financing, (C) Use Cash Collateral; and (D) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* ([Docket No. 17]; the "Motion").

4. Following presentation of evidence and arguments at the "first day" hearing held on March 29, 2011, the Court entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Use Cash Collateral and (C) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims, (III) Scheduling a Final Hearing; and (IV) Granting Related Relief (*[Docket No. 60]; the "Interim Order").

5. On April 7, 2011, the United States Trustee for the District of Delaware formed the Official Committee of Unsecured Creditors (the "Committee"). [Docket No. 126].

6. On April 21, the Committee filed a number of objections, including its *Objection of the Official Committee of Unsecured Creditors and to the Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Obtain Exit Financing, (C) Use Cash Collateral; and (D) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* ([Docket No. 166]; the "DIP Objection").

7. On April 22, the Debtors filed their *Reply to Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order Approving Post-Petition Financing* ([Docket No. 181]; the "Debtors' Reply"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Interim Order, the DIP Objection, or the Debtors' Reply, as applicable. UBS hereby joins in the Debtors' Reply and incorporates the Debtors' Reply herein by reference.

8. On April 27, the Ad Hoc Committee filed its *Reply of the Ad Hoc Committee to the Objection of the Official Committee of Unsecured Creditors to the Debtors' DIP Financing Motion* ([Docket No. 238]; the "Ad Hoc Committee Reply").

### B. The Prepetition Revolving Loan Facility

9. Pursuant to that certain credit agreement dated as of March 20, 2006 (as amended, restated or otherwise modified, the "Prepetition Revolving Loan Agreement") among Harry and David, as borrower, certain other Debtors, as guarantors, UBS AG Stamford Branch, as issuing bank, administrative collateral agent and administrative agent (in such capacity, the "Prepetition Revolving Agent"), GMAC Commercial Finance LLC (n/k/a Ally Commercial Finance LLC) as collateral and documentation agent, UBS Securities LLC as arranger, UBS Loan Finance LLC as swingline lender, and the lenders party thereto from time to time (each, a "Prepetition Revolving Lender" and collectively in their lender capacity, the "Prepetition Revolving Lenders") party thereto, the Prepetition Lenders made loans, issued letters of credit and provided other financial accommodations to or for the benefit of the Debtors.

10. The Debtors were, as of the Petition Date, jointly and severally indebted to the Prepetition Revolving Agent and the Prepetition Revolving Lenders in the amount of: (a) $8,464.50 on account of LC Participation Fees and Fronting Fees (each as defined in the Prepetition Revolving Loan Agreement); and (b) $251,596.75 on account of the Commitment

Fee (as defined in the Prepetition Revolving Loan Agreement). As of the Petition Date, the Debtors were unable to borrow any amounts under the Prepetition Revolving Loan Agreement because of their failure to meet minimum liquidity requirements thereunder.

11. In the interest of providing the Committee with documents related to the Prepetition Revolving Loan Agreement as quickly as possible, copies of the Prepetition Revolving Loan Agreement and related exhibits and schedules, and the related security agreement and exhibits and schedules were sent to the Committee on or about Friday, April 22, 2011. In addition, a full set of loan and collateral documents related to the Prepetition Revolving Loan Agreement were sent to the Committee by overnight mail on Thursday, April 28, 2011.

### C. DIP Facilities and Exit Facility

12. The Debtors propose to support the ongoing operations of their businesses during these Cases primarily through the DIP Notes Facility, which will provide the Debtors with up to $55 million in postpetition liquidity, and the Revolving DIP Facility, which will provide the Debtors with up to $100 million in postpetition liquidity.

13. As part of the overall strategy to reorganize the Debtors prior to the 2011 holiday season and to allow the Debtors to emerge from chapter 11 as soon as possible, the Revolving DIP Agent and the Revolving DIP Lenders provided a fully underwritten commitment to the Debtors to fund the Exit Facility at emergence. To provide such commitment, the Revolving DIP Agent and Revolving DIP Lenders undertook diligence and have set aside capital necessary to fund the Exit Facility when the time arises. Nothing prevents the Debtors or the Committee from seeking alternative exit financing, if such financing is available on more advantageous terms than those offered by the Revolving DIP Agent and the Revolving DIP Lenders. Deeming the closing fee payable in connection with the Exit Facility earned upon entry of the Final Order simply provides consideration for the work undertaken, the funds committed,

and the benefit to the Debtors' estates today of having committed exit financing in place to assist in implementing their announced reorganization plan.

