# EXHIBIT 1

## TERM SHEET WITH RESPECT TO
## GLOBAL SETTLEMENT AND WITHDRAWAL OF COMMITTEE OBJECTIONS

The following terms and conditions are part of a comprehensive compromise and settlement between the Debtors, the Ad Hoc Committee, Wasserstein and the Official Committee (each as defined below and, collectively, the "Parties" and each, a "Party"). The Parties have authorized their respective undersigned counsel to execute this term sheet on their behalf, and the undersigned counsel hereby represent and warrant that they are so authorized. Each element of this term sheet is consideration for each other element and an integral aspect of the proposed comprehensive compromise and settlement. This term sheet does not constitute an offer of securities or a solicitation of acceptances or rejections of any future chapter 11 plan for the Debtors. The terms and provisions set forth herein are preliminary and subject to the execution and delivery of definitive documentation. This summary of terms and conditions is not intended to define or describe all of the terms and conditions of the proposed transactions described herein.

| | **Proposed Global Resolution** |
|---|---|
| **Debtors:** | Harry & David Holdings, Inc.; Harry and David; Harry & David Operations, Inc.; and Bear Creek Orchards, Inc. |
| **Ad Hoc Committee:** | The ad hoc committee of certain holders of the Debtors' public notes represented by Stroock & Stroock & Lavan LLP in connection with the Debtors' chapter 11 bankruptcy cases |
| **Wasserstein:** | Wasserstein Partners LP and its affiliate Wasserstein & Co., LP., together with the funds managed by them. |
| **Official Committee:** | The official committee of unsecured creditors appointed in the Debtors' chapter 11 cases |
| **Amended Plan Term Sheet:** | Each of the Parties hereto agrees to support the Plan Term Sheet annexed hereto (the "Amended Plan Term Sheet") reflecting the terms of an amended plan support agreement (the "Amended PSA"). The Parties' agreement to the Amended Plan Term Sheet is a condition to the Committee's agreement to this term sheet. |
| **Committee Backstop and Accredited Investor Objections:** | No later than Monday, May 9, 2011, the Committee will file with the Bankruptcy Court notices of withdrawal of the objections filed with respect to the *Motion of the Debtors for an Order Approving and Assuming Backstop Stock Purchase Agreement and Fee and Indemnification Provisions Related Thereto* (the "Backstop Motion") and the *Motion of the Debtors for an Order (I) Authorizing Them to Distribute an Accredited Investor Questionnaire to Their Unsecured Creditors; (II) Approving Procedures Related Thereto and (III) Setting Rights Offering Record Date* (the "Accredited Investor Motion") |

| | |
|---|---|
| **DIP Financing:** | The Parties agree to the entry of the attached proposed final order approving the DIP Financing Motion (as defined below).  No later than Monday, May 9, 2011, the Committee will file with the Bankruptcy Court a notice of withdrawal of its objection to the *Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financings, (B) Obtain Exit Financing, (C) Use Cash Collateral; and (D) File Related Fee Letters Under Seal; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (the "DIP Financing Motion"). |
| **Announcement of Settlement:** | The Parties will announce to the Bankruptcy Court at the hearing on May 10, 2011 the terms of the settlement, including the Committee's agreement to support and commit to a plan of reorganization consistent with the terms of the Amended Plan Term Sheet. |
| **Discovery:** | All discovery propounded by the Committee in connection with the Backstop Motion, the Accredited Investor Motion and the DIP Financing Motion (including the subpoenas issued to the Debtors, the Ad Hoc Committee, and Wasserstein) shall be stayed until the earlier of (a) the effective date of a plan consistent with the Amended PSA, at which time the discovery shall be withdrawn or otherwise terminate, or (b) the occurrence of a Termination Event as defined in the Amended PSA. |
| **SEC Filing:** | No later than 7 a.m. ET on Tuesday May 10, 2011, the Debtors will issue an 8K with the Securities and Exchange Commission, together with a copy of the Amended Plan Term Sheet and this term sheet, announcing the terms of the Amended Plan Term Sheet, along with the committee's support thereof and thereto, and an estimate of the range of general unsecured claims expected in the cases. |

Date:    May 9, 2011

By: /s/ *Daniel J. DeFranceschi*
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Tyler D. Semmelman (No. 5386)

RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

Brad B. Erens
Timothy W. Hoffmann
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION

By: /s/ *Robert J. Dehney*
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Andrew Remming (No. 5120)

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP
1201 North Market Street, 18th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Erez E. Gilad
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

ATTORNEYS FOR THE AD HOC
COMMITTEE

Date:    May 9, 2011

By: /s/ *Laura Davis Jones*
Laura Davis Jones (Bar No. 2436)
Bradford J. Sandler (Bar No. 4142)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

-and-

LOWENSTEIN SANDLER PC
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Thomas A. Pitta, Esq.
Nicole Stefanelli, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

PROPOSED COUNSEL TO OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

By:  /s/ *Michael R. Nestor*
Michael R. Nestor, Esq.
Edmon L. Morton, Esq.
Donald J. Bowman, Jr., Esq.
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Thomas B. Walper, Esq.
Seth Goldman, Esq.
MUNGER, TOLLES & OLSON LLP
255 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9554

ATTORNEYS FOR WASSERSTEIN
PARTNERS LP AND WASSERSTEIN & CO.,
LP

**[Amended Plan Term Sheet]**

**EXHIBIT A**

**THIS TERM SHEET IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS WITH RESPECT TO ANY RESTRUCTURING OR PRE-ARRANGED PLAN OR AN OFFER OR SOLICITATION FOR THE SALE OF SECURITIES OF ANY KIND.**

***TERMS FOR PROPOSED RESTRUCTURING OF HARRY & DAVID HOLDINGS, INC.***

May 9, 2011

This term sheet ("Term Sheet"), which amends and restates Exhibit A to the Support Agreement dated March 27, 2011 (the "Support Agreement"), describes certain of the principal terms of a proposed restructuring (the "Restructuring") for Harry & David Holdings, Inc., and its direct and indirect subsidiaries (together "HD"). As described in greater detail herein, the Restructuring shall be consummated through the "Pre-Arranged Plan" (as defined in the Support Agreement) pursuant to voluntary chapter 11 cases (the "Cases") to be filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

As used herein, the term "Holders" refers to holders of HD's outstanding Senior Floating Rate Notes due 2012 and 9.0% Senior Notes dues 2013 (the "Notes") issued under that certain indenture dated February 25, 2005 (the "Indenture").

| | |
|---|---|
| **The Restructuring** | The Restructuring set forth in this Term Sheet is intended to be effected through the Pre-Arranged Plan, pursuant to which: |
| | (a) Each Holder shall receive (i) its pro rata share (subject to adjustment for the Non-Accredited Investor Distribution) of approximately 122,262 shares of new common stock (the "HD Shares") of the holding company ("Reorganized Holdings") of the reorganized debtors (the "Reorganized Debtors") to be issued and outstanding as of the effective date of the Pre-Arranged Plan (the "Effective Date"), plus (ii) each Holder that timely and validly certifies that it is an Accredited Investor (as defined below) shall receive its pro rata share (based on the amount of such Holder's allowed claim with respect to the Notes relative to the total amount of allowed claims of all Accredited Investors with respect to the Notes) of non-transferable subscription rights ("Subscription Rights") to acquire up to approximately 733,333 HD Shares in connection with the HD Rights Offering (as defined below). Each Holder that timely and validly certifies that it is not an Accredited Investor shall be entitled to receive, in lieu of Subscription Rights, the Non-Accredited Investor Distribution (defined below). |
| | (b) Each holder of an allowed general unsecured claim (other than the Holders or the PBGC) against the Debtors ("Unsecured Creditors") shall receive cash in an amount equal to 10% of the amount of such Unsecured Creditor's allowed general unsecured claim. |
| | (c) The treatment of the claim of the PBGC in connection with any distress termination of the Pension Plan shall be as determined by HD and the Requisite Principal Holders (as defined in the Support Agreement). |
| | (d) The Reorganized Debtors shall raise approximately $55 million in equity capital through the HD Rights Offering described herein. |
| **Implementation of the Restructuring** | HD and the Principal Holders shall mutually agree upon the list of the definitive documentation required for the Restructuring, including, without limitation, the |

Pre-Arranged Plan, Disclosure Statement and all other documents or forms related to solicitation, the HD Backstop Agreement and all other documents or forms related to the HD Rights Offering, DIP Financing Agreements and related documentation, Charter and By-laws and other organizational documents for the Reorganized Debtors, Exit Financing Agreement and related documentation, MSA and Releases (each as defined below or in the Support Agreement), Schedule of Assumed Executory Contracts (defined below) and all of the documents, notes, certificates or instruments related to each of the foregoing (as amended, modified, or supplemented from time to time in accordance with the terms hereof, the "<u>Definitive Restructuring Documents</u>"). Each of the Definitive Restructuring Documents shall reflect the terms and conditions set forth herein and shall be reasonably acceptable to the Requisite Principal Holders and HD.

HD shall solicit acceptances of the Pre-Arranged Plan on the terms set forth herein and such other terms as are mutually acceptable to the Requisite Principal Holders and HD pursuant to which HD shall emerge from bankruptcy as Reorganized Debtors. The Pre-Arranged Plan shall satisfy the requirements of the Bankruptcy Code with respect to all classes of claims and interests.

| | |
|---|---|
| **Documentation and Timing** | All documentation prepared in connection with the Restructuring, including without limitation, the Definitive Restructuring Documents, and any documents, motions, pleadings, orders or similar documentation prepared or filed by HD in connection with the Restructuring, shall be in form and substance reasonably satisfactory to the Requisite Principal Holders and reasonably acceptable to HD. |

The HD Backstop Agreement shall have been executed prior to the Petition Date and shall be consistent with the terms hereof and shall otherwise be satisfactory to the Requisite Principal Holders.

A $55 million junior term loan ("<u>DIP Notes Facility</u>") to be provided by some or all of the Principal Holders (in their capacity as such, the "<u>DIP Lenders</u>") and $100 million senior asset based credit facility ("<u>DIP ABL Facility</u>" and together with the DIP Notes Facility, the "<u>DIP Financings</u>") for debtor-in-possession financing shall have been agreed upon and committed no later than the Petition Date on terms satisfactory to the Requisite Principal Holders, and shall be the subject of a motion for approval to be filed no later than the Petition Date, and shall receive interim approval within three (3) calendar days after the Petition Date and final approval by May 11, 2011.