### D. DIP Objections

14. The DIP Objection blatantly disregards the fact that the DIP Facilities offer in the aggregate $155 million of new postpetition liquidity to the Debtors to fund the Cases and recites a list of objections to such DIP Facilities, many of which, if sustained, would be detrimental to the Debtors' estates and thereby, to the Debtors' creditors. Notably, (i) the DIP Objection ignores the applicable standard for evaluating the DIP Facilities, *i.e.*, the Debtors' reasonable business judgment, (ii) the DIP Objection does not claim that the DIP Facilities are not critical to these Cases or propose any alternative that would provide the Debtors with the much-needed liquidity offered by the DIP Facilities, and (iii) the DIP Objection provides no evidentiary support for its assertions that terms of the DIP Facilities should be modified. Instead, the DIP Objection sets forth the following laundry list of objections, all of which disregard the circumstances of the Cases:

- Final approval of the DIP Facilities should be delayed because the Committee has not had sufficient time to review the "Debtors' financial and operational information and prepetition debt documentation" DIP Objection, ¶ 20;

- Fees payable in connection with the DIP Facilities and the Exit Facility are "excessive" or "inappropriate" DIP Objection, ¶¶ 25-31;

- The terms of the Investigation Period as set forth in the Interim Order "restrain[] the Committee from bringing claims against the Prepetition Secured Entities" DIP Objection, ¶ 33;

- The Committee's $50,000 cap to investigate prepetition liens and its allotted budget thereafter are both too low;

- The releases contained in the Interim Order are too broad;

- The financial covenants in the DIP Revolving Loan Agreement are too restrictive;

- The Exit Facility should not be approved yet;

- Proceeds of avoidance actions should not be included in the DIP Collateral[3];

- Waivers of 506(c) and 552(b) are inappropriate;

- The DIP Agents and DIP Lenders should not receive relief from the automatic stay following a default under their respective DIP Facilities; and

- The restrictions on consensual use of cash collateral set forth in the Interim Order should be removed.

15. As will be discussed more fully herein, the DIP Revolving Loan Facility has been offered to the Debtors on substantially the same terms as the Prepetition Revolving Loan Agreement. The Committee does not deny that the Debtors have a critical need for the liquidity offered by both the DIP Notes Facility and the DIP Revolving Loan Facility, yet the DIP Objection seeks to pick and choose from the negotiated terms of the DIP Facilities and claims, oddly, that several features of the DIP Revolving Loan Facility are not reasonable irrespective of the fact that they are virtually identical to the terms of the Prepetition Revolving Loan Agreement. The fees and the financial covenants related to the DIP Revolving Loan Facility were carefully negotiated, and they represent the terms on which the Revolving DIP

---

[3] The Revolving DIP Agent declines to address the Committee's argument that proceeds of avoidance actions should not be included in the DIP Collateral; provided, however, that to the extent that the DIP Notes Agent is granted a security interest in such proceeds in connection with the DIP Notes Facility, the Revolving DIP Agent should be granted a first-lien security interest in such proceeds in accordance with the DIP Facilities and the DIP Intercreditor Agreement.

Lenders are willing to proceed to offer the DIP Revolving Loan Facility to the Debtors. The Committee's request that this Court re-write the DIP Revolving Loan Facility and strip out market provisions that were bargained for in good faith and deemed by the Debtors to be in their best interests is inappropriate and should be denied.

16. Moreover, the Committee inexplicably seeks to drag out the Investigation Period beyond the period required by the Bankruptcy Rules and the applicable Local Rules, despite the fact that the amounts outstanding on account of the Prepetition Revolving Obligations are *de minimis*. UBS is not opposed to providing the Committee with the time it needs to complete its investigation, but anything other than a short extension to investigate the Debtors' standard and straightforward prepetition capital structure is unnecessary and unduly disruptive to these Cases.

17. Finally, the Committee asserts that the Debtors should not be "locked in" to the Exit Facility at this time. Contrary to this objection, the Debtors are **_not_** "locked in" to the Exit Facility. In raising this issue, however, the Committee ignores the work that has been done by the Revolving DIP Agent, the Revolving DIP Lenders, and the Debtors in conducting diligence, negotiating the structure of the Exit Facility, and actually committing capital for the Exit Facility, all of which confer a substantial benefit on the Debtors' estates and thereby the unsecured creditors of the Debtors' estates. If the Committee chooses to seek alternative exit financing for the Debtors, it is free to do so, but any alternative lender offering exit financing would essentially be stepping into a situation where most of the preparatory work has already been done for it, and the Exit Facility remains committed as a safety net to ensure the Debtors' speedy emergence from bankruptcy proceedings. Accordingly, deeming the closing fee

associated with the Exit Facility earned now – but not payable until closing of the Exit Facility or termination of the DIP Facility - is reasonable and appropriate.