| | |
|---|---|
| **DIP Notes Facility** | Estimated Allowed Amount: $55 million. Paid in full in cash on the Effective Date or satisfied on another basis agreed upon by HD and all of the DIP Lenders. |
| **DIP ABL Facility** | The DIP ABL Facility shall replace the prepetition asset based facility (see below) pursuant to a credit agreement with UBS and Ally Commercial Finance (the "<u>ABL Lenders</u>") which shall provide a $100 million asset based facility, on the terms of the commitment letter dated March 25, 2011 provided by the ABL Lenders, and which shall convert into the Exit ABL Facility (defined below), and the definitive documentation with respect thereto shall be reasonably satisfactory to the Requisite Principal Holders. |
| **Exit ABL Facility** | On the Effective Date, the Reorganized Debtors shall enter into the $100 million Exit ABL Facility (as defined in the Support Agreement), on the terms of the commitment letter dated March 25, 2011 provided by the ABL Lenders, and the definitive documentation with respect thereto shall be reasonably satisfactory to the Requisite Principal Holders. |

| | |
|---|---|
| **Administrative Expense Claims and Priority Tax Claims** | Paid in full in cash on the Effective Date or on such other terms as a holder of such claim may agree upon the prior written consent of the Requisite Principal Holders. |
| **Secured Claims** | The holders of pre-petition Secured Claims shall receive, at the option of HD or Reorganized Holdings, as the case may be, one of the following treatments: (a) payment in full on the Effective Date, (b) the return of the property securing such claim or (c) such other treatment that satisfies the requirements of section 1129 of the Bankruptcy Code, in each case as consented to by the Requisite Principal Holders. |
| **ABL Facility with UBS and Ally Commercial Finance** | Replaced by the DIP or Exit ABL Facility. |
| **Trade and Other Unsecured Claims** | Each Unsecured Creditor shall be entitled to receive cash in an amount equal to 10% of the amount of such Unsecured Creditor's allowed general unsecured claim (the "GUC Cash Payment"), payable on such dates, in such installments, and upon such terms as set forth below under "Terms of Payment of GUC Cash Payment and Non-Accredited Investor Payment." |
| | Only the Debtors or the Reorganized Debtors, as the case may be, shall have the authority to file (if applicable), settle, compromise, withdraw or litigate to judgment objections to all claims. |
| **Convenience Class** | A convenience class may exist under the Pre-Arranged Plan to pay in cash certain claims not to exceed such dollar thresholds, and in such percentage recovery amounts, as the Requisite Principal Holders and HD shall mutually agree prior to the filing of the Pre-Arranged Plan, or, if such parties so agree, there shall be no convenience class under the plan. |
| **Senior Floating Rate Notes due 2012 and 9.0% Senior Notes due 2013** | Estimated Allowed Amount: approximately $206.5 million (including approximately $8.1 million of accrued interest up to the Petition Date). |
| | Each Holder with an allowed claim under the Notes (the "Notes Claim") shall be entitled to receive (a) its pro rata share (based on such Holder's Notes Claim relative to the total amount of Notes Claims) of 122,262 HD Shares outstanding as of the Effective Date (subject to adjustment for the Non-Accredited Investor Distribution) (the "Initial Share Pool"), and (b) each Holder that timely and validly certifies that it is an "Accredited Investor" as defined in Rule 501 promulgated under the Securities Act (an "Accredited Investor") shall receive its pro rata share (based on the amount of such Holder's allowed claim with respect to the Notes relative to the total amount of allowed claims of all Accredited Investors with respect to the Notes) of Subscription Rights to acquire up to approximately 733,333 HD Shares in connection with the HD Rights Offering to the extent such Holder complies with the Rights Offering Procedures (defined below). Each Holder that timely and validly certifies that it is not an Accredited Investor shall be entitled to receive, in lieu of Subscription Rights (and at the option of the Requisite Principal Holders, in their sole discretion, which option may be exercised up to the date of entry of an order by the Bankruptcy Court approving the Disclosure Statement), an amount equal to the difference between (x) the value of the distribution received pursuant to (a) above (based on the valuation under the Pre-Arranged Plan) and (y) 10% of the total amount of allowed Notes Claim held by such Holder, in the form of either of the |

following (the "Non-Accredited Investor Distribution"): (1) cash (the "Non-Accredited Investor Payment"), payable on such dates, in such installments, and upon such terms as set forth below under "Terms of Payment of GUC Cash Payment and Non-Accredited Investor Payment"; or (2) HD Shares (the "Non-Accredited Investor Shares"). Any Non-Accredited Investor Shares distributed as the Non-Accredited Investor Distribution shall reduce, on a share for share basis, the number of HD Shares in the Initial Share Pool.

| | |
|---|---|
| **Terms of Payment of GUC Cash Payment and Non-Accredited Investor Payment** | The GUC Cash Payment shall be paid as follows: 40% of the GUC Cash Payment (up to $1,600,000) shall be disbursed on the first Monday following the end of fiscal August 2012 (the "2012 Payment"); 60% of the GUC Cash Payment (up to $2,400,000) shall be disbursed on the first Monday following the end of fiscal August 2013 (the "2013 Payment"); and if the GUC Cash Payment exceeds $4 million in the aggregate, the amount over $4.0 million shall be disbursed on the first Monday following the end of fiscal August 2014 (the "2014 Payment"). To the extent an Unsecured Creditor's general unsecured claim remains contingent, unliquidated or disputed as of the 2014 Payment date, the GUC Cash Payment to which that Unsecured Creditor is entitled shall be paid as soon as practicable following the date such Unsecured Creditor's claim is allowed. |

The Non-Accredited Investor Payment shall be paid as follows: 40% of the Non-Accredited Investor Payment shall be disbursed on the first Monday following the end of fiscal August 2012 and 60% of the Non-Accredited Investor Payment shall be disbursed on the first Monday following the end of fiscal August 2013.

As set forth in the Pre-Arranged Plan, all unpaid distributions on allowed general unsecured claims held by Unsecured Creditors shall accrue interest at the annual rate of 5% from the Effective Date through the applicable payment date referenced above. The Reorganized Debtors, or an agent appointed by the Reorganized Debtors, shall serve as disbursing agent with respect to all distributions of the GUC Cash Payment and the Non-Accredited Investor Payment.

The GUC Cash Payment and the Non-Accredited Investor Payment shall be due and payable upon the occurrence of a Liquidity Event with respect to Reorganized HD.

For the purposes of this Term Sheet, **"Liquidity Event"** means (a) the closing of the sale, transfer or other disposition of all or substantially all of Reorganized HD's (and its subsidiaries) assets, (b) the consummation of the merger or consolidation of Reorganized HD with or into another entity, pursuant to which the holders of HD Shares receive cash, securities or other compensation, (c) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of Reorganized HD's securities), of the HD Shares if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding HD Shares (or the common equity of the surviving or acquiring entity), (d) an initial public offering of the stock of Reorganized HD, or (e) a liquidation, dissolution or winding up of Reorganized HD.

| | |
|---|---|
| **Existing Common Equity** | No distribution; cancelled. |
| **Intercompany Claims** | Reinstated. |
| **Pension Plan** | Unless otherwise agreed by the Requisite Principal Holders, no later than May 9, |

2011 (or such later date as agreed by the Requisite Principal Holders), HD shall file a motion, in form and substance reasonably acceptable to the Requisite Principal Holders, seeking a determination from the Bankruptcy Court that HD's qualified pension plan (the "Pension Plan") meets the requirements of the distress termination reorganization test under section 4041(c) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA"), and a final non-appealable order of the Bankruptcy Court approving such motion is entered no later than the date the order confirming the Pre-Arranged Plan is entered.

Treatment of the Pension Plan and all claims held by the PBGC under the Pre-Arranged Plan shall be satisfactory to HD and the Requisite Principal Holders.

| | |
|---|---|
| **Executory Contracts** | No later than 14 days prior to the deadline to vote on the Pre-Arranged Plan, HD shall present to the Principal Holders a schedule of executory contracts and unexpired leases the Debtors intend to assume, which schedule, prior to filing with the Bankruptcy Court, shall be in form and substance reasonably acceptable to the Requisite Principal Holders (the "Schedule of Assumed Executory Contracts").  All other executory contracts and unexpired leases shall be rejected as of the Effective Date.  HD reserves the right, at any time prior to the effective date of the Pre-Arranged Plan, to amend the schedule of executory contracts and unexpired leases the Debtors intend to assume to:  (a) delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant to the Pre-Arranged Plan; or (b) add any executory contract or unexpired lease to the schedule, thus providing for its assumption pursuant to the Pre-Arranged Plan, in each case (in the case of clause (a) or (b), with the written consent of the Requisite Principal Holders). |
| **New Common Shares** | On the Effective Date and in connection with the HD Rights Offering (as defined herein), Reorganized Holdings, Inc. shall issue approximately 955,595 HD shares. Those shares not necessary to satisfy obligations under the Pre-Arranged Plan shall be cancelled. |
| **Equity Raise Upon Bankruptcy Exit** | HD shall raise $55.0 million in capital through the consummation of a rights offering (the "HD Rights Offering"), pursuant to which Subscription Rights to acquire HD Shares shall be made available to all eligible Holders of Notes that timely and validly certify that they are Accredited Investors (collectively, the "RO Participants").  Each of the RO Participants shall have the right to elect to participate in the HD Rights Offering and to subscribe to HD Shares pro-rata based on the dollar amount of such RO Participant's allowed Notes Claim relative to aggregate the dollar amount of all RO Participants' allowed Notes Claims, for an exercise price of $75 per HD Share, reflecting a 25% discount to the Pre-Arranged Plan's implied equity value of $100 per share as of the Effective Date. |

The HD Rights Offering will be backstopped in an amount of $55 million by those Principal Holders (the "Backstop Parties") that enter into a backstop agreement in form and substance satisfactory to HD and the Backstop Parties (the "HD Backstop Agreement").  The Backstop Fee will become payable to the Backstop Parties only upon completion of the HD Rights Offering and, if necessary, the purchase of HD Shares by the Backstop Parties pursuant to their obligations under the HD Backstop Agreement.  The Backstop Parties shall subscribe to any HD Shares not purchased by the exercise deadline in the HD Rights Offering, subject to the terms and conditions contained in the HD Backstop Agreement.

**Backstop Fee**:  As consideration for the performance of their obligations under

the HD Backstop Agreement, the Backstop Parties shall receive back-stop consideration of 50,000 HD Shares, to be shared pro-rata based on each party's backstop commitment under the HD Backstop Agreement. In addition, the Backstop Parties shall be entitled to the reimbursement of all of their reasonable fees and expenses pursuant to the terms of the HD Backstop Agreement.

**Break-up Fee**: $1.1 million (the "Break-Up Fee"), payable pro-rata in cash to the Backstop Parties in accordance with the terms of the HD Backstop Agreement.

The rights offering procedures to be utilized in connection with the HD Rights Offering (the "Rights Offering Procedures") shall be reasonably satisfactory to HD and the Backstop Parties. HD shall, within eight (8) calendar days after the Petition Date, file motions seeking approval for (1) certain procedures related to the pre-screening of Accredited Investors in connection with the HD Rights Offering, (2) entry into the HD Backstop Agreement and the payment of all fees thereunder, including the Break Up Fee, and (3) a bar date, each in form and substance reasonably acceptable to the Backstop Parties, and HD shall obtain entry of an order of the Bankruptcy Court approving such motions by May 11, 2011. HD shall modify the relief sought in connection with the pending motion related to the pre-screening of Accredited Investors to require that each Holder affirmatively and timely certify whether or not it is an Accredited Investor, and to provide that each Holder that fails to timely submit such certification shall not be entitled to any Non-Accredited Investor Distribution.

**Mechanics and Conditions to Effectiveness of Plan**

The Pre-Arranged Plan shall contain usual and customary conditions to confirmation and effectiveness, as well as such other conditions that are satisfactory to the Requisite Principal Holders, including, without limitation, the following:

(i) the Pre-Arranged Plan and Definitive Restructuring Documents shall be in form and substance reasonably satisfactory to HD and the Requisite Principal Holders, and the provisions of the Pre-Arranged Plan related to the treatment of General Unsecured Creditors shall be consistent in all material respects with this Term Sheet;

(ii) the Bankruptcy Court shall have entered an order, in form and substance satisfactory to HD and the Requisite Principal Holders, confirming the Pre-Arranged Plan and such order shall not have been stayed or modified or subject to an appeal;

(iii) the conditions to effectiveness of the HD Backstop Agreement shall have been satisfied and the HD Backstop Agreement shall be in full force and effect;

(iv) all fees and expenses of the Principal Holders as set forth in the Support Agreement, this Term Sheet and the HD Backstop Agreement shall have been paid in full in cash;

(v) the Exit Facility, including all documentation related thereto, shall each be in form and substance reasonably satisfactory to the Requisite Principal Holders, and shall have been consummated;

(vi) the Debtors shall have paid all of the Backstop Parties' fees and expenses under the HD Backstop Agreement;

(vii) either (a) the Pension Plan shall have been terminated under either section

4041(c) or section 4042 of ERISA, or (b) the treatment of the Pension Plan shall otherwise be satisfactory to the Requisite Principal Holders;

(viii)     All employment arrangements of senior management as of the Effective Date shall be reasonably satisfactory to the Requisite Principal Holders; and

(ix) all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Term Sheet shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.