## REPLY TO THE COMMITTEE'S DIP OBJECTION

**I.  THE DEBTORS EXERCISED THEIR REASONABLE BUSINESS JUDGMENT IN ENTERING INTO THE DIP FACILITIES, WHICH WERE NEGOTIATED AT ARMS'-LENGTH AND IN GOOD FAITH BY THE DEBTORS, THE DIP AGENTS, AND THE DIP LENDERS.**

18.  The Court should approve the DIP Facilities because they reflect the exercise of the Debtors' reasonable business judgment and provide a substantial benefit to the Debtors' estates as a whole.  *See In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Mid-State Raceway*, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) (approving the working capital portion of postpetition financing which allowed the lender to appoint a CEO and two directors to the board of the directors and observing that "to overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.") (internal citations omitted).  Despite the Committee's assertion that section 364 of the Bankruptcy Code "is not a 'secured lenders act'", the DIP Objection fails to discuss the fact that (i) the DIP Facilities represent the Debtors' proper exercise of their reasonable business judgment and (ii) the DIP Facilities were negotiated following the Debtors' solicitation of debtor-in-financing proposals from more than 47 different financial institutions, none of which were willing or able to provide terms as advantageous as those provided by the DIP Facilities.  *See* Debtors' Reply, ¶ 4, 7.

19.  The DIP Facilities provide the Debtors with the working capital needed to continue their operations as a going concern, maximize the value of the Debtors' estates by putting forward a plan of reorganization that will provide the highest possible recovery to the

Debtors' creditors as a whole, and conclude the bankruptcy process well before the beginning of the 2011 holiday season. As such, the DIP Facilities benefit the Debtors' employees by allowing the Debtors to retain as many jobs as possible. The DIP Facilities benefit the Debtors' trade creditors by maintaining the Debtors' need for supplies postpetition and providing liquidity for payment of allowed 503(b)(9) claims pursuant to the procedures outlined to and approved by the Court. Moreover, the DIP Facilities benefit the Debtors' customers by allowing the Debtors to continue operations and continue supplying their customers. And, furthermore, the DIP Facilities benefit other creditors by providing the Debtors with the additional working capital to fund the Cases, which will allow the Debtors to preserve enterprise value and confirm a plan of reorganization that will maximize recoveries to creditors. Without the DIP Facilities, the Debtors would likely have faced liquidation instead of the likelihood of a successful reorganization supported and paid for by the Debtors' prepetition secured creditors, certain unsecured noteholders, and the Debtors' primary equity holder.

20. The Debtors, the DIP Agents, and the DIP Lenders have negotiated at arms'-length and in good faith to close the DIP Facilities. The protections and benefits to the DIP Lenders under the DIP Facilities are entirely reasonable under the circumstances of these Cases and are largely similar to the terms of financing available to the Debtors prepetition. Accordingly, the DIP Agents and DIP Lenders are entitled to the benefits of their bargains and should not be held hostage to the Committee's baseless notions of what the terms of the DIP Facilities should have been. *See generally In re Farmland Indus.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (internal citations omitted) (finding that postpetition financing was negotiated in good faith and observing that "[i]t is not impermissible for a bank to use its superior bargaining power to obtain creditor-favorable terms in a financing agreement."); *In re Western*

*Pac. Airlines*, 223 B.R. 567 (Bankr. D. Colo. 1997) (approving postpetition financing where the alternative to such financing would have been immediate liquidation of the company, even though the court found the terms of such postpetition financing "onerous").

21. As related to the DIP Facilities, the Committee's allegations against Wasserstein are simply a red herring to distract the Court from the fact that the Debtors negotiated the DIP Facilities and the Exit Facility at arms' length and in good faith with the DIP Notes Agent, the Revolving DIP Agent, and the Revolving DIP Lenders, respectively. The Committee has not offered any evidentiary basis to suggest that the DIP Agents or the DIP Lenders have somehow exploited their bargaining power, or worse, acted in bad faith, nor has the Committee asserted that the Debtors' reasonable business judgment is no longer the applicable standard to judge the DIP Facilities. The Debtors, in the exercise of their reasonable business judgment, deemed the DIP Facilities acceptable and in the Debtors' best interests. The applicable standard for approval of postpetition financing under section 364(d) is the reasonable business judgment standard, which the Debtors have satisfied.

**II. THE FEES PAYABLE IN CONNECTION WITH THE DIP REVOLVING LOAN FACILITY SHOULD BE APPROVED BECAUSE THEY ARE MARKET FEES THAT ARE VIRTUALLY IDENTICAL TO FEES CHARGED IN CONNECTION WITH THE PREPETITION REVOLVING LOAN AGREEMENT.**

22. The DIP Objection recognizes that the DIP Revolving Loan Facility "requires the Debtors to pay to the [Revolving] DIP Lenders (i) an unused line fee of 1% ***calculated and paid per the terms of the Prepetition Revolving [Loan] Agreement***; (ii) letter[] of credit fronting fees equal to 0.25% per annum on the undrawn amount of all outstanding letter[s] of credit, and (iii) letter of credit participation fees equal to 3.75% per annum on the issued and outstanding letters of credit." DIP Objection, ¶ 24 (emphasis added). Yet, with respect to the Revolving DIP Facility, the Committee objects to the unused line fee and the

closing fee payable in connection therewith on the grounds that such fees are "excessive" and unnecessary to induce the Revolving DIP Lenders to extend the DIP Revolving Loan Facility to the Debtors. *See* DIP Objection, ¶¶ 27, 28.