**Releases**

To the fullest extent permitted by applicable law, each of (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Lenders, (d) the Backstop Parties, (e) the Principal Holders, (f) the Committee and its members, and (f) the respective officers and directors, members, employees, agents, affiliates, and advisors of the persons or entities described in clauses (a) through (e), shall be released of any and all claims or causes of action, known or unknown, of HD or its creditors or shareholders arising from or in connection with the Pre-Arranged Plan or arising at any time on or before the Effective Date of the Pre-Arranged Plan in connection with or related to HD, subject to standard exceptions for gross negligence or willful misconduct (collectively, the "Releases"). In addition, the Pre-Arranged Plan shall contain standard exculpation provisions.

**Tax Issues**

HD and the Requisite Principal Holders shall discuss methods to preserve value of any available NOLs and other tax considerations, including such other restructuring transactions as necessary to maximize value of the Reorganized Debtors

**Fees & Expenses**

HD agrees to pay on the Effective Date, to the extent not already paid (a) all reasonable and documented fees, costs, expenses and disbursements of (i) Stroock & Stroock & Lavan LLP and its local counsel, (ii) Munger, Tolles & Olson LLP and its local counsel, (iii) Akin Gump Strauss Hauer & Feld LLP, and (iv) Moelis & Company ("Moelis") (it being understood that, notwithstanding anything contained herein to the contrary, with respect to Moelis, on the Effective Date, HD shall pay in cash all monthly fees accrued during the Cases, to the extent not already paid, at the rate of $125,000 per month, as well as a transaction fee in the amount of $1.25 million (subject to the "Monthly Fee Credit" contained in clause 2(a)(ii) of the pre-petition letter agreement between Moelis and HD)), and (b) all documented and out-of-pocket fees, costs and expenses of each of the Principal Holders (but not legal, financial advisor or other consulting or professional fees), in each case, solely in connection with the negotiation, formulation, preparation, execution, delivery and consummation of this Agreement, the Restructuring Documents, the Pre-Arranged Pan, the transactions contemplated hereunder and the Restructuring Documents and all transactions related thereto. None of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Copies of any such invoices shall be provided to the U.S. Trustee and counsel to the Committee, as redacted to protect against the disclosure of privileged and/or confidential information.

The Principal Holders are familiar with, and, where applicable and requested,

have been provided with a copy of the engagement agreements or reimbursement agreements (as applicable) signed by HD with Rothschild Inc., Alvarez & Marsal, and Moelis & Company. Each of the Principal Holders acknowledge the terms of these engagements as in effect of the date hereof (and, in the case of Moelis, as modified by the terms hereof) and waives any objection to the structure thereof. Each of the Principal Holders, however, expressly preserve all other fee or expense related objections.

**Management Incentive Plan**

Up to 10% of the HD Shares (or options to purchase HD Shares that would have the effect of diluting Reorganized Holdings' then existing stock by no more than 10% on a fully diluted basis) will be reserved to provide to management in connection with a management incentive plan after giving effect to all transactions contemplated herein ("MIP"). The terms of the MIP will be established by the Board of Directors of the Reorganized Debtors.

**Avoidance Actions**

All avoidance actions shall be released as of the date of entry of the confirmation order, subject to the occurrence of the Effective Date.

**Classification**

Classification under the Pre-Arranged Plan shall be satisfactory to the Requisite Principal Holders and HD.

**Board of Directors of Restructured HD**

Upon the Effective Date, the initial Board of Directors of Reorganized Holdings shall be comprised of five members, of which 2 shall be selected by Wasserstein & Co. (the "WC Directors") and 2 shall be selected by the other Principal Holders (the "Principal Holder Directors"), and one shall be the then CEO of Reorganized Holdings (except during any period in which there is an interim CEO, in which event such fifth director shall be a person acceptable to WC and to the Requisite Principal Holders) with any future CEO who replaces the then-CEO as of the Effective Date shall fill the CEO board seat. The CEO shall be acceptable to the Requisite Principal Holders. Each new Board member shall be entitled to a D & O Indemnification Agreement in form reasonably acceptable to such member and Reorganized HD upon his or her appointment.

The Board of Directors will be divided into three classes. The initial directors will serve terms of 1, 2 or 3 years each (each term expiring immediately after the annual stockholder meeting in the year indicated below), as follows:

Class III (Term expiring in three years) 2 directors
Class II (Term expiring in two years) 2 directors
Class I (Term expiring in one year) 1 director

On and after the Effective Date, the Board of Directors will be constituted as follows:

(a) Class III will consist of one of the WC Directors and one of the Principal Holder Directors;

(b) Class II will consist of one of the WC Directors and one of the Principal Holder Directors; and (c) Class I will consist of HD's then-CEO.

**Protective Voting Provisions**

The consent of four (4) of five (5) members of the Board of Directors shall be required for actions requiring supermajority approval, including, but not limited to, the following:

i.  enter into a transaction for a sale of all or substantially all of the Reorganized Debtors' parent company or its subsidiaries by way of an asset sale, stock sale, tender offer, merger or other business combination;

ii.  declare or pay any dividend or any other distribution on, or repurchase, any of the HD Shares or other of its equity securities; provided that any such distribution or repurchase shall be on a pro rata basis;

iii.  enter into transactions with affiliates (as defined in the Securities and Exchange Act of 1933) involving the acquisition by any of the Reorganized Debtors of any entity controlled by an affiliate, the sale of material assets of any of the Reorganized Debtors to an affiliate or any entity controlled by an affiliate, or the payment of a fee to an affiliate for the provision of services to any of the Reorganized Debtors; *provided*, *however*, that this section shall not apply to the MSA (defined below); and

iv.  take other material actions to be set forth in the by-laws as shall be agreed upon by the Principal Holders and any other parties thereto no later than the Effective Date, including but not limited to new equity issuances, material acquisitions, material debt incurrence, and public/private decisions.

**Charter Documents**

All organizational and charter documents for the Reorganized Debtors shall be satisfactory to HD and the Requisite Principal Holders and consistent herewith. The certificate of incorporation shall provide for a staggered board (as described above).

As of the Effective Date, Reorganized HD shall post on its website all information required under Rule 144A(d)(4) under the Securities Act of 1933 for shareholders that are qualified institutional buyers, and, after one year from the Effective Date, all information required under Rule 144(c) under the Securities Act of 1933.

**Distributions to Equity**

Prior to the payment of the 2012 Payment, Reorganized HD shall not make any dividends or equity distributions to the holders of HD Shares. Simultaneously with or after the payment of the 2012 Payment, Reorganized HD shall be entitled to pay dividends or equity distributions to holders of HD Shares, in one or more dividends or distributions, in an amount not to exceed $10.5 million in the aggregate. Simultaneously with or after the payment of the 2013 Payment, Reorganized HD shall be entitled to pay dividends or equity distributions to holders of HD Shares, in one or more dividends or distributions, in an amount not to exceed $25.0 million in the aggregate (such $25.0 million to include the $10.5 million of aggregate dividends or distributions previously paid on the date of or following the 2012 Payment). Reorganized HD shall have no further restriction on the payment of any dividend or equity distribution after the 2013 Payment (or to the extent applicable, the 2014 Payment) has been paid in full, provided however that this provision shall have no impact on the terms of the Exit ABL Facility.

**WC Post-Emergence Management Services and Fees**

Notwithstanding that Wasserstein & Co. ("WC") shall be only a minority owner of the Reorganized Debtors, following the Effective Date, WC shall provide to the Reorganized Debtors full oversight and management services commensurate with those resources customarily dedicated to an actively managed portfolio company, as mutually agreed upon by the Requisite Principal Holders and to be set forth in a management services agreement ("MSA"), which shall be consistent with this Term Sheet and otherwise in form and substance satisfactory to the Requisite Principal

Holders.  The services shall include the following:

i.   Provide assistance and oversight in the execution of the purchasing and vendor optimization, supply chain optimization, SKU rationalization, IT migration, outsourcing and other operational initiatives outlined in the Reorganized Debtor's business plan;

ii.  Provide assistance and analysis for preparation of budgets, forecasts and capital spending plans, and assess and monitor the Reorganized Debtors' performance against the Reorganized Debtors' business plan;

iii. Assistance in management recruitment and compensation review;

iv.  Assistance in the preparation of reporting to constituencies; and

v.   At the direction of the Board of Directors, analytical and strategy assistance, including  identification, evaluation and execution of acquisition or divestiture opportunities, and debt financings / refinancings.

In consideration of WC providing the foregoing services under the MSA to the Reorganized Debtors following the Effective Date, WC shall receive the following compensation:  (a) 50,000 HD Shares on the Effective Date, and (b) following the Effective Date, an annual management fee, as described below, in accordance with and subject to the terms and conditions of the MSA.

Annual Management Fee:  WC shall be entitled to receive a percentage of an annual base fee of $625,000 (the "Base Fee") based on the Reorganized Debtors' achievement of Adjusted EBITDA targets as follows:

Plan Targets for Adjusted EBITDA:

FY12: $21.03 million
FY13: $26.28 million
FY14: $32.09 million
FY15: $39.16 million
FY16: $45.68 million
FY17 and thereafter, if necessary, to be determined by amendment to the MSA

| Percentage of Plan Target | Percentage of Base Fee Payable |
|---|---|
| | |
| 100% or more | 100% |
| At least 90% but less than 100% | 80% |
| At least 80% but less than 90% | 60% |
| Less than 80% | 0% |

The plan targets are based on Adjusted EBITDA as calculated and used in a manner that is consistent with past practice of HD and HD's business plan.

The Base Fee shall be paid 50% (i.e., $312,500) upon the closing of the books and records for the second quarter of each fiscal year (subject to a true-up adjustment at the end of the fiscal year), and the balance paid upon completion of HD's annual audited financial statements;  *provided*, *however*, that no fee shall be payable at any time for any period after WC (including its affiliates and investment funds and

its/their limited partners who received HD Shares in a distribution) owns less than 90% of the HD Shares that WC receives on the Effective Date under or in connection with the Pre-Arranged Plan.

**No Waiver**

Nothing herein shall affect in any way, nor be deemed a waiver of, any of the rights of HD or any Holder under the Indenture or any other document or under applicable law. Nothing herein is intended to waive, limit, or restrict the ability of any of the foregoing parties, in whatever capacity, to protect and preserve their rights, remedies against, and interests in HD or any third party, whether under the Indenture, any other document or applicable law.

**Indenture Trustee**

All reasonable and documented fees and expenses of the Indenture Trustee, to the extent reimbursable under the Indenture, shall be paid in full in cash on the Effective Date.