23. Despite such assertions, the Committee offers no evidence that any fees charged in connection with the DIP Revolving Loan Facility are "excessive," nor does the Committee offer any evidence that such fees were unnecessary to induce the Revolving DIP Lenders to enter into the Revolving DIP Facility. The fees charged in connection with the DIP Revolving Loan Facility to which the Committee objects are essentially identical to the fees charged in connection with the Prepetition Revolving Loan Agreement; accordingly, the suggestion that such fees are excessive or out of sync with the market simply do not make sense and do not recognize the seasonal fluctuations of the Debtors' business. Moreover, such fees are part and parcel of the terms and conditions which were heavily-negotiated and bargained-for in connection with the Revolving DIP Facility. The Committee's assertion that such fees were not necessary to induce the Revolving DIP Lenders to offer the DIP Revolving Loan Facility has no basis in fact.

**III. DEEMING THE CLOSING FEE PAYABLE IN CONNECTION WITH THE EXIT FACILITY DEEMED UPON ENTRY OF THE FINAL ORDER IS REASONABLE AND APPROPRIATE GIVEN THE CIRCUMSTANCES OF THE CASES AND THE BENEFIT CONFERRED ON THE DEBTORS' ESTATES BY HAVING COMMITTED EXIT FINANCING IN PLACE.**

24. In addition to the laundry list of items in the DIP Objection, the Committee also objects to the deeming the closing fee payable in connection with the Exit Facility on the grounds that it is premature and "excessive." *See* DIP Objection, ¶ 29.

25. The closing fee payable in connection with the Exit Facility, which the Debtors, the Revolving DIP Agent, and the Revolving DIP Lenders have requested be deemed earned upon entry of the Final Order, is reasonable and entirely appropriate given the

12

circumstances of the Cases. The Revolving DIP Agent and the Revolving DIP Lenders have "front-loaded" a substantial amount of work on the Exit Facility, and they have committed funds to the Exit Facility as requested in order to ensure that the Debtors will be able to exit bankruptcy upon confirmation of a plan of reorganization. Far from demanding higher interest or other economic consideration in connection with the Exit Facility based on the inherent risk therein, the Revolving DIP Agent and the Revolving DIP Lenders have provided terms and conditions for the Exit Facility that are virtually identical to those existing in the Prepetition Revolving Loan Facility, and they have committed funds to such Exit Facility to allow the Debtors to proceed down the path of presenting a confirmable plan of reorganization. As such, the Revolving DIP Agent and the Revolving DIP Lenders are entitled to have the closing fee payable in connection with the Exit Facility deemed earned upon entry of the Final Order as consideration for providing committed financing on eminently reasonable terms so early in these Cases.

## CONCLUSION

The Debtors have entered the chapter 11 process with a view to reorganize and exit bankruptcy as quickly as possible before the 2011 holiday season. Because of intensive and comprehensive prepetition negotiations among the Debtors, several creditor constituents, and equity holders, the Debtors have a viable structure for a confirmable plan of reorganization and, by virtue of the DIP Facilities, the liquidity necessary to fund such a plan. The Debtors used their reasonable business judgment to determine that the terms of the DIP Facilities as negotiated and as disclosed to this Court were in the best interest of their estates and their creditors, and on those grounds, the Revolving DIP Agent asks the Court to overrule the DIP Objection and grant

final approval of the DIP Facilities so that all parties-in-interest may focus on moving these Cases forward and confirming a plan of reorganization.

WHEREFORE, the DIP Agent respectfully requests that this Court:

(i) overrule the Committee's objections to the DIP Facilities for the reasons discussed herein; and

(ii) grant such other and further relief as is just and necessary.


Dated: April 29, 2011
      Wilmington, Delaware

*/s/ Richard W. Riley*
Richard W. Riley, Esq.
**DUANE MORRIS LLP**
Suite 1600
222 Delaware Avenue
Wilmington, DE 19801-1659

and

Jesse H. Austin, III, Esq.
Cassie Coppage, Esq.
PAUL HASTINGS JANOFSKY & WALKER, LLP
600 Peachtree Street, N.E.
Twenty-Fourth Floor
Atlanta, GA 30308

*Counsel for UBS AG, Stamford Branch as Prepetition Agent and DIP Agent*