**[Proposed Final DIP Financing Order]**

```
--------------------------------------------------------------x
                                                   :
In re                                              :    Chapter 11
                                                   :
HARRY & DAVID HOLDINGS, INC, et al.,¹              :    Case No. 11-10884 (MFW)
                                                   :
            Debtors.                               :    (Jointly Administered)
                                                   :
--------------------------------------------------------------x
```
**Re: Docket Nos. 17, 60, 64, 161, 162, 165, 166, 181, 238 & 249**

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 AND 507 AND RULES 2002, 4001, 9014 AND 9018 OF THE FEDERAL RULES OF BANKRUPTCY (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCINGS, (B) USE CASH COLLATERAL AND (C) FILE RELATED FEE LETTERS UNDER SEAL; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, AND (III)  GRANTING RELATED RELIEF**

This matter is before the Court on the motion dated March 28, 2011 (the "Motion")² of Harry & David Holdings, Inc. ("HND") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of an interim order and this final order (this "Final Order"), under sections 105, 107, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rules 4001-2 and 9018-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things, final authorization for the following:

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Harry & David Holdings, Inc. (4389); Harry and David (1765); Harry & David Operations, Inc. (1427); Bear Creek Orchards, Inc. (7216).  The address of each of the Debtors is 2500 South Pacific Highway, Medford, Oregon 97501.

[2] All defined terms shall have the meaning ascribed to them in the DIP Documents (as defined below) unless otherwise defined herein.

A.        DIP Revolving Loan Facility.

(1) authorization for Harry and David, an Oregon corporation (with respect to the DIP Revolving Loan Facility (defined below), the "Borrower") to obtain secured post-petition financing in the form of a senior secured, super-priority revolving asset-based credit facility (the "DIP Revolving Loan Facility") with commitments in an aggregate principal amount up to $100 million, inclusive of letters of credit issued and outstanding under the Prepetition Revolving Loan Documents (as defined below), which shall be deemed to have been issued under the DIP Revolving Loan Facility (together with interest and reasonable fees, charges and expenses that are, in each case, payable under the DIP Revolving Loan Documents) pursuant to that certain $100 million Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of March 29, 2011, by and among the Borrower, Harry & David Holdings, Inc., Bear Creek Orchards, Inc., and Harry & David Operations, Inc., as guarantors, the lenders party thereto, UBS Securities LLC, as lead arranger, UBS Loan Finance LLC, as a lender and as a swingline lender, UBS AG, Stamford Branch, as issuing bank, administrative collateral agent and administrative agent for the lenders (in such capacities, together with its successors and permitted assigns, the "Revolving DIP Agent"), and Ally Commercial Finance LLC, as collateral agent for the lenders, as documentation agent, and as a lender (together with UBS Loan Finance LLC, the "Revolving DIP Lenders"), substantially in the form attached to the Interim Order (defined below) as Exhibit A (as the same may be amended,

-2-

restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Revolving Loan Agreement", and together with any related notes, certificates, agreements, security agreements, documents (including, without limitation, the Fee Letter (as defined in the DIP Revolving Loan Agreement) and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith, the "DIP Revolving Loan Documents"), and (b) for each other Debtor to jointly and severally guarantee the payment and performance of the obligations under the DIP Revolving Loan Facility, in each case, pursuant to the terms of the DIP Revolving Loan Documents and this Final Order;

(2) authorization for the Debtors to execute and enter into the DIP Revolving Loan Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Revolving Loan Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Revolving Loan Documents (the "Revolving DIP Obligations") as such amounts become due and payable;

(3) authorization for the Debtors to grant security interests, liens and super-priority claims (including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) on all of the DIP Collateral (defined

below), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code, to the Revolving DIP Agent, for the benefit of the Revolving DIP Agent and the Revolving DIP Lenders, to secure all of the Debtors' Revolving DIP Obligations, as more fully set forth in this Final Order, in each case, subject to the terms of that certain Intercreditor Agreement dated as of March 29, 2011, substantially in the form attached to the Interim Order as <u>Exhibit B</u> (the "<u>DIP Intercreditor Agreement</u>"), by and between the Revolving DIP Agent and the DIP Notes Agent (defined below);

B.         <u>DIP Notes Facility</u>

(1)   authorization for (a) Harry and David, one of the Debtors (with respect to the DIP Notes Facility (as defined below), the "<u>Issuer</u>"), to obtain secured post-petition financing, consisting of a super-priority junior debtor-in-possession notes facility in an aggregate principal amount not to exceed $55 million (the "<u>DIP Notes Facility</u>" and together with the Revolving DIP Facility, the "<u>DIP Facilities</u>"), pursuant to that certain Junior Secured Super-Priority Debtor-in-Possession Note Purchase Agreement, dated as of March 29, 2011, by and among the Debtors, Wilmington Trust FSB, as administrative agent (in such capacity, together with its successors and permitted assigns, the "<u>DIP Notes Agent</u>", and together with the Revolving DIP Agent, the "<u>DIP Agents</u>"), and each of the DIP Note Purchasers party thereto, substantially in the form attached to the Interim Order as <u>Exhibit C</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "<u>DIP Note Purchase Agreement</u>", and together with any related notes, certificates, agreements, documents and

-4-

instruments, including without limitation, the Fee Letters (as defined in the DIP Note Purchase Agreement) (including any amendments, restatements, supplements or modifications of the foregoing) related to or executed in connection therewith, the "<u>DIP Note Documents</u>", and together with the DIP Revolving Loan Documents, the "<u>DIP Documents</u>"), and (b) for each other Debtor to jointly and severally guarantee the payment and performance of the Issuer's obligations under the DIP Notes Facility on a secured and super-priority basis, as more fully set forth in this Final Order (subject to the terms of the DIP Intercreditor Agreement);

(2) authorization for the Debtors to execute and enter into the DIP Note Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Note Documents including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Note Documents (collectively, the "<u>DIP Note Obligations</u>" and together with the Revolving DIP Obligations, the "<u>DIP Obligations</u>"), as such amounts become due and payable;

(3) authorization for the Debtors to grant security interests, liens and super-priority claims (including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) on all of the DIP Collateral (defined below), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code, to the DIP

Notes Agent, for the benefit of the DIP Notes Agent and the DIP Note

Purchasers, to secure all obligations of the Debtors under and with respect to

the DIP Note Obligations;

C.    Fees and Expenses.

Authorization for the Debtors to make non-refundable payments of the

principal, interest, fees, expenses and other amounts payable under each of the DIP

Documents to the respective DIP Agents, the Revolving DIP Lenders and the DIP Note

Purchasers (collectively, the "DIP Lenders"), in each case, as they become due,

including, without limitation, letter of credit fees (including issuance and other related

charges), continuing commitment fees, closing fees, servicing fees, audit fees, structuring

fees, administrative agent's fees, the fees and disbursements of attorneys, advisers,

accountants, and other consultants, and the legal expenses of the respective DIP Agents

and DIP Lenders, all to the extent provided by and in accordance with the terms of the

respective DIP Documents and the terms hereof.

D.    Cash Collateral.

Authorization for the Debtors' limited use of cash collateral, as such term is

defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), (i) in

which the lenders (such lenders in such capacities, the "Prepetition Revolving Lenders")

under that certain credit agreement dated as of March 20, 2006, as amended by that

certain First Amendment dated as of June 21, 2007, as further amended by that certain

Consent and Second Amendment dated as of August 8, 2008, as further amended by that

certain Third Amendment dated as of July 7, 2010 (as further amended prior to the date

hereof, the "Prepetition Revolving Loan Agreement"), by and among HND, as borrower,

and the other guarantor parties thereto, UBS AG, Stamford Branch, as issuing bank, administrative collateral agent and administrative agent (in such capacity, the "Prepetition Revolving Agent"), GMAC Commercial Finance LLC (n/k/a Ally Commercial Finance LLC) as collateral and documentation agent, UBS Securities LLC as arranger, and UBS Loan Finance LLC as swingline lender, and (ii) the DIP Lenders under the DIP Documents have an interest, subject to the terms and conditions set forth in this Final Order.

E.          Final Relief.

(1) approving the Motion and entry of this Final Order, which authorizes the Debtors, on an final basis, to (A) issue and sell the DIP Notes to the DIP Note Purchasers in an aggregate principal amount of $55 million, subject to the terms and conditions of this Final Order and the DIP Note Documents; and (B) obtain from the Revolving DIP Lenders under the DIP Revolving Loan Facility, revolving loan commitments in an aggregate principal amount not to exceed $100 million

(2) authorizing (i) the issuances of DIP Notes and borrowings under the DIP Facilities on a final basis, as well as the approval of notice procedures with respect thereto, and (ii) the Debtors to enter into an exit financing facility; and

(3) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (a) Debtors, (b) DIP Notes Agent and DIP Note Purchasers, (c) Revolving DIP Agent and Revolving DIP Lenders and (d) Prepetition Revolving Lenders and Prepetition Revolving Agent (collectively, the "Prepetition Secured Entities", and

-7-

together with the DIP Agents and the DIP Lenders, the "Secured Lending Entities") to implement the terms of this Final Order, and as otherwise provided herein.

This Court having found that, under the circumstances, due and sufficient notice of the Motion and Interim and Final Hearings was provided by the Debtors as set forth below, and having held the interim hearing on March 29, 2011 (the "Interim Hearing"); and the Court having entered an order approving the Motion on an interim basis [D.I. 60] (the "Interim Order"); and the Court having held a final hearing on May 10, 2011 (the "Final Hearing"); and after considering all the pleadings filed with this Court, including the First Day Declaration and the testimony proffered or presented in connection therewith at the Interim Hearing and the Final Hearing (together, the "Hearings"); and, as further stated on the record of the Hearings, this Court having overruled any objections to entry of this Final Order in all respects; and upon the record made by the Debtors at the Hearings; and this Court having concluded that the DIP Facilities are otherwise fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and approval of the Motion essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS**:

A. On March 28, 2011 (the "Petition Date"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

-8-

B.  This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  Subject to Paragraph 17 below, the Debtors hereby admit, acknowledge, agree and stipulate that:

(i)    as of the Petition Date, (a) the Debtors' obligations to the Prepetition Revolving Agent and the Prepetition Revolving Lenders pursuant to the Prepetition Revolving Loan Agreement and all the notes, documents, instruments or certificates related to or executed in connection therewith (the "Prepetition Revolving Loan Documents") constitute legal, valid and binding obligations of each of the Debtors; and

(ii)    the liens and security interests (the "Prepetition Revolving Liens") which secure the Debtors' obligations under the Prepetition Loan Documents (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Revolving Loan Documents, the "Prepetition Revolving Obligations"), were granted by the applicable Debtors to the Prepetition Revolving Agent, for its benefit and the benefit of the Prepetition Revolving Lenders, and such liens include a security interest in substantially all of the Debtors' assets as set forth in the Prepetition Revolving Loan Documents (the "Prepetition Collateral"); and

(iii) (a) as of the Petition Date there were no principal amounts outstanding under the Prepetition Revolving Loan Documents but the Debtors were jointly and severally indebted to the Prepetition Secured Parties for (1) $8,464.50 with respect to LC Participation Fees and Fronting Fees (as these terms are defined in the

-9-

Prepetition Revolving Loan Agreement) and (2) $251,596.75 with respect to the Commitment Fee (as that term is defined in the Prepetition Revolving Loan Agreement)[3]; (b) the Prepetition Revolving Obligations constitute legal, valid and binding obligations of each of the Debtors; (c) no offsets, defenses or counterclaims to the Prepetition Revolving Obligations exist; (d) no portion of the Prepetition Revolving Obligations is subject to avoidance, disallowance, reduction, subordination or any challenge of any nature, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Prepetition Revolving Documents are valid and enforceable by the Prepetition Revolving Agent and Prepetition Revolving Lenders against each of the Debtors party thereto; (f) the Prepetition Revolving Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition Collateral, having the priority set forth in the Prepetition Revolving Documents and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, subordination or any other challenge, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (g) no claim of or cause of action held by the Debtors exists against the Prepetition Revolving Agent, the Prepetition Revolving Lenders or their respective affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Revolving Documents (or the transactions

---

[3] As of the Petition Date, there were $891,000 in letters of credit that were issued and outstanding under the Prepetition Revolving Loan Documents that have been fully cash collateralized at 100% of face amount in accordance with the Prepetition Revolving Loan Documents. Such letters of credit shall be deemed to have been issued under the DIP Revolving Loan Facility (together with interest and reasonable fees, charges and expenses that are, in each case, payable under the DIP Revolving Loan Documents).

NY 73355216v6
RLF1 4007871v. 1

contemplated thereunder), Prepetition Revolving Obligations or Prepetition Revolving Liens, including without limitation, any right to assert any disgorgement or recovery, and the Debtors hereby release the Prepetition Revolving Agent and the Prepetition Revolving Lenders from any and all such claims or causes of action.

D. Subject to Paragraph 17 below, the Debtors hereby further admit, acknowledge, agree and stipulate that:

(i)     as of the Petition Date, (a) the Debtors' obligations (the "Prepetition Note Obligations") under the Senior Floating Rate Notes due 2012 and 9.0% Senior Notes due 2013 (collectively, the "Prepetition Notes" and the holders thereof, solely in their capacity as holders of Prepetition Notes, the "Prepetition Noteholders") issued pursuant to that certain indenture dated February 25, 2005, by and among Harry and David, as issuer, the guarantors party thereto, and Wells Fargo Bank, N.A., as indenture trustee (the "Indenture Trustee" and together with the Prepetition Noteholders, the "Noteholder Parties"), and all the notes, documents, instruments or certificates related to or executed in connection therewith (the "Prepetition Note Documents") constitute legal, valid and binding obligations of each of the Debtors; and

(ii) (a) as of the Petition Date, there was at least approximately $198 million in principal amount outstanding under the Notes (exclusive of any and all interest, fees, costs or other amounts that accrued but were unpaid as of the Petition Date and exclusive of any Notes owned by the Debtors); (b) the Prepetition Note Obligations constitute legal, valid and binding obligations of each of the Debtors; (c) no offsets, defenses or counterclaims to the Prepetition Note Obligations exist; (d) no portion of the Prepetition Note Obligations is subject to avoidance, disallowance, reduction,

subordination or any challenge of any nature, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Prepetition Note Documents are valid and enforceable by the Noteholder Parties against each of the Debtors party thereto; and (f) no claim of or cause of action held by the Debtors exists against the Noteholder Parties or their respective affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Note Documents (or the transactions contemplated thereunder) or Prepetition Note Obligations, including without limitation, any right to assert any disgorgement or recovery, and the Debtors hereby release the Noteholder Parties from any and all such claims or causes of action.

E.   Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facilities.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees, make capital expenditures, purchase and supply new inventory and otherwise finance their operations is essential to the Debtors' continued viability.  In addition, based on the record presented at the Hearings: (i) the Debtors' critical need for financing is immediate; (ii) in the absence of the DIP Facilities, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; and (iii) the preservation,

NY 73355216v6
RLF1 4007871v. 1

maintenance and enhancement of the going concern value of the Debtors' estates are of the utmost significance and importance to a successful reorganization of the Debtors.

F.  The Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facilities, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  New credit is unavailable to the Debtors without providing the DIP Super-Priority Claims (as defined below) and the DIP Liens (as defined below) in the DIP Collateral (as defined below) to the respective DIP Agents and DIP Lenders (as applicable), as provided herein.

G.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facilities as set forth in the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) each of the DIP Facilities and the DIP Documents has been negotiated in good faith and at arm's length among the Debtors and the applicable DIP Agents and DIP Lenders, and (iii) any credit extended, loans made and other financial accommodations extended or made to the Debtors by the DIP Lenders have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

H.  The Prepetition Revolving Agent, on behalf of the Prepetition Revolving Lenders, and each of the Prepetition Revolving Lenders have each consented to the financing arrangements, liens and security interests contemplated by this Final Order and the DIP Documents on the terms and conditions set forth in this Final Order and the DIP Documents respectively.

NY 73355216v6
RLF1 4007871v. 1

I.     Notice of the Final Hearing and the entry of this Final Order, in accordance with the Interim Order, has been provided to: (i) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) counsel to the Debtors' proposed postpetition secured lenders (iv) the Securities and Exchange Commission; (v) counsel to the DIP Notes Agent; (vi) counsel to the Revolving DIP Agent; (vii) the Prepetition Revolving Agent; (viii) counsel to that certain ad hoc committee of holders of the Notes (the "Ad Hoc Committee"); (ix) proposed counsel to the official committee of unsecured creditors; and (x) any other parties requesting such notice (collectively, the "Notice Parties"). Requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Final Order.

J.     This Court concludes that entry of this Final Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based on the foregoing, and upon the record made before this Court at the Hearings, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     Approval of Final Order.  The Motion is approved on a final basis, subject to the terms and conditions set forth in this Final Order.  Any objections that have not previously been withdrawn are hereby overruled on the merits.  All actions taken by any Debtor, the DIP Agents, the Revolving DIP Lenders, the New Note Purchasers or the Initial Note Purchasers, in

-14-

each case, in connection with or in reliance upon the Interim Order are hereby reaffirmed in full as if taken in connection with or in reliance upon this Final Order.

2. **Approval of DIP Documents; Authority Thereunder.** The Debtors are hereby authorized and directed, on a final basis, to enter into the DIP Documents and such additional documents, instruments and agreements as may be required or requested by either of the DIP Agents or the DIP Lenders to implement the terms or effectuate the purposes of this Final Order. The Debtors are authorized and directed, on a final basis, to comply with and perform all of the terms and conditions contained in the DIP Documents. The Issuer or Borrower, as the case may be, is/are directed, on a final basis, to repay amounts outstanding with respect to the DIP Facilities, and with respect to the DIP Notes Facility, each other Debtor is further directed to repay amounts guaranteed, together with interest, fees and premiums (as applicable) thereon and any other outstanding DIP Obligations to the DIP Lenders in accordance with and subject to the terms and conditions set forth in the respective DIP Documents, the DIP Intercreditor Agreement and this Final Order. Pursuant to sections 105(a) and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure, the Debtors are authorized to file the Fee Letters under seal. The terms of the Fee Letters (as defined in each of the DIP Notes Purchase Agreement and DIP Revolving Loan Agreement) are approved on a final basis, and the Debtors are authorized to pay all amounts due thereunder, including any break-up or expense reimbursement fees, which shall be deemed allowed as administrative expenses under section 503(b) of the Bankruptcy Code and deemed earned on the Closing Date, in accordance with the terms of the Fee Letters. Any DIP Documents entered into by any Debtor, the DIP Agents, the Revolving DIP Lenders, the New Note Purchasers or the Initial Note Purchasers, in each case, prior to the date of this Final Order in accordance with the terms and conditions of the

NY 73355216v6
RLF1 4007871v. 1

Interim Order (including, without limitation the Eligible Holder Commitments (as defined in the DIP Note Purchase Agreement)) are hereby approved and ratified in full.

3. <u>Syndication Procedures With Respect to DIP Notes Facility</u>. The syndication procedures contained in the DIP Note Purchase Agreement (the "<u>Syndication Procedures</u>") are hereby approved and shall be binding upon all parties in interest, including, without limitation, the Debtors, the DIP Notes Agent, each Initial Note Purchaser each Eligible Holder (as defined in the DIP Note Purchase Agreement). The filing of the Motion, the execution of the DIP Note Purchase Agreement and the issuance and sale of the DIP Notes pursuant to the DIP Note Purchase Agreement (including, without limitation, the Syndication Procedures), the Interim Order and this Final Order complies with applicable state and federal securities laws. The DIP Notes Agent and the Initial DIP Note Purchasers, as applicable, shall have no liability whatsoever in respect of the Syndication Procedures.

4. <u>Authorization to Issue/Sell DIP Notes and Borrow</u>. For so long as the Debtors are not in default under the terms of this Final Order or the DIP Documents (and have satisfied the conditions precedent contained in the DIP Documents), the Debtors are immediately authorized to (i) issue and sell DIP Notes to the DIP Note Purchasers under the DIP Note Facility, and (ii) borrow from the Revolving DIP Lenders under the DIP Revolving Loan Facility, in each case, (a) in accordance with the terms and provisions of the respective DIP Documents, the DIP Intercreditor Agreement and the Final Order and (b) to the extent required to pay those expenses enumerated in the Approved Budget (as defined below), as and when such expenses come due.

5. <u>No Obligation to Extend Credit</u>. None of the DIP Agents or DIP Lenders shall have any obligation to make any loan or advance, purchase DIP Notes or to issue any letters

NY 73355216v6
RLFI 4007871v. 1

of credit under the respective DIP Documents unless all of the conditions precedent to the making of such extension of credit or the issuance of such letter of credit under the applicable DIP Documents and this Final Order have been satisfied in full or waived in accordance with the terms thereof.

6. <u>Use of Proceeds of DIP Facilities</u>. From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facilities or proceeds from the issuances of DIP Notes only for the purposes specifically set forth in this Final Order and the DIP Documents, and in compliance with the Approved Budget. Upon the entry of this Final Order, the Debtors are authorized and directed to pay to the Prepetition Revolving Agent on behalf of the Prepetition Revolving Lenders $260,061.25 for payment of the LC Participation Fees, Fronting Fees and Commitment Fee due and owing under the Prepetition Revolving Loan Agreement. Without in any way limiting the foregoing, no Cash Collateral, DIP Collateral, proceeds from the issuance of the DIP Notes under the DIP Notes Facility or borrowings under the DIP Revolving Loan Facility, any portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Debtors, the official creditors' committee appointed in the Chapter 11 Cases (the "<u>Committee</u>"), or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees and disbursements incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the DIP Super-Priority Claims (except to the extent expressly set forth herein); or (b) to assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any

-17-

of the DIP Agents, DIP Lenders, the Prepetition Revolving Lenders, the Prepetition Revolving Agent or the Noteholder Parties and each of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors (collectively, the "Released Parties"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Super-Priority Claims, the DIP Liens, the DIP Documents, the Prepetition Revolving Obligations, the Prepetition Note Obligations, the Prepetition Note Documents or the Prepetition Revolving Documents; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, DIP Obligations, the Prepetition Revolving Obligations or the Prepetition Note Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the DIP Agents or DIP Lenders hereunder or under any of the DIP Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agents' or DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Documents and this Final Order); or (vi) objecting to, contesting, or interfering with, in any way, the DIP Agents' and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; provided, however, that no more than $75,000 in the aggregate of Cash Collateral, the DIP Collateral, the Carve-Out, proceeds from the issuance of the DIP Notes under the DIP Note Facility, borrowings under the DIP Revolving Loan Facility or any other amounts may be used to fund an investigation by the Committee into

NY 73355216v6
RLF1 4007871v. 1

the existence of any causes of action against the Released Parties with respect to the Prepetition Revolving Obligations or the Prepetition Note Obligations, subject to the terms and limitations set forth below in Paragraph 17.

7.   Segregated DIP Collateral Account.   The Debtors are authorized and directed to establish the DIP Collateral Account (as defined in the DIP Note Purchase Agreement).   Notwithstanding anything contained herein or in the DIP Intercreditor Agreement to the contrary, the proceeds of the issuance and purchase of all DIP Notes pursuant to the DIP Note Documents shall be held in the DIP Collateral Account, which account shall at all times, immediately and automatically upon the entry of this Final Order, without the need for any further act by the DIP Notes Agent, the DIP Note Purchasers or the Debtors, be subject to a first-priority perfected security interest and lien solely in favor of the DIP Notes Agent and the DIP Note Purchasers (and, for the avoidance of doubt, notwithstanding anything contained herein to the contrary, the DIP Collateral Account and all funds deposited therein shall not be subject to a security interest or lien in favor of any other person or entity, including, without limitation, the Revolving DIP Agent or the Revolving DIP Lenders).   The Debtors and the depositary bank are authorized and directed, at the request of the DIP Note Agent, at the direction of the Requisite DIP Note Purchasers, to execute an account control agreement in form and substance reasonably satisfactory to the Requisite DIP Note Purchasers.   Prior to the occurrence of an Event of Default (as defined in the DIP Note Purchase Agreement), funds held in the DIP Collateral Account may solely be withdrawn from such account and used by the Issuer solely as permitted under the DIP Note Documents.   Any account control agreement entered into by any Debtor prior to the date of this Final Order in accordance with the terms and conditions of the Interim Order is hereby approved and ratified in full.

-19-

8. <u>Validity and Effect of DIP Intercreditor Agreement</u>. Each of the DIP Agents (the "<u>Intercreditor Parties</u>") shall be bound by, and their respective rights and remedies pursuant to the DIP Facilities shall be, subject to the terms, provisions and restrictions of the DIP Intercreditor Agreement, and the DIP Intercreditor Agreement shall apply and govern the Intercreditor Parties in these Cases. Nothing in this Final Order is meant to or shall be deemed to alter or otherwise modify the rights contained in the DIP Intercreditor Agreement as between the Intercreditor Parties.

9. <u>Payment of DIP Fees and Expenses</u>. The Debtors are hereby authorized and directed, on a final basis, to pay upon receipt of an invoice all reasonable fees and out-of-pocket costs and expenses of each DIP Agent, the Revolving DIP Lenders and the Initial Note Purchasers as follows: (a) (1) other than with respect to the fees and out-of-pocket costs and expenses of counsel and financial advisors to each DIP Agent, the Revolving DIP Lenders and the Initial Note Purchasers, all reasonable fees and out-of-pocket costs and expenses of the DIP Agent, the Revolving DIP Lenders and the Initial Note Purchasers and (B) with respect to the fees and out-of-pocket costs and expenses of counsel and financial advisors to DIP Agent, the Revolving DIP Lenders and the Initial Note Purchasers, all reasonable fees and out-of-pocket costs and expenses of the following: (i) Ropes & Gray LLP and its local counsel, (ii) Paul, Hastings, Janofsky & Walker LLP and its local counsel, (iii) Stroock & Stroock & Lavan LLP and its local counsel, (iv) Munger, Tolles & Olson LLP and its local counsel, (v) Akin Gump Strauss Hauer & Feld LLP, (y) Moelis & Company (excluding any success fees), and (vi) other professional advisors hired by any of the foregoing counsel named or referenced above (collectively, the "<u>DIP Professionals</u>"), in each case, in connection with the preparation, execution and delivery of the DIP Documents, the administration of the DIP Facilities and the

-20-

consummation of the transactions contemplated under the DIP Facilities and hereby, including, without limitation, all due diligence, syndication (including printing, distribution and bank meeting), transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agents and the DIP Lenders in connection with the DIP Facilities, the DIP Documents or the transactions contemplated thereby, the administration of the DIP Facilities and any amendment or waiver of any provision of the DIP Documents; and (b) out-of-pocket costs and expenses of the DIP Agents, the Revolving DIP Lenders and the Initial Note Purchasers (including fees, expenses and disbursements of the DIP Professionals) incurred in connection with (i) enforcing this Final Order or any DIP Document or DIP Obligation or any security therefor or exercising or enforcing any other right or remedy available by reason of an Event of Default (as defined in the applicable DIP Documents); (ii) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or in any insolvency or bankruptcy proceeding; (iii) commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal proceeding relating to the DIP Obligations or any Debtor and related to or arising out of the transactions contemplated hereby or by any of the DIP Documents; and (iv) in taking any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) described in clauses (i) through (iii) above.

10.     The Debtors shall promptly reimburse each DIP Agent, the Revolving DIP Lenders and the Initial Note Purchasers for such invoiced amounts within twenty (20) calendar days (if no written objection is received within such twenty (20) calendar day period) after delivery of an invoice describing such fees, costs, and expenses substantially in the form provided in the ordinary course of business; provided, however, that any such invoice may be

NY 73355216v6
RLF1 4007871v. 1

redacted to protect privileged, confidential or proprietary information. A copy of each invoice submitted to the Debtors shall simultaneously be sent to the U.S. Trustee, counsel for the Committee, Stroock & Stroock & Lavan LLP, Munger, Tolles & Olson LLP and Akin Gump Strauss Hauer & Feld LLP. Any written objection to such fees, costs or expenses must contain a specific basis for the objection and a quantification of the undisputed amount of the fees, costs and expenses invoiced; failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. None of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

11. <u>Validity of DIP Documents</u>. Upon due execution and delivery to the applicable DIP Agents or DIP Lenders, as the case may be, the DIP Documents shall constitute, and are hereby deemed to be the legal, valid and binding obligations of the Debtors party thereto, enforceable against each such Debtor in accordance with the terms of such DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or the Interim Order or this Final Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

12. <u>Super-Priority Claims</u>. In accordance with Bankruptcy Code section 364(c)(1), but subject to the terms of the DIP Intercreditor Agreement, (i) the DIP Note Obligations shall constitute claims (the "<u>DIP Note Super-Priority Claims</u>") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections

105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, which DIP Super-Priority Claims shall be payable from and have recourse to all DIP Collateral, including all pre- and post-petition property of the Debtors and all proceeds thereof, including the proceeds of Avoidance Actions (as defined below); and (ii) the Revolving DIP Obligations shall constitute claims (the "Revolving DIP Super-Priority Claims", together with the DIP Note Super-Priority Claims, the "DIP Super-Priority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, which DIP Super-Priority Claims shall be payable from and have recourse to all DIP Collateral, including all pre- and post-petition property of the Debtors and all proceeds thereof, including the proceeds of Avoidance Actions (as defined below).

13.    DIP Liens.  (i) The DIP Notes Agent and the DIP Note Purchasers, as security for the DIP Note Obligations, and (ii) the Revolving DIP Agent and the Revolving DIP Lenders, as security for the Revolving DIP Obligations, are hereby granted, on a final basis (without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by either of the DIP Agents) valid and perfected security interests in, and liens on (the "DIP Note Liens" and the "Revolving DIP Liens", respectively, and together

NY 73355216v6
RLF1 4007871v. 1

the "DIP Liens"), the DIP Collateral (defined below), subject, in each case, to the terms of the DIP Intercreditor Agreement, and subject to the Carve-Out (defined below), as follows:

(a) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise subject to or encumbered by a validly perfected, unavoidable security interest or lien on the Petition Date;

(b) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is subject to or encumbered by a validly perfected, unavoidable security interest or lien on the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (other than the priming liens and security interests granted pursuant to clause (c) below); and

(c) pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral that is subject to or encumbered by a validly perfected, unavoidable security interest or lien on the Petition Date or subsequently perfected thereafter;

For purposes of this Final Order, the term "DIP Collateral" shall mean the following: all present and after-acquired property or assets of each of the Debtors of any nature whatsoever and wherever located (whether acquired pre- or post-petition), including, without limitation: (x) all "Collateral" as defined in each of the DIP Revolving Loan Agreement and the DIP Note Purchase Agreement, (y) the proceeds of all claims or causes of action (including

-24-

proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (the "Avoidance Actions")), whether pursuant to federal law or applicable state law, of the Debtors or their estates, but excluding any such claims or causes of action against insiders as that term is defined in section 101(31) of the Bankruptcy Code, and (z) all proceeds and products of any or all of the foregoing. Notwithstanding anything contained herein to the contrary, the DIP Collateral Account, together with any funds on deposit in such account, shall constitute DIP Collateral solely with respect to the DIP Notes Facility, and, for the avoidance of doubt, no party, other than the DIP Notes Agent (for the benefit of the DIP Notes Agent and the DIP Note Purchasers) shall have any lien or security interest in such account (or in the funds on deposit in such account). Notwithstanding anything in this order to the contrary, the DIP Agents and DIP Lenders shall not seek to enforce their rights or remedies arising out of the DIP Superpriority Claims to or the DIP Liens on the Avoidance Actions or the proceeds thereof unless and until the DIP Agents and DIP Lenders have taken commercially reasonable efforts to liquidate their other collateral to satisfy any outstanding DIP Obligations, provided however that this limitation on enforcement of rights and remedies against the Avoidance Actions shall be of no further effect upon the passage of 120 days from the declaration of the occurrence of an Event of Default; provided further that before the expiration of such 120 day period, no use of such proceeds shall be permitted without the prior written consent of the DIP Lenders and the Debtors shall take all actions necessary to preserve all avoidance actions and/or proceeds thereof.

14. <u>Priority of DIP Liens</u>. In furtherance of the foregoing, notwithstanding anything contained herein to the contrary, each of the DIP Note Liens and the Revolving DIP Liens, and each of the Revolving DIP Super-Priority Claims and the DIP Note Super-Priority Claims, shall have the relative ranking and priority set forth in the DIP Intercreditor Agreement.

NY 73355216v6
RLF1 4007871v. 1

15.    Covenants.  As a condition to the extension of credit under the DIP Facilities, the DIP Agents, the DIP Lenders and the Debtors have agreed that, until the DIP Obligations have been paid in full, in cash, or with a form of security to be agreed upon between the Debtors, the DIP Agents and the DIP Lenders (as applicable), the Debtors shall be obligated to comply with all covenants contained in the DIP Documents.

16.    Carve-Out.

(a)    As used in this Final Order, "Carve-Out" means the following:  (1) all unpaid fees required to be paid in these Cases to the Clerk of the Court and to the office of the U.S. Trustee under 28 U.S.C. §1930, whether arising prior to or after the delivery of the Carve-Out Trigger Notice (defined below); (2) all reasonable and documented unpaid fees, costs, disbursements and expenses, including, without limitation, success, financing, completion, or similar fees (collectively, "Transaction Fees") and the reasonable expenses of any member of the Committee (collectively, together with the Transaction Fees, the "Professional Fees"), of professionals retained by the Debtors and the Committee (collectively, the "Professionals") in these Chapter 11 Cases, in each case, that (x) are incurred, and in the case of a professional seeking compensation for a Transaction Fee, the services giving rise to the Transaction Fee actually occur or the event that triggers the Transaction Fee occurs (regardless of any provision contained in any engagement letter or retention order with respect to the professional seeking compensation for a Transaction Fee), prior to the delivery by either DIP Agent of a Carve-Out Trigger Notice, that are ultimately allowed (regardless of the time of any such allowance) by the Bankruptcy Court; and (y) that remain unpaid after application of any retainers; and (3) all Professional Fees incurred on or after the delivery by the applicable DIP Agent of a Carve-Out

Trigger Notice, that are allowed by the Bankruptcy Court (and remain unpaid after application of any retainers) in an aggregate amount not to exceed $1,750,000 (the "Carve-Out Cap").

(b)     The term "Carve-Out Trigger Notice" shall mean a written notice issued by either DIP Agent and delivered to the Debtors' lead counsel, the U.S. Trustee, the other DIP Agent and lead counsel to the Committee, at any time following the occurrence and during the continuation of any Event of Default; provided, however, that the Carve-Out shall not include, apply to or be available for any fees, disbursements, costs or expenses incurred by any party, including, without limitation, the Debtors, the Committee, or any party-in-interest, in connection with (subject to paragraph 6 hereof) the investigation (including discovery proceedings), the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Released Parties, including challenging the amount, extent, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the Prepetition Revolving Documents, the Prepetition Revolving Obligations, the Prepetition Note Documents or the Prepetition Note Obligations, the DIP Documents or the DIP Obligations or the DIP Liens or DIP Super-Priority Claims.

(c)     Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, the DIP Agents, the DIP Lenders, the Prepetition Secured Entities, the Noteholder Parties, the Committee, the U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.

(d)     None of the DIP Agents or the DIP Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals or Professional Fees in connection with the Chapter 11 Cases or any successor cases. Nothing in

NY 73355216v6
RLF1 4007871v. 1

this Final Order or otherwise shall be construed to obligate any of the DIP Agents or DIP Lenders, in any way, to pay compensation to or to reimburse expenses of any of the Professional Fees, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Any payment or reimbursement made on or after the delivery of the Carve-Out Trigger Notice in respect of any Professional Fees incurred on or after the delivery by the applicable DIP Agent of a Carve-Out Trigger Notice, that are allowed by the Bankruptcy Court (exclusive of the application of any retainers by any of the Professionals) shall permanently reduce the Carve-Out Cap on a dollar-for- dollar basis. Any funding of the Carve-Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code and applicable law.

17.     <u>Investigation Rights</u>. The Committee (or any non-Debtor party-in-interest, including any trustee or examiner that is elected or appointed in these Cases) shall have until the later of (a) the date that is three (3) days prior to the initial date scheduled for the hearing to consider the adequacy of the Debtors' disclosure statement and (b) ten (10) days after the declaration of the occurrence of an Event of Default (the "<u>Investigation Period</u>") to file a motion seeking standing which attaches as an exhibit a complaint (the "<u>Standing</u> <u>Motion</u>") or otherwise commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, and challenge (each, a "<u>Challenge</u>") the findings, the Debtors' stipulations, or any other stipulations herein, including, without limitation, any challenge to the validity, priority, perfection or enforceability of the Prepetition Revolving Liens, the Prepetition Revolving Obligations or the Prepetition Note Obligations, or to assert any claim or cause of action against

NY 73355216v6
RLF1 4007871v. 1

the Prepetition Secured Entities or the Noteholder Parties arising under or in connection with the Prepetition Revolving Obligations or the Prepetition Note Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Revolving Obligations or the Prepetition Note Obligations, provided however, that in the event the Debtors file or amend their schedules of assets and liabilities (the "Schedules") and/or statement of financial affairs (the "SOFA") within fifteen (15) days of the expiration of the Investigation Period, the Investigation Period, solely with respect to any assets or potential claims identified in those Schedules and/or SOFA, shall expire upon the passage of fifteen (15) days from the filing of thereof. Any Standing Motion shall attach a draft complaint setting forth the basis for the Challenge. Upon the filing of a Standing Motion, the Investigation Period shall be tolled with respect to the plaintiffs and defendants identified in the complaint attached thereto until ten (10) days following the entry of an order with respect to the Standing Motion. The Investigation Period may only be extended: (a) with the prior written consent of counsel to the Prepetition Revolving Lenders, and the prior written consent of the Requisite DIP Note Purchasers (to be provided by Stroock & Stroock & Lavan LLP), as memorialized in an order of this Court, or (b) pursuant to an order of this Court upon a showing of good cause for such extension. Except to the extent asserted in an adversary proceeding or contested matter, including with out limitation, in any Standing Motion, filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), without further order of the Court: (a) any and all such challenges by any party (including, without limitation, the Committee, any chapter 11 trustee, and/or any examiner appointed in the Chapter 11 Cases) shall be deemed to be forever waived and barred; (b) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in

-29-

this Final Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, without further action by any party or this Court; (c) the liens and security interests of the Prepetition Revolving Agent and Prepetition Revolving Lenders shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Revolving Obligations and the Prepetition Note Obligations shall be deemed to be finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (e) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Entities and the Noteholder Parties (in each case, whether in their prepetition or post-petition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Revolving Obligations or the Prepetition Note Obligations. Notwithstanding anything to the contrary herein: (i) if any such Challenge is timely commenced, the stipulations contained in this Final Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (ii) the Prepetition Secured Entities and the Noteholder Parties reserve all of their rights to contest on any grounds any Challenge.

18. <u>Approved Budget</u>.

(a)    For purposes of this Final Order, the term "Approved Budget" means the following: (a) an initial 13-week cash flow forecast setting forth all forecasted receipts and

disbursements for the succeeding 13 week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of each of the DIP Facilities for such period, which shall provide, among other things, for the payment of the fees and expenses relating to each of the DIP Facilities, ordinary course expenses, fees and expenses related to the Chapter 11 Cases, and working capital and other general corporate needs, a copy of which is attached hereto as <u>Exhibit D</u> (the "<u>Initial DIP Budget</u>"); (b) on each Friday prior to the beginning of each fiscal month, the Debtors will furnish an updated budget, in each case, in form and substance reasonably satisfactory to the Initial Note Purchasers and the Revolving DIP Agent (the "<u>Updated DIP Budget</u>" and together with the Initial Budget, the "<u>Approved Budget</u>") for the subsequent 13 week period consistent with the form of the Initial DIP Budget; and (c) beginning three weeks after the Petition Date, and on each Friday thereafter, a variance report (the "<u>Variance Report</u>") setting forth actual cash receipts and disbursements of the Debtors for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to (i) the Initial DIP Budget on a weekly and cumulative basis (which shall be subject to the variances set forth in the DIP Documents), and (ii) the most recent Updated DIP Budget (as applicable) delivered by the Debtors, in each case, on a weekly and cumulative basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer or Chief Restructuring Officer of the Issuer).

(b)     The line item entitled "Creditors Committee" in the Initial DIP Budget is hereby amended to include $600,000 under the column for "Week 13". Any Updated DIP Budget shall reflect for such line item (i) $300,000 during the week ending July 23 and (ii) $150,000 for the week ending August 27, provided that in the event of a material change in

-31-

circumstances with respect to the Debtors' cases that requires the Committee's professionals to provide significantly greater services the week ending August 27 shall be increased to $250,000. For purposes of this section 18(b), a material change in circumstances means a change to the Agreed Plan (as defined herein) that materially and adversely impacts recoveries to general unsecured creditors and requires the Committee professionals to provide additional services.

(c)     No Cash Collateral, DIP Collateral, proceeds from the issuance of the DIP Notes under the DIP Notes Facility or borrowings under the DIP Revolving Loan Facility, any portion of the Carve-Out or any other amounts may be used directly or indirectly by the Committee (or to pay any professional fees and disbursements incurred in connection therewith) to directly or indirectly, through another person or entity, seek, solicit, negotiate, support or encourage the formulation, preparation, filing or prosecution of any plan, plan proposal, restructuring proposal or offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Debtors or take any other action that could reasonably be expected to prevent, interfere with, delay or impede the approval of the disclosure statement, the solicitation of votes on the Agreed Plan or the implementation or consummation of the Agreed Plan.

(d)     Section 5.1 of the DIP Note Purchase Agreement is amended to delete all language following part (i) of the first sentence of section 5.1 of the DIP Note Purchase Agreement and replace such deleted language with the following: "and (ii) post-petition disbursements with respect to the Debtors' professional fees through such week, in each case, shall not have a Variance of greater than (a) with respect to testing in the 5th, 6th, 7th and 8th weeks, 20% of the projected amounts set forth in the Initial Budget for prior periods, (b) with respect to testing in the 9th, 10th, 11th, 12th and 13th weeks, 15% of the projected amounts set

-32-

forth in the Initial Budget for prior periods and (c) with respect to testing in the 14th week and each week thereafter, 15% of the projected amounts set forth in the Initial Budget and the most recent updated Budget delivered prior to the end of the initial 13-week period covered by the Initial Budget.  Beginning with the first week subsequent to the Closing Date and continuing for each week thereafter, and as measured on a cumulative basis from the Closing Date, the Debtors' post-petition disbursements with respect to the Committee's professional fees shall not have a Variance of greater than 0% of the amounts set forth in the Budget, as modified by the Final Order.  "Variance" for purposes of this Section 5.1 means (x) with respect to the calculation of net cash flow, actual net cash flow being less than the amount set forth in the applicable Budget, and (y) with respect to the Debtors' or the Committee's professional fees, disbursements with respect to post-petition professional fees being greater than the amount set forth therefor in the applicable Budget."

(e)     For purposes of this Order, "Agreed Plan" means a plan of reorganization consistent in all respects with the amended plan term sheet dated May 9, 2011 attached as part of Exhibit A to the order approving the backstop stock purchase agreement entered into March 27, 2011, as amended, supplemented or otherwise modified from time to time, in accordance with its terms.

19.     506(c) and 552(b) Waiver.  The Debtors irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment), for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Secured Lending Entities upon the DIP Collateral or the Prepetition Collateral

-33-

(as applicable).  In no event shall the Secured Lending Entities be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

20.　　　　　　Joint and Several Liability. Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that each of the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facilities and the DIP Documents.

21.　　　　　　Restrictions on Granting DIP Liens.  Other than the Carve-Out, or as otherwise provided in this Final Order, and subject to the terms of the DIP Intercreditor Agreement, no claim having a priority superior to or *pari passu* with those granted by this Final Order to the DIP Agents shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, while (i) any amounts remain outstanding under either of the DIP Facilities (or refinancing thereof), or (ii) the DIP Lenders have any commitment under the DIP Facilities.  Except as expressly permitted by the DIP Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

22.　　　　　Automatic Effectiveness of DIP Liens.

(a)　　　　Each of the DIP Liens to granted to the respective DIP Agents and DIP Lenders shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any

NY 73355216v6
RLF1 4007871v. 1

further action by the Debtors or any other party and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including without limitation the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions. The granting of the DIP Liens on the DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Documents and this Final Order. If either DIP Agent, as directed by the requisite DIP Lenders in accordance with the terms of the applicable DIP Documents, hereafter requests that the Debtors execute and deliver to such DIP Agent financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such DIP Agent, at the direction of the requisite DIP Lenders in accordance with the terms of the applicable DIP Documents, to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and such DIP Agent is hereby authorized to file or record such documents, as directed by the requisite DIP Lenders in accordance with the terms of the applicable DIP Documents, without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order.

(b)     Without in any way limiting the foregoing paragraph 22(a), a certified copy of the Interim Order or this Final Order may, at the direction of the requisite DIP Lenders to the applicable DIP Agent in accordance with the terms of the applicable DIP Documents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing

statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of the Interim Order or this Final Order for filing and recording.

(c)     Any provision of any lease or other license, contract or other agreement that requires (1) the consent or approval of one or more landlords or other parties or (2) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post-petition liens in such leasehold interest, or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders or the DIP Agents in accordance with the terms of the DIP Documents or this Order.

(d)     Notwithstanding anything to the contrary in the Motion or this Final Order, (a) with respect to the liens and security interests granted under this Final Order, for any real property lease with the Debtors that contains a provision that expressly prohibits a leasehold mortgage or lien thereon, such lien or security interest shall be limited to and shall attach solely to the proceeds of such real property lease; and (b) the provisions of paragraph 22(c) shall not (1) render any real property lease unable to be assumed and/or assigned by any Debtor (or by the applicable DIP Agent, as the Debtors' true and lawful agent and attorney-in-fact pursuant to the DIP Documents), or (2) impair, limit or waive the ability or right of (A) any Debtor (or the applicable DIP Agent, as the Debtors' true and lawful agent and attorney-in-fact pursuant to the DIP Documents), to assume and/or assign any real property lease or (B) any lessor to object to such relief on any other grounds, including but not limited to sections 365(b)(3) or 1123 of the

-36-

Bankruptcy Code; and (c) notwithstanding the provisions of paragraph 29 hereof, the DIP Lenders and/or the DIP Agents (as applicable) shall not, prior to the assumption and assignment of a lease under Section 365 of the Bankruptcy Code, access any premises then leased by the Debtors that are the subject of real property leases other than: (i) in a manner consistent with the existing rights of the DIP Lenders and landlords under applicable non-bankruptcy law (if any) to the extent such rights are enforceable or effective under the Bankruptcy Code, (ii) pursuant to the written consent of the applicable landlord, or (iii) as provided for in a further order of this Court on motion and notice appropriate under the circumstances to each affected landlord.

23.         *Automatic Stay*.  Without further order from this Court, but subject to the terms of the DIP Intercreditor Agreement, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the applicable DIP Agents and the applicable DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Documents, all rights and remedies provided for in the applicable DIP Documents, and to take any or all of the following actions without further order of or application to this Court (as applicable): (a) immediately terminate the Debtors' limited use of Cash Collateral; (b) cease making any loans or issue DIP Notes under the applicable DIP Facilities to the Debtors; (c) declare all applicable DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Note Agreement and the DIP Note Facility, sweep all funds contained in the DIP Collateral Account); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the applicable DIP Agent or applicable DIP Lenders against the DIP Note Obligations or the Revolving DIP Obligations, as applicable,  otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable

DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the applicable DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under this Final Order, the DIP Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right in clauses (e) or (f) of this paragraph, the applicable DIP Agent shall be required to provide five (5) business days written notice to the Debtors, their bankruptcy counsel, counsel to the Committee, counsel to the respective Secured Lending Entities, and the U.S. Trustee of such DIP Agent's intent to exercise its rights and remedies, and during such five (5) business day period, the Debtors and other parties-in-interest may request an expedited hearing on any motion seeking such a finding, and the applicable DIP Agents shall consent to such expedited hearing; provided, further, neither the Debtors nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in this Final Order and the DIP Documents (other than with respect to Section 9.1(j)(iii) or Section 9.1(u) of the DIP Note Purchase Agreement) on any basis other than an assertion that an Event of Default (as defined in the applicable DIP Documents) has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Documents. The rights and remedies of the DIP Agents and DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agents and DIP Lenders may have under the DIP Documents or otherwise. The Debtors shall cooperate fully with the DIP Agents and DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise. Notwithstanding anything contained herein to the contrary, all of the rights, remedies, benefits and protections provided to the applicable DIP Agents and the applicable DIP Lenders under this Final Order and the applicable DIP Documents shall survive the occurrence of either the Termination Date (with respect to, and as defined in,

-38-

the DIP Notes Facility) or the Final Maturity Date (with respect to, and as defined in, the DIP Revolving Loan Facility). Upon such event, the principal of and all accrued interest and fees and all other DIP Obligations under the applicable DIP Documents shall be immediately due and payable and the applicable DIP Agents and applicable DIP Lenders shall have all other rights and remedies provided in this Final Order, the DIP Documents and applicable law.

24. <u>Prohibition on Use of Cash Collateral</u>. Upon the occurrence and during the continuance of an Event of Default under the DIP Documents, or this Final Order, the DIP Lenders shall have no further obligation to provide financing under the DIP Documents as approved by this Final Order, and the limited authorization to use Cash Collateral as provided herein shall automatically terminate; except that upon the occurrence and during the continuance of an Event of Default under the DIP Documents or this Final Order, the Debtors shall be authorized to use Cash Collateral, in the ordinary course of business, to the extent necessary to administer, preserve and protect the value of the DIP Collateral. The Debtors may not seek to use Cash Collateral, other than as expressly provided herein, without the consent of the DIP Agents for so long as either of the DIP Agents (as applicable) or DIP Lenders (as applicable) have commitments which have not terminated under the DIP Documents. Notwithstanding anything herein to the contrary, the Prepetition Secured Entities, the DIP Agents and the DIP Lenders shall not be deemed to have consented to the Debtors' use of Cash Collateral except to the extent expressly set forth herein, and expressly reserve all of their respective rights to object to any request by the Debtors to use Cash Collateral or to seek adequate protection. Further, nothing in this paragraph shall limit in any way the right of the Secured Lending Entities to exercise their respective rights and remedies as set forth in this Final Order. Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the

NY 73355216v6
RLF1 4007871v. 1

ordinary course of business, or any Debtor's use of any Cash Collateral, DIP Collateral or other proceeds resulting therefrom, except as permitted in this Final Order, the DIP Facilities, the DIP Documents, and in accordance with the Approved Budget.

25. **Binding Effect**. The provisions of this Final Order (including paragraph 17, subject to the terms thereof) shall be binding upon and inure to the benefit of the Released Parties, the Debtors and their respective successors and assigns. To the extent permitted by applicable law, this Final Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Final Order.

26. **Survival**. The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge); (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Final Order as well as the DIP Liens and the DIP Super-Priority Claims granted pursuant to this Final Order and the DIP Documents shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Final Order and the DIP Documents (subject to the terms of the DIP Intercreditor Agreement), and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged. In no event shall any plan of

reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the applicable DIP Documents.

27.         <u>Modifications of DIP Documents</u>.  The Debtors, the DIP Agents and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the respective DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders) of the respective DIP Documents without further Order of this Court, or any other modifications to the respective DIP Documents; <u>provided</u>, <u>however</u>, that notice of any material modification or amendment to the respective DIP Documents shall be provided to counsel to the Committee, to the U.S. Trustee, and counsel for the Ad Hoc Committee, each of whom shall have three (3) business days from the date of such notice within which to object in writing to such modification or amendment.  If the Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

28.         <u>Modification of Certain Milestones under the DIP Note Purchase Agreement</u>.  Section 7.18(d) of the DIP Note Purchase Agreement is hereby amended and restated as follows:

> "*Disclosure Statement and Plan*. (x) On or prior to May 18, 2011, the Debtors shall have filed (i) a Plan and (ii) a disclosure statement that contains adequate information that is reasonably satisfactory to the Requisite Note Purchasers relating to such Plan, and (y) on or prior to June 29, 2011, the Debtors shall have obtained entry of an order of the Bankruptcy Court approving such disclosure statement."

29.         <u>Access to the Debtors</u>.  In accordance with the terms of the DIP Facilities, the DIP Agents and their respective professionals shall be afforded continued reporting as to DIP Collateral amounts and reasonable access to the DIP Collateral and the

NY 73355216v6
RLF1 4007871v. 1

Debtors' business premises, during normal business hours, for purposes of verifying the Debtors' compliance with the terms of this Final Order as it pertains to the DIP Facilities.

30.     Access to Leased Premises/No Landlord's Liens. Subject to the DIP Intercreditor Agreement, upon written notice to the landlord of any leased premises that an Event of Default (as defined in the applicable DIP Documents) has occurred and is continuing under the DIP Documents, the applicable DIP Agent may, at the direction of the requisite DIP Lenders in accordance with the applicable DIP Documents, subject to any separate agreement by and between such landlord and the applicable DIP Agent (a "Separate Agreement"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to the Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, that, subject to such Separate Agreement, the applicable DIP Agent shall only pay, to the extent the funds for such payment are first received by the Applicable DIP Agent from the applicable DIP Lenders, rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent, calculated on a per diem basis. Nothing herein shall require the applicable DIP Agent to assume any lease as a condition to the rights afforded to the applicable DIP Agent in this paragraph or impair the Debtors' rights (a) under the lease except as provided for in the preceding sentence or (b) under Section 365 of the Bankruptcy Code.

31.     After Acquired Property. Except as otherwise provided in this Final Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including, without limitation, all DIP Collateral pledged or otherwise granted to the DIP Agents pursuant to the DIP Documents, the Interim Order and this Final

-42-

Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

32.        Insurance Policies.   Upon entry of the Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Agents and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds; and (ii) the DIP Agents, on behalf of the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as loss payee.  The Debtors are authorized and directed to take any actions necessary to have each of the DIP Agents, on behalf of the applicable DIP Lenders, be added as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

33.        Protection Under Section 364(e).  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not in any way affect the (i) validity of any DIP Obligations incurred prior to the actual receipt by the DIP Agents of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations by the Debtors prior to the actual

-43-

receipt by the DIP Agents of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of the Interim Order or this Final Order (as applicable), and the DIP Agents and DIP Lenders shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, the Interim Order, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral, the DIP Collateral and the incurrence of DIP Obligations.

34.      <u>Effect of Dismissal of Chapter 11 Cases</u>.  If the Chapter 11 Cases are dismissed, converted or substantively consolidated, then neither the entry of this Final Order nor the dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall affect the rights of the DIP Agents or DIP Lenders under their respective DIP Documents, the rights of the Secured Lending Entities under the Prepetition Revolving Documents, the rights of the Noteholder Parties under the Prepetition Note Documents, or this Final Order, and all of their respective rights and remedies thereunder shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Super-Priority Claims granted to and conferred upon the DIP Agents and DIP Lenders and the protections afforded to the DIP Agents and/or the DIP Lenders pursuant to this Final Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Liens, DIP Super-Priority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); and (ii) the effectiveness of any order dismissing the Chapter 11 Cases shall not occur until sixty (60) days after it is entered in order to

-44-

give the Secured Lending Entities the opportunity to perfect their respective security interests and liens in the collateral under non-bankruptcy law, including, without limitation, the filing or recording of financing statements, mortgages, deeds of trust, security deeds, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar United States entity) and the procurement of waivers from any landlord, tenant, mortgagee, bailee or warehouseman and consents from any licensor or similar party-in-interest.

35.     <u>Credit Bid</u>.    Subject only to the terms of the DIP Intercreditor Agreement, the DIP Agents and the DIP Lenders shall have the right to credit bid all of the amounts outstanding under the respective DIP Facilities in connection with a sale of the Debtors' assets under either section 363 of the Bankruptcy Code or under a plan of reorganization.

36.     <u>Findings of Fact and Conclusions of Law</u>.    This Final Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

37.     <u>Choice of Law; Jurisdiction</u>.    The DIP Facilities and the DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.    The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facilities or the DIP Documents.

NY 73355216v6
RLF1 4007871v. 1

38.    Indemnification.  Except as otherwise ordered by this Court, the Debtors are hereby authorized and directed to jointly and severally indemnify and hold harmless the applicable DIP Agents, each of the DIP Lenders (as applicable) and their respective affiliates, officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to, as applicable, the DIP Facilities, the DIP Documents or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the DIP Facilities, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Documents are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct.  In no event, however, shall any Indemnified Party be liable on

-46-

any theory of liability for any special, indirect, consequential or punitive damages. All indemnities of the DIP Agents and the DIP Lenders shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Documents.

39. <u>Discharge Waiver</u>. Absent the consent of the applicable DIP Lenders, the DIP Obligations, evidenced by the DIP Documents, shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization. The Debtors shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full, on or prior to the effective date of such plan of reorganization or sale, of all DIP Obligations unless the applicable DIP Lenders have otherwise consented in writing to such plan or sale.

40. <u>Controlling Effect of Final Order</u>. To the extent any provision of this Final Order conflicts with any provision of the Motion, any prepetition agreement or any DIP Documents, the provisions of this Final Order shall control.

41. <u>Effect of this Final Order</u>. This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

NY 73355216v6
RLF1 4007871v. 1

42.	Proofs of Claim.  The DIP Agents and the DIP Lenders will not be required to file proofs of claim in the Chapter 11 Cases for any of the DIP Obligations or the liens or claims granted hereunder.  Any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases shall not apply to the DIP Agents or the DIP Lenders.

Dated: May _____, 2011

THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

NY 73355216v6
RLF1 4007871v. 1