# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **IN RE:** | **:** | **Jointly Administered** |
| | **:** | **Case No. 11-10884 (MFW)** |
| **Harry & David Holdings, Inc.** *et al.*, | **:** | |
| | **:** | **Chapter 11** |
| **Debtors,** | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |
| **Harry & David Holdings, Inc.** | **:** | **Case No. 11-10884 (MFW)** |
| **Harry and David** | **:** | **Case No. 11-10885 (MFW)** |
| **Harry & David Operations, Inc.** | **:** | **Case No. 11-10886 (MFW)** |
| **Bear Creek Orchards, Inc.** | **:** | **Case No. 11-10887 (MFW)** |
| | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |

**DISCLOSURE STATEMENT
PURSUANT TO SECTION 1125 OF THE
BANKRUPTCY CODE FOR THE JOINT
PLAN OF REORGANIZATION OF
HARRY & DAVID HOLDINGS, INC.
AND ITS DEBTOR SUBSIDIARIES**

DANIEL J. DEFRANCESCHI (DE 2732)
PAUL N. HEATH (DE 3704)
RICHARDS, LAYTON & FINGER
One Rodney Square
920 North King Street
Wilmington, Delaware 19899
Telephone: (302) 651-7700

- and -

DAVID G. HEIMAN
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

BRAD B. ERENS
MARK A. CODY
TIMOTHY W. HOFFMANN
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939

May 18, 2011

ATTORNEYS FOR DEBTORS

**DISCLOSURE STATEMENT DATED MAY 18, 2011**
**SOLICITATION OF VOTES WITH RESPECT TO**
**THE JOINT PLAN OF REORGANIZATION OF**
**HARRY & DAVID HOLDINGS, INC. AND ITS DEBTOR SUBSIDIARIES**

All creditors entitled to vote thereon are urged to vote in favor of the Joint Plan of Reorganization of Harry & David Holdings, Inc. ("Holdings") and its Debtor Subsidiaries attached as Exhibit I (the "Plan") to this Disclosure Statement (the "Disclosure Statement"). A summary of the voting instructions is set forth in Section II.D.1. Additional instructions are contained on the ballots distributed to creditors entitled to vote on the Plan (the "Ballots"). **To be counted, your Ballot must be duly completed, executed and received by [5:00 p.m., Eastern Time, on July 28, 2011] (the "Voting Deadline"), unless extended in writing by the Debtors.** The boards of directors of Holdings and each of its subsidiary debtors (collectively, with Holdings, the "Debtors") believe that the Plan is in the best interests of creditors and urge all creditors to vote in favor of the Plan.

The Debtors' key stakeholders support the Plan, including the Official Committee of Unsecured Creditors of the Debtors (the "Creditors Committee") and an ad hoc group of holders of the Debtors' public notes (the "Ad Hoc Committee") that own the vast majority of outstanding notes. The individual members of the Ad Hoc Committee have agreed to vote in favor of the Plan. Further, the Creditors Committee is committed to the Plan and, together with the Ad Hoc Committee, encourages holders of Claims in Class 3 and Class 4 to vote in favor of the Plan.

**All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached as Exhibit I and the Risk Factors described under Section VIII, prior to submitting Ballots in response to this solicitation. The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied or waived by the relevant parties. See Section XIV.**

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan. The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and the documents described therein. Additional copies of this Disclosure Statement, the Plan, and all Exhibits to the Plan will be available for review free of charge from Garden City Group (the "Voting Agent") by accessing **http://www.gardencitygroup.com/cases/had/**.

**Any statements in this Disclosure Statement concerning the provisions of any other document are not complete descriptions of such document, and in each instance reference is made to such document for the full text thereof.**

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors.

Although the Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses and projections relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, and not for any other purpose. Nothing in this Disclosure Statement is intended to be or constitutes a concession by or admission of any Debtor for any purpose.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section VIII. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ......................................................................... 1

II.   CLAIMS CLASSIFICATION AND VOTING UNDER THE PLAN ........................... 4

    II.A.    Introduction ....................................................................................... 4

    II.B.    Summary of Classes and Treatment of Claims and Interests ................................ 4

    II.C.    Unclassified Claims ................................................................................ 8

        II.C.1.    Payment of Administrative Claims ...................................... 8

        II.C.2.    Payment of Priority Tax Claims ......................................... 11

        II.C.3.    Disallowance of Reclamation Claims ................................... 11

    II.D.    Voting on and Confirmation of the Plan ............................................... 11

        II.D.1.    Voting Procedures and Requirements ................................... 11

        II.D.2.    Hearing on Confirmation of the Plan ................................... 12

III.  THE DEBTORS' BUSINESS .......................................................................... 13

IV.   CORPORATE AND CAPITAL STRUCTURE AS OF THE PETITION DATE .......... 15

    IV.A.    Corporate Structure and History ........................................................ 15

    IV.B.    Senior Unsecured Notes .................................................................... 16

    IV.C.    Pension Obligations ......................................................................... 16

    IV.D.    Unsecured Trade Debt ...................................................................... 17

    IV.E.    Lease Obligations ............................................................................ 17

V.    EVENTS LEADING TO THE DEBTORS' CHAPTER 11 FILING ......................... 17

VI.   EVENTS DURING THE CHAPTER 11 CASES ................................................. 18

    VI.A.    Commencement of Chapter 11 Cases ................................................... 18

    VI.B.    First Day Relief .............................................................................. 19

    VI.C.    Debtor-in-Possession Financing ......................................................... 19

    VI.D.    Appointment of the Creditors' Committee ............................................ 20

    VI.E.    Exit Financing ................................................................................ 21

    VI.F.    Plan Support Agreement ................................................................... 25

    VI.G.    The Rights Offering and Backstop Agreement ...................................... 25

    VI.H.    Termination of the Pension Plan ......................................................... 31

    VI.I.    Plan Settlement ............................................................................... 31

    VI.J.    Claims Process and Bar Date .............................................................. 32

VI.K.    Management Services Agreement ........................................................ 32

VII.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN ....................................... 34

    VII.A.    Requirements of Section 1129(a) of the Bankruptcy Code ............................... 34

    VII.B.    Requirements of Section 1129(b) of the Bankruptcy Code ............................... 34

        VII.B.1.    Fair and Equitable .................................................................................. 35

        VII.B.2.    "Unfair Discrimination" .......................................................................... 36

    VII.C.    Best Interests of Creditors Test; Liquidation Analysis ...................................... 36

    VII.D.    Feasibility ...................................................................................................... 36

VIII.    RISK FACTORS .................................................................................................... 37

    VIII.A.    Risks In Connection with the Chapter 11 Cases .............................................. 37

        VIII.A.1.    Risk of Non-Confirmation of the Plan .................................................... 37

        VIII.A.2.    Milestones Imposed by the DIP Financings and Delays in
Confirmation or Effective Date .............................................................. 38

        VIII.A.3.    Nonconsensual Confirmation.................................................................. 38

        VIII.A.4.    Conditions Precedent to the Effectiveness of the Plan ............................ 38

        VIII.A.5.    Pension Plan........................................................................................... 38

        VIII.A.6.    Allowance of Claims............................................................................... 39

        VIII.A.7.    The Debtors May Object to the Amount, or the Secured or Priority
Status, of a Claim .................................................................................. 39

        VIII.A.8.    Risk of Non-Payment to Holders of Claims in Class 4 ........................... 39

        VIII.A.9.    Causes of Action .................................................................................... 39

    VIII.B.    Risks Related to Securities Issued in Connection With the Plan....................... 40

        VIII.B.1.    Risks Associated with Receipt and Ownership of HD Shares................. 40

        VIII.B.2.    Holders of Rights Offering Shares, Commitment Fee Shares and
MSA Shares Will Be Restricted in Their Ability to Transfer or
Resell Their Rights Offering Shares ....................................................... 40

        VIII.B.3.    No Established Market for HD Shares...................................................... 40

        VIII.B.4.    Certain Holders of HD Shares Could Have a Significant Degree of
Influence on Reorganized Harry & David Holdings, Inc. and
Matters Presented to Shareholders .......................................................... 41

        VIII.B.5.    Future Sales of Common Stock of Reorganized Harry & David
Holdings, Inc. will Cause Holders to Incur Substantial Dilution ........... 41

CHI-1804345v1

VIII.C.    Risks Related to Financial Projections ................................................................ 41

    VIII.C.1.    The Reorganized Debtors May Not be Able to Achieve Their Projected Financial Results ......................................................... 41

    VIII.C.2.    Financial Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions Used in Their Formulation ......................... 42

VIII.D.    Risks Related to the Reorganized Debtors' Business and Financial Condition........................................................................................................... 42

    VIII.D.1.    Post-Emergence Business Projections ..................................................... 42

    VIII.D.2.    We Are Dependent On Our Management Team, and the Loss of Any Key Member of This Team Could Negatively Impact Our Ability to Implement Our Business Plan .................................................... 42

    VIII.D.3.    The Exit Facility Will Restrict Activities and Require the Reorganized Debtors to Maintain Certain Financial Ratios ................... 42

    VIII.D.4.    Demand for Merchandise is Difficult to Gauge........................................ 43

    VIII.D.5.    The Majority of Sales and Net Earnings are Realized During the Holiday Selling Season from October Through December ..................... 43

    VIII.D.6.    Maintaining Relationships with Third Parties .......................................... 44

    VIII.D.7.    Decrease in the Availability, or Increase in the Cost, of Raw Materials ................................................................................................... 44

    VIII.D.8.    Agricultural Risks .................................................................................... 45

    VIII.D.9.    Increased Competition .............................................................................. 45

    VIII.D.10. The Failure to Protect Intellectual Property Could Adversely Affect Brand............................................................................................. 46

    VIII.D.11. Unexpected Costs Associated With Environmental Compliance or Liability................................................................................................ 46

    VIII.D.12. Product Liability Claims.......................................................................... 47

    VIII.D.13. Natural Disasters, Terrorism, Acts of War and Retail Industry Conditions ................................................................................................ 47

IX.    Valuation of the Debtors............................................................................................. 48

X.    MEANS FOR IMPLEMENTATION OF THE PLAN.................................................... 49

    X.A.    Issuance of HD Shares/Rights Offering/Backstop Commitment......................... 49

    X.B.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors................................................................................................................. 49

CHI-1804345v1

X.C.     Restructuring Transactions ................................................................. 50

  X.C.1.     Restructuring Transactions Generally.................................... 50

  X.C.2.     Obligations of Any Successor Corporation in a Restructuring
      Transaction............................................................................ 50

X.D.     Corporate Governance, Directors and Officers, Employment-Related
    Agreements and Compensation Programs, Continuation of Certain
    Employee and Workers' Compensation Benefits, Special Provisions
    Regarding Insured Claims and Insurance Policies and Corporate Action .......... 51

  X.D.1.     Certificates of Incorporation and By-Laws of the Reorganized
      Debtors.................................................................................. 51

  X.D.2.     Directors and Officers of the Reorganized Debtors................................. 51

  X.D.3.     Employee Benefits ................................................................. 52

  X.D.4.     Retiree Benefits...................................................................... 52

  X.D.5.     Workers' Compensation Benefits............................................. 52

  X.D.6.     New Employment, Retirement, Indemnification and Other Related
      Agreements and Compensation Programs ............................... 53

  X.D.7.     Limitations on Amounts to Be Distributed to Holders of Allowed
      Insured Claims ...................................................................... 53

  X.D.8.     Reinstatement and Continuation of Insurance Policies ........................... 53

  X.D.9.     Corporate Action................................................................... 53

X.E.     Obtaining Cash for Plan Distributions and Transfers of Funds Among the
    Debtors and the Reorganized Debtors ................................................ 54

X.F.     Preservation of Rights of Action; Settlement of Claims and Releases ............... 54

  X.F.1.     Preservation of Rights of Action by the Debtors and the
      Reorganized Debtors............................................................. 54

  X.F.2.     Comprehensive Settlement of Claims and Controversies........................ 55

  X.F.3.     Releases................................................................................. 55

X.G.     Cancellation and Surrender of Instruments, Securities and Other
    Documentation................................................................................ 56

X.H.     Release of Liens ................................................................................. 56

X.I.     Effectuating the Rights Offering.......................................................... 57

X.J.     Effectuating Documents; Further Transactions; Exemption from Certain
    Transfer Taxes ................................................................................ 57

XI.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 57

XI.A.     Executory Contracts and Unexpired Leases to Be Assumed.............................. 57

XI.A.1.     Assumption Generally .............................................................. 57

XI.A.2.     Assumption of Executory Contracts and Unexpired Leases.................... 58

XI.A.3.     Assignments Related to the Restructuring Transactions ........................ 58

XI.A.4.     Approval of Assumption and Assumption Procedures........................... 58

XI.B.     Payments Related to the Assumption of Executory Contracts and
          Unexpired Leases................................................................................... 59

XI.C.     Executory Contracts and Unexpired Leases to be Rejected and Rejection
          Procedures........................................................................................... 60

XI.D.     Bar Date for Rejection Damages ............................................................... 61

XI.E.     Obligations to Indemnify Directors, Officers and Employees........................... 61

XI.F.     Contracts and Leases Entered Into After the Petition Date ................................ 61

XII.    PROVISIONS GOVERNING PLAN DISTRIBUTIONS.............................................. 61

XII.A.     Distributions for Claims Allowed as of the Effective Date ................................. 61

XII.B.     Method of Distributions to Holders of Claims ...................................... 62

XII.C.     Compensation and Reimbursement for Services Related to Distributions.......... 62

XII.D.     Delivery of Distribution and Undeliverable or Unclaimed Distributions............ 62

XII.D.1.     Delivery of Distributions ......................................................... 62

XII.D.2.     Undeliverable Distributions Held by Disbursing Agents ....................... 62

XII.E.     Distribution Record Date ...................................................................... 63

XII.F.     Means of Cash Payments....................................................................... 64

XII.G.     Timing and Calculation of Amounts to be Distributed..................................... 64

XII.G.1.     Timing of Distributions Under the Plan.................................... 64

XII.G.2.     Allowed Claims .................................................................. 64

XII.G.3.     Compliance with Tax Requirements........................................ 64

XII.H.     Surrender of Canceled Instruments or Securities................................................ 65

XII.I.     Setoffs ............................................................................................... 65

XII.J.     Allocation of Payments......................................................................... 65

XII.K.     Postpetition Interest ............................................................................ 65

XII.L.    Fractional Plan Distributions ................................................................ 65

XIII.    PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........................................ 66

XIII.A.   Prosecution of Objection to Claims ................................................ 66

XIII.A.1.  Objections to Claims ................................................................ 66

XIII.A.2.  Authority to Prosecute Objections ............................................ 66

XIII.A.3.  Liquidation and Resolution of Litigation Claims ...................... 66

XIII.A.4.  Authority to Amend Schedules ................................................ 67

XIII.B.   Treatment of Disputed Claims ........................................................ 67

XIII.C.   Enforcement of Bar Date Order ...................................................... 67

XIII.D.   Indenture Trustee as Relevant Claim Holder .................................. 67

XIV.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
        OF THE PLAN ................................................................................ 68

XIV.A.   Conditions to Confirmation ............................................................ 68

XIV.B.   Conditions to the Effective Date ...................................................... 68

XIV.C.   Waiver of Conditions to Confirmation or the Effective Date .......... 69

XIV.D.   Effect of Nonoccurrence of Conditions to the Effective Date ......... 69

XV.     DISCHARGE, INJUNCTION AND SUBORDINATION RIGHTS ............................ 69

XV.A.    Discharge of Claims ........................................................................ 69

XV.B.    Injunctions ...................................................................................... 70

XV.C.    Subordination Rights ...................................................................... 70

XVI.    MISCELLANEOUS PLAN PROVISIONS ............................................................ 71

XVI.A.   Dissolution of the Committee .......................................................... 71

XVI.B.   Limitation of Liability ...................................................................... 71

XVI.C.   Payment of Fees and Expenses of Principal Holders ...................... 72

XVI.D.   Distributions to the Holders of Equity Interests in Reorganized Holdings ........ 73

XVI.E.   Payment of Fees and Expenses of Senior Note Indenture Trustee ...... 73

XVI.F.   Administrative Consolidation .......................................................... 73

XVII.   FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE
        PLAN ............................................................................................ 74

XVII.A.  General ............................................................................................ 74

CHI-1804345v1

XVII.B.   U.S. Federal Income Tax Consequences to the Debtors........................................ 75

XVII.B.1.  Cancellation of Debt Income .................................................................. 75

XVII.B.2.  Limitation on Tax Attributes .................................................................. 76

XVII.B.3.  Alternative Minimum Tax ...................................................................... 76

XVII.B.4.  Accrued Interest .................................................................................... 77

XVII.C.   U.S. Federal Income Tax Consequences to Holders of Claims........................... 77

XVII.C.1.  In General .............................................................................................. 77

XVII.C.2.  Holders of Class 3 Claims...................................................................... 77

XVII.C.3.  Holders of Class 4 General Unsecured Claims ....................................... 80

XVII.C.4.  Certain Other Tax Considerations for Holders of Claims ....................... 80

XVIII. APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES
LAWS ................................................................................................................... 82

XVIII.A. Initial Shares and Non-Accredited Investor Shares ............................................. 82

XVIII.A.1. Initial Offer and Sale............................................................................... 82

XVIII.A.2. Subsequent Transfer................................................................................ 82

XVIII.A.3. Subsequent Transfers Under State Law .................................................. 84

XVIII.B.  Rights Offering Shares, Commitment Fee Shares and MSA Shares .................... 84

XVIII.B.1. Initial Offer and Sale............................................................................... 84

XVIII.B.2. Subsequent Transfers .............................................................................. 84

XIX.   ADDITIONAL INFORMATION.................................................................................. 85

XX.    RECOMMENDATION AND CONCLUSION.............................................................. 85

**EXHIBIT I**        **Joint Plan of Reorganization of Harry & David Holdings, Inc. and Its Debtor Subsidiaries**

**EXHIBIT II**        **Liquidation Analysis of the Debtors**

**EXHIBIT III**        **Projections for the Reorganized Debtors**

**EXHIBIT IV**        **Valuation of the Debtors**

**EXHIBIT V**        **Historical Financials of the Debtors**

**EXHIBIT VI**        **Rights Offering Procedures**

**EXHIBIT VII**        **Backstop Agreement**

## I.    PRELIMINARY STATEMENT

The Debtors are a leading multi-channel specialty retailer and producer of branded premium gift-quality fruit, gourmet food products and other gifts marketed under the Harry & David®, Wolferman's® and Cushman's® brands.  Signature products and offerings marketed under the Harry & David name include Royal Riviera® pears, Fruit-of-the-Month Club® products, Tower of Treats® gifts and Moose Munch® caramel and chocolate popcorn snacks. Products marketed under the Wolferman's brand include specialty English muffins and other breakfast products, and the Cushman's product line includes Cushman HoneyBells® citrus, among other products.  The Debtors' marketing channels include direct marketing (via catalog, phone, Internet, mail/fax and telemarketing), business-to-business, Harry and David stores, seasonal Cushman's stores, and wholesale distribution through select retailers.

For nearly 75 years, the Debtors thrived as an industry leading catalog retailer.  Over the course of this time, the Debtors developed significant brand recognition, high customer awareness and distinctive ownership of fruit gifting.  The Debtors further benefited from the high barriers of entry for potential competitors that resulted from the expenses associated with printing and mailing catalogs and the length of time necessary to develop a profitable customer base.

### *The Events Leading to the Filing of These Chapter 11 Cases*

Over the course of the last several years, however, various external market factors diminished the Debtors' competitive advantages and, correspondingly, revenues and profitability. Specifically, these factors included the emerging number of low cost competitors, reduced customer spending and worse-than-expected holiday sales performance.  Notwithstanding this trend, during the 2010 holiday season, the Debtors expected a significant increase in sales performance, but such increase ultimately did not materialize.  As such, in order to clear inventory purchases, the Debtors were forced to discount more heavily than anticipated, which decreased the Debtors' net profits.

As a result, the Debtors failed to generate enough cash flow during the 2010 holiday season to satisfy the minimum available cash covenant contained in their prepetition credit facility, and the Debtors were unable to continue borrowing under that facility.  After losing the ability to borrow under their prepetition credit facility, and facing a significant liquidity shortfall as a result of their 2010 holiday season results, the commencement of these cases became necessary to (a) address the Debtors' liquidity needs through, among other things, the infusion of new equity capital and (b) provide the opportunity to implement operational improvements in the Debtors' business and deleverage the Debtors' balance sheet.  On March 28, 2011 (the "Petition Date"), the Debtors filed their petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

### *The Debtors' Pre-Negotiated Chapter 11 Cases*

Prior to the Petition Date, in order to avoid a "free-fall" bankruptcy filing and the resulting negative impact such a bankruptcy filing might have on the Debtors' business and core constituents — including their employees, vendors, customers and lenders — the Debtors

engaged in discussions and negotiations with numerous potential lenders and investors.  These negotiations ultimately allowed the Debtors to finalize a pre-arranged chapter 11 filing that the Debtors and their major stakeholders believe maximizes the value of the Debtors' estates for the benefit of all of the Debtors' various creditor constituencies.  The Debtors' pre-arranged chapter 11 filing included the following components:

(a)      debtor-in-possession financing necessary to fund their business during chapter 11;

(b)      the agreement of holders (the "<u>Noteholders</u>") of approximately 81 percent of the Debtors' prepetition public notes (the "<u>Senior Notes</u>"), including the majority equity owner of Holdings, Wasserstein & Company, LP, or affiliates thereof (collectively, "<u>Wasserstein</u>"), in Wasserstein's capacity as a holder of Senior Notes, to support and vote in favor of a plan of reorganization for the Debtors that includes, among other things, (i) the conversion of such Senior Notes to equity in the reorganized Debtors and (ii) a significant infusion of new capital into the Debtors in the form of equity in connection with a rights offering.  The Debtors will use this new capital to repay certain amounts borrowed under one of their debtor-in-possession financing facilities and for the operation of the Debtors' businesses going forward; and

(c)      a commitment for exit financing that is intended to provide the Debtors with necessary working capital to build inventory for the 2011 holiday season and generally fund the Debtors' business operations after the Debtors' emergence from chapter 11.

As described below, the Plan reflects the financing and other arrangements obtained by the Debtors prior to the Petition Date, as modified in certain respects during the chapter 11 cases.

*The Debtors' Financing Facilities*

Specifically, immediately after the Petition Date, the Debtors obtained Bankruptcy Court approval to enter into:  (a) a $100 million first lien revolving credit facility from the lenders that provided the Debtors with a similar facility prior to the Petition Date; and (b) a $55 million second lien term loan from certain members of the Ad Hoc Committee and Wasserstein.  Prior to the Debtors' chapter 11 filing, the Debtors engaged in extensive negotiations with the Ad Hoc Committee that resulted in the execution of a support agreement (as amended, the "<u>Plan Support Agreement</u>") that provides the basis for the Plan.  Approximately 81 percent of the Noteholders, including Wasserstein, in its capacity as a Noteholder, are party to the Plan Support Agreement and have agreed to support and vote for the Plan, subject to the terms of the Plan Support Agreement.

The Plan contemplates the reorganization of the Debtors through (a) the elimination of the PBGC Claim and the Debtors' Senior Notes in exchange for the issuance of new stock and (b) a rights offering (the "<u>Rights Offering</u>") that will provide the PBGC and the Noteholders that meet certain SEC requirements with the opportunity to purchase stock of the reorganized Debtors in connection with their emergence from chapter 11.  The Debtors will utilize the proceeds of the Rights Offering to repay outstanding amounts under their second lien debtor-in-possession term loan described above and to fund the Debtors' business operations going forward.  The Rights Offering permits qualified Noteholders to purchase approximately 74.9 percent of the stock of the reorganized Debtors for $55 million.  Because the Plan does not

require qualified Noteholders to participate in the Rights Offering, the Debtors also entered into an agreement with a specific group of their Noteholders to "backstop" the Rights Offering (as amended, the "Backstop Agreement").  Pursuant to the Backstop Agreement, the Noteholders that are party to that agreement will purchase any remaining stock that was not purchased by other Noteholders or the PBGC as part of the Rights Offering.  In consideration for the performance of their obligations under the Backstop Agreement, the Noteholders that are party to the Backstop Agreement will receive 50,000 shares in Reorganized Holdings.  The Backstop Agreement ensures that the Debtors will obtain $55 million in new equity financing upon their emergence from these cases.

After the Petition Date, the Debtors also obtained Bankruptcy Court approval to enter into a $100 million exit facility that would become effective on the effective date of the Plan. This facility, provided by the same lenders who provided the Debtors with a similar facility prior to the Petition Date and the $100 million first lien debtor-in-possession revolving credit facility, permits the Debtors to maintain their historical working capital financing upon emergence from chapter 11 on terms substantially similar to those that existed prior to the Petition Date.

*Operational Restructuring Efforts During These Chapter 11 Cases*

To emerge from chapter 11, the Debtors have re-focused their attention on their core business during the course of these chapter 11 cases.  This has led to various operational improvements designed to successfully position the Debtors for the 2011 holiday season and beyond.  For instance, the Debtors have performed a comprehensive review of their vendor base in an effort to reduce the cost of materials and other inventory.  In addition, the Debtors have examined their executory contracts and leases and rejected various executory contracts and leases to eliminate unnecessary operating expenses.  By way of example, the Debtors sought and obtained Bankruptcy Court approval to reject "dark store" leases at 53 store locations.  The Debtors had exited each of these unprofitable store locations just prior to the filing of these chapter 11 cases.  The cessation of operations at these store locations and the rejection of these leases have reduced the Debtors' expenses and overall cost structure, and have increased the Debtors' profitability.

*The Creditors' Committee Support for the Plan*

The Plan is supported by the Debtors' key stakeholders, including not only Noteholders holding 81 percent of the outstanding Senior Notes pursuant to the Plan Support Agreement, but also by the Creditors Committee as a result of a resolution (the "Plan Settlement") reached between the Debtors, the Ad Hoc Committee and the Creditors Committee on May 9, 2011. Pursuant to the Plan Settlement, the Debtors and the Ad Hoc Committee agreed to amend the Plan Support Agreement and the plan term sheet attached to the Plan Support Agreement (as amended, the "Plan Term Sheet") to provide the treatment of Class 4 claims and interests as described in Section II.B of this Disclosure Statement.  Pursuant to the Plan Settlement, Class 4 claimants will receive cash in an amount equal to 10 percent of each Unsecured Creditor's Allowed General Unsecured Claim.

As a result of the Plan Settlement, the Debtors and their key stakeholders anticipate the Plan will be largely consensual.  The Plan, which includes the elimination of a significant

amount of unsecured debt and the commitment for exit financing, will allow the Debtors to emerge successfully from these chapter 11 cases with a deleveraged balance sheet and well-positioned to take advantage of a strong product mix and right-sized capital structure. The Creditors Committee, the Ad Hoc Committee and the board of directors of Holdings and each of its subsidiary Debtors believe that the Plan will maximize the value of the Debtors' estates and therefore is in the best interest of the Debtors' creditors.

A general discussion of the Plans' terms, its treatment of creditors and other relevant information is set forth below.

## II. CLAIMS CLASSIFICATION AND VOTING UNDER THE PLAN

### II.A. Introduction

The following is a brief overview of certain provisions of the Plan. This overview is qualified by reference to the provisions of the Plan, which is attached hereto as Exhibit I, and the exhibits thereto, as amended from time to time.

The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case. Upon confirmation of a plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan. The Plan contemplates a reorganization of the Debtors and is therefore referred to as a "Plan of Reorganization."

The Debtors and the Creditors Committee believe that the Plan is in the best interests of their estates and creditors. **All creditors entitled to vote on the Plan are urged to vote in favor of the Plan prior to [5:00 p.m., Eastern Time, July 28, 2011], the Voting Deadline.**

### II.B. Summary of Classes and Treatment of Claims and Interests

The Plan divides holders of Claims against and Interests in the Debtors into seven separate classes. The classes, proposed treatment and the estimated percentage recovery for each class under the Plan, is provided in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. See Section II.C. for the provisions of the Plan governing such claims.

- 4 -

## SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN

| CLASS | TREATMENT | STATUS/ VOTING RIGHTS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 1<br><br>Other Secured Claims | Each holder of an Allowed Claim in Class 1 shall receive, at the option of the Reorganized Debtors, in full and final satisfaction and discharge of such Claim, either: (a) cash in the full amount of the Allowed Secured Claim; (b) the return of the collateral securing such Allowed Claim; or (c) such other treatment that satisfies section 1129 of the Bankruptcy Code, in each case as consented to by the Requisite Principal Holders. | Unimpaired<br><br>Deemed to Have Accepted the Plan<br><br>Not Entitled to Vote | 100% |
| Class 2<br><br>Priority Claims | Each holder of an Allowed Priority Claim against a Debtor will receive, in full and final satisfaction and discharge of such Claim, cash equal to the amount of such Allowed Claim, unless otherwise agreed by the holder of a Class 2 Claim. | Unimpaired<br><br>Deemed to Have Accepted the Plan<br><br>Not Entitled to Vote | 100% |

CHI-1804345v1

| CLASS | TREATMENT | STATUS/ VOTING RIGHTS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 3 Senior Note Claims and PBGC Claim | Each holder of an Allowed Class 3 Claim shall receive, in full and final satisfaction and discharge of such Claim (a) its Pro Rata share of 145,945 HD Shares outstanding as of the Effective Date (subject to adjustment for the Non-Accredited Investor Shares to the extent applicable) (the "Initial Share Pool") and (b) Subscription Rights to acquire up to 733,333 HD Shares in connection with, and on the terms and conditions of, the Rights Offering and the Rights Offering Procedures; *provided, however*, that in order for the holder of an Allowed Class 3 Claim to participate in the Rights Offering and receive a Pro Rata share of the Subscription Rights contemplated by Section III.B.3(b) of the Plan, such holder must be an Eligible Holder and must have held such Claim on the Rights Offering Record Date. Each holder of an Allowed Class 3 Claim that completes the Accredited Investor Questionnaire in a timely manner and validly certifies that it is not an Accredited Investor and otherwise complies with the Accredited Investor Order shall be entitled to receive, in lieu of Subscription Rights, the Non-Accredited Investor Distribution. Any Non-Accredited Investor Shares distributed as the Non-Accredited Investor Distribution shall reduce, on a share for share basis, the number of HD Shares in the Initial Share Pool. Each holder of an Allowed Class 3 Claim that is not an Eligible Holder and fails to complete the Accredited Investor Questionnaire in a timely manner or otherwise fails to comply with the Accredited Investor Order shall not be entitled to receive any Non-Accredited Investor Distribution. Any Senior Floating Rate Notes due 2012 and/or 9.0% Senior Notes due 2013 held or owned by the Debtors shall be cancelled as of the Effective Date and not entitled to any distributions under the Plan. | Impaired Entitled to Vote | 5.9% -14.8%[1] |

---

[1]     The percentage recovery is based on the valuation of the Debtors in Exhibit IV. A holder of an Allowed Class 3 Claim that exercises its Subscription Rights pursuant to the Plan will receive an estimated recovery of 14.8 percent on account of its claim. A holder of an Allowed Class 3 Claim that does not exercise its Subscription Rights pursuant to the Plan will receive an estimated recovery of between 5.9 percent and 10 percent on account of its claim.

CHI-1804345v1

| CLASS | TREATMENT | STATUS/ VOTING RIGHTS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 4 General Unsecured Claims | Each holder of an Allowed Class 4 Claim shall receive cash in an amount equal to 10% of such holder's Allowed General Unsecured Claim payable as follows:<br><br>Forty-percent (40%) of the Distribution on account of an Allowed Class 4 Claim shall be disbursed by the Reorganized Debtors (up to $1,600,000 in the aggregate for all Allowed General Unsecured Claims) in the 2012 Payment.<br><br>Sixty-percent (60%) of the Distribution on account of an Allowed Class 4 Claim shall be disbursed by the Reorganized Debtors (up to $2,400,000 in the aggregate for all Allowed General Unsecured Claims) in the 2013 Payment.<br><br>If the Distributions on account of Allowed Class 4 Claims exceed $4,000,000 in the aggregate for all Allowed General Unsecured Claims, the amount in excess of $4,000,000 in the aggregate for all Allowed Class 4 Claims shall be disbursed by the Reorganized Debtors in the 2014 Payment.<br><br>All unpaid distributions on account of Allowed General Unsecured Claims held by Unsecured Creditors shall accrue simple interest at the annual rate of 5% from the Effective Date through the applicable disbursement date referenced in Section III.B.4 of the Plan. The disbursement to be disbursed pursuant to Section III.B.4 of the Plan shall be due and payable upon the occurrence of a Liquidity Event with respect to the Reorganized Debtors. To the extent that a Class 4 Claim remains contingent, unliquidated or disputed as of the date of the 2014 Payment, the holder of such Class 4 Claim shall receive the full amount of the Distribution provided for in Section III.B.4 of the Plan as soon as practicable following the date such Class 4 Claim becomes Allowed.[2] | Impaired<br><br>Entitled to Vote | 10% |

---

[2] To the extent that a Class 4 Claim remains contingent, unliquidated or disputed as of the first Monday following the end of the Reorganized Debtors' fiscal month of August 2014, the holder of such Class 4 Claim shall receive the full amount of the Distribution provided for in Section III.B.4 of the Plan as soon as practicable following the date such Class 4 Claim becomes Allowed.

CHI-1804345v1

| CLASS | TREATMENT | STATUS/ VOTING RIGHTS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 5 Intercompany Claims | No property will be distributed to or retained by the holders of Allowed Claims in Class 5, and such Claims will be extinguished on the Effective Date, subject to the Restructuring Transactions; *provided, however*, that the Debtors with the consent of the Requisite Principal Holders (at any time on or prior to the Effective Date) or the Reorganized Debtors reserve the right to reinstate or eliminate some or all of the Intercompany Claims. Notwithstanding this treatment of Class 5 Claims, each holder of an Intercompany Claim will be deemed to have accepted the Plan. | Impaired Deemed to Have Accepted the Plan Not Entitled to Vote | N/A |
| Class 6 Equity Interests in Subsidiary Debtors | On the Effective Date, Class 6 Interests shall be Reinstated. | Unimpaired Deemed to Have Accepted the Plan Not Entitled to Vote | N/A |
| Class 7 Equity Interests in Harry & David Holdings | On the Effective Date, Class 7 Interests shall be extinguished and no consideration shall be paid or distributed on account of Class 7 Interests. | Impaired Deemed to have Rejected the Plan Not Entitled to Vote | 0% |

## II.C. Unclassified Claims

### II.C.1. Payment of Administrative Claims

#### a. Administrative Claims in General

Except as specified in this Section III.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Reorganized Debtor, each holder of an Allowed Administrative Claim (other than the Principal Holder Fees and Expenses or the professionals retained by the Principal Holders and the Backstop Parties and the Senior Note Indenture Trustee Fee) shall receive, in full satisfaction of its Administrative Claim, cash equal to the Allowed amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, within 45 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

#### b. DIP Revolver Claims

On or before the Effective Date, all outstanding DIP Revolver Claims shall be (i) paid in full in cash in accordance with the DIP Revolving Loan Agreement, or (ii) converted to claims and obligations outstanding under the Exit Facility in accordance with the terms thereof.

CHI-1804345v1

c. DIP Note Claims

On the Effective Date, payment in full in cash shall be disbursed on account of all DIP Note Claims. In accordance with and subject to the terms of the Backstop Agreement, each Backstop Provider shall be deemed to have satisfied its obligation to pay the Backstop Commitment Amount (as defined in the Backstop Agreement) by submitting the Exchange Documentation (as defined in the Backstop Agreement) to the Subscription Agent, in form and substance reasonably satisfactory to the Requisite Backstop Providers (as defined in the Backstop Agreement), Holdings and the Subscription Agent, pursuant to which such Backstop Provider irrevocably agrees to cancel on the Effective Date an amount of DIP Note Claims held by such Backstop Provider in exchange for a number of HD Shares equal to the Conversion Amount (as defined in the Backstop Agreement) divided by the Exercise Price (as defined in the Backstop Agreement). To the extent any Backstop Provider's Conversion Amount is less than its respective Backstop Commitment Amount, such Backstop Provider shall deposit an amount of cash into the Escrow Account (as defined in the Backstop Agreement) equal to the difference between the Conversion Amount and such Backstop Provider's Backstop Commitment Amount on or prior to the Backstop Funding Deadline (as defined in the Backstop Agreement).

d. Exit Facility Claims

On or before the Effective Date, all Exit Facility Fee Claims shall be paid in full in cash.

e. Statutory Fees

On or before the Effective Date, cash shall be disbursed on account of Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined at the Confirmation Hearing by the Bankruptcy Court, in an amount equal to the amount of such Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 shall be disbursed by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

f. Ordinary Course Liabilities

Administrative Claims based on liabilities incurred by a Debtor after the Petition Date in the ordinary course of its business, including Administrative Trade Claims, any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.F of the Plan, shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims or further approval of the Bankruptcy Court.

g. Bar Dates for Administrative Claims

i. General Bar Date Provisions

Except as otherwise provided in Section III.A.1.g.ii of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized

Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by 90 days after the Effective Date.

ii.      Bar Dates for Certain Administrative Claims

A.      Professional Compensation

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than 25 days after the Effective Date; *provided*, *however*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order. A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application. Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by 45 days after the Effective Date. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims. Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

B.      Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred after the Petition Date by a Debtor in the ordinary course of its business, including Administrative Trade Claims, any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.F of the Plan, shall not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims shall be satisfied pursuant to Section III.A.1.f of the Plan.

Holders of claims pursuant to section 503(b)(9) of the Bankruptcy Code against the Debtors and governmental units holding claims against the Debtors (whether secured, unsecured priority or unsecured nonpriority) that arose prior to the Petition Date, including governmental units with claims against a Debtor for unpaid taxes, whether such claims arise from prepetition tax years or periods or prepetition transactions to which the Debtor was a party, must file their claim pursuant to the applicable Bar Date in the Bar Date Order.

- 10 -

### II.C.2.        Payment of Priority Tax Claims

a.        Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full of the allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

b.        Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section III.A.2.a of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 4 Claim, and the holder (other than as the holder of a Class 4 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

### II.C.3.        Disallowance of Reclamation Claims

All Reclamation Claims shall be disallowed on the Effective Date, any related adversary proceedings shall be dismissed on the Effective Date and any Allowed Claims relating to the provision of goods to the Debtors prior to the Petition Date shall be treated and paid as Class 4 Claims.

### II.D.        Voting on and Confirmation of the Plan

### II.D.1.        Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified by the Plan, other than by curing defaults and reinstating maturity. Classes of claims and interests that are not impaired under the terms of a plan are not entitled to vote on such plan and are conclusively presumed to have accepted the plan. The classification of Claims and Interests under the Plan is summarized, together with an indication of whether each class of Claims or Interests is impaired or unimpaired, in Section II.B above. Under the terms of the Plan, only holders of Claims in Class 3 and Class 4 are impaired and entitled to vote on the Plan. Interests in Class 7 are impaired, and because they will not receive or retain any property under the Plan, they are deemed to have rejected the Plan.

Bankruptcy Rule 3017(d) provides that the "date [an] order approving the disclosure statement is entered," or such other date established by the court, is the record date for determining the "holders of stock, bonds, debentures, notes, and other securities" entitled to receive the materials specified in Bankruptcy Rule 3017(d), including ballots for voting on a plan of reorganization. **The record date for voting purposes has been established as [5:00 p.m. Eastern Time on June 24, 2011].**

Please carefully follow all of the instructions contained on the Ballot or Ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All Ballots must be completed and returned in accordance with the instructions provided. It is of the utmost importance to the Debtors that you vote promptly to accept the Plan. If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent at (888) 425-7040. You also may obtain solicitation materials from the Voting Agent by accessing **http://www.gcginc.com/cases/had/**.

**To be counted, your Ballot or Ballots must be received by the Voting Agent by no later than [5:00 p.m., Eastern Time, July 28, 2011]. Votes cannot be transmitted orally, by email or facsimile.** Accordingly, you must return your signed and completed Ballot, by mail, personal delivery or overnight courier promptly and **in advance**, so that it is **received** by the Voting Agent prior to **[5:00 p.m., Eastern Time, July 28, 2011]**.

As described in greater detail in the instructions contained on the Ballot, a beneficial owner of Senior Notes for which a nominee will be completing a Senior Notes master ballot must return its Senior Notes Ballot to the appropriate nominee in sufficient time to permit the nominee to process the Senior Notes Ballot, complete a Senior Notes master ballot, and forward the Senior Notes master ballot to the Voting Agent for receipt prior to **[5:00 p.m., Eastern Time, July 28, 2011]**.

Holders of Claims in Class 3 or Class 4 may withdraw or modify their executed Ballots by delivering (or having their nominee deliver) to the Voting Agent, prior to the Voting Deadline, a subsequent properly completed and duly executed Ballot. After the Voting Deadline, withdrawals of or modifications to executed Ballots will not be permitted unless expressly agreed to by the Debtors in writing. Withdrawal or revocation of votes accepting or rejecting the Plan may be effected only in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### II.D.2. Hearing on Confirmation of the Plan

In order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code (the "Confirmation Hearing"). The Confirmation Hearing has been scheduled for August 11, 2011 at 11:00 a.m. (Eastern Time). The Debtors expect that the Confirmation Hearing will be held in the usual courtroom of the Honorable Mary F. Walrath, the United States Bankruptcy Judge assigned to the Chapter 11 Cases, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code for confirmation are met. Among such requirements are that the Plan:

a)  is accepted by the requisite holders of claims and interests in each impaired class under the Plan;

b)       provides that each creditor voting against the Plan in an impaired class       will receive at least as much as it would if the Debtors were instead       liquidated pursuant to chapter 7 of the Bankruptcy Code; and

c)       is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtors.

However, the "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization in certain circumstances even if the Plan is not accepted by all impaired classes of claims and interests.  A detailed description of the requirements for confirmation of the Plan is contained in Section VII of this Disclosure Statement.

If either Class 3 or Class 4 votes to reject the Plan, (a) the Debtors may seek to satisfy the requirements for confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code and, if required, may amend the Plan to conform to the standards of such section or (b) the Plan may be withdrawn with respect to a particular Debtor, without affecting the Plan as to other Debtors, or in its entirety.  The Debtors will be seeking to confirm the Plan pursuant to the cramdown provisions of section 1129(b) of the Bankruptcy Code as to Interests in Class 7, if necessary.

Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector.  Any such objections must be filed with the Bankruptcy Court and served upon the persons designated in the notice of the Confirmation Hearing included with this Disclosure Statement and in the manner and by the deadline described therein.

## III.    THE DEBTORS' BUSINESS

The Debtors are a leading multi-channel specialty retailer and producer of branded premium gift-quality fruit, gourmet food products and other gifts marketed under the Harry & David®, Wolferman's® and Cushman's® brands.  Signature products and offerings marketed under the Harry & David name include Royal Riviera® pears, Fruit-of-the-Month Club® products, Tower of Treats® gifts and Moose Munch® caramel and chocolate popcorn snacks. Products marketed under the Wolferman's brand include specialty English muffins and other breakfast products, and the Cushman's product line includes Cushman HoneyBells® citrus, among other products.  The Debtors' marketing channels include direct marketing (via catalog, phone, Internet, mail/fax and telemarketing), business-to-business, Harry and David stores, seasonal Cushman's stores, and wholesale distribution through select retailers.

The Debtors grow, manufacture, design and package products that account for the significant majority of their annual sales revenue.  The Debtors own approximately 3,400 acres of land in Oregon, of which approximately 1,900 acres are planted orchards geographically dispersed throughout the Rogue Valley of Southern Oregon at varying elevations and micro-climates.  Also included in the 3,400 acres is the Debtors' 93 acre campus in Medford, Oregon, which houses:  (a) a 54,000 square foot bakery, confectionery and chocolate complex dedicated to the production of baked goods, chocolates and confections; (b) a 646,000 square foot fruit

packing and gift assembly complex, including cold storage; (c) a 72,000 square foot year-round call center and various other distribution and storage facilities. The Debtors owned acreage in Rogue Valley further includes housing for their seasonal agricultural workforce. The Debtors also own a 51-acre campus in Hebron, Ohio that houses a 275,000 square foot fruit packing and gift assembly complex, including cold storage and a 55,000 square foot call center and office space.

The Debtors' owned real property and other manufacturing related assets have enabled them to create a substantial and scalable infrastructure in their production, fulfillment and distribution capabilities, information technology systems and retail stores network. The Debtors maintain vertically integrated operations that allow them to efficiently monitor costs, quality and manufacturing processes and inventory. This vertical integration further allows the Debtors to maintain a high degree of control over product quality compared with that of the Debtors' competitors, as the Debtors rely less heavily on third-party suppliers.

The Debtors sell their products primarily through direct marketing and retail stores. The Debtors direct marketing consists of the distribution of various catalogs and other direct mail and other online marketing through email and the Debtors' various websites. The Debtors also currently operate approximately 69 permanent retail stores, after having rejected the leases for 53 store locations during these chapter 11 cases. The Debtors' stores are located generally in leading outlet and lifestyle centers, specialty malls and other high traffic shopping areas throughout the United States. In addition, the Debtors operate a single flagship Country Village store in Medford, Oregon, which offers the full selection of Harry and David retail products as well as expanded offerings consisting of fresh fruit, vegetables and produce, gourmet specialty foods and wine selections.

A significant portion of the Debtors' net sales, earnings and cash flows are generated during the holiday season from October through December. Accordingly, the Debtors' annual operating results and their liquidity are materially impacted by the holiday season. For example, in fiscal 2010, as is typical for their businesses, over 60 percent of the Debtors' revenues were generated during the holiday season and that was the only fiscal quarter during which the Debtors generated positive cash flows or operating income.

The Debtors employed approximately 1,950 employees as of the Petition Date. The Debtors also typically employ thousands of seasonal employees. For the twelve months ending March 26, 2011, the Debtors generated approximately $409.8 million in revenue. As of March 26, 2011, the Debtors had approximately $217.2 million in assets and approximately $331.2 million in liabilities on a book-value basis.

CHI-1804345v1

# IV. CORPORATE AND CAPITAL STRUCTURE AS OF THE PETITION DATE[3]

## IV.A. Corporate Structure and History

Harry & David Holdings, Inc. is a holding company that owns, directly or indirectly, each of the other Debtors. Wasserstein, owns approximately 63 percent of Harry & David Holdings, Inc.'s outstanding shares and affiliates of funds sponsored by Highfields Capital Management LP own approximately 34 percent of Harry & David Holdings, Inc.'s outstanding shares. Employees or former employees of the Debtors own the remaining outstanding shares of Harry & David Holdings, Inc.

Harry & David Holdings, Inc. holds 100 percent of the outstanding shares of subsidiary Harry and David. In turn, Harry and David owns 100 percent of the outstanding shares of Harry & David Operations, Inc. and Bear Creek Orchards, Inc. Harry and David functions as the Debtors' primary marketer and seller of products. Harry & David Operations, Inc. is responsible primarily for the manufacture of goods sold by the Debtors. Bear Creek Orchards, Inc. holds legal title to the Debtors' orchards.

Harry & David Holdings, Inc. was incorporated in 2004 to acquire the Harry & David companies. On June 17, 2004, Harry & David Holdings, Inc. purchased all of the outstanding shares of common stock of Harry and David from Yamanouchi Consumer Inc. In connection with that acquisition, Harry & David Holdings, Inc. issued one million shares of $.01 par value stock to Wasserstein and to Highfields. In addition, and subject to the Debtors' financing agreements and note indentures, the Debtors entered into an agreement with Wasserstein, on behalf of Wasserstein and Highfields, to pay Wasserstein and Highfields an aggregate fee of up to $1 million annually plus expenses for financial management, consulting and advisory services. Under that management agreement, the Debtors also agreed to engage Wasserstein as an advisor in connection with any material financing transactions, asset acquisitions or dispositions or any direct or indirect change of control of the Debtors and to pay a customary transaction fee for such services upon consummation of such a transaction. The Debtors intend to reject that existing management agreement under the Plan.

At the time of the Petition Date, the three member board of Harry & David Holdings, Inc. consisted of two directors affiliated with Wasserstein and Stephen J. Heyer, the previous Chief Executive Officer of the Debtors. Since the Petition Date, the Debtors have added a fourth director, Mr. David Webster, to the board of directors of Harry & David Holdings, Inc. Mr. Webster is independent of the Debtors and Wasserstein.

---

[3]   In addition to the capital structure described below, the Debtors are party to a Credit Agreement, dated March 20, 2006 (as amended) with Ally Commercial Finance LLC (f/k/a GMAC Commercial Finance LLC), as Collateral Agent and Documentation Agent, UBS Securities LLC, as Arranger, UBS AG Stamford Branch, as Issuing Bank, Administrative Collateral Agent and Administrative Agent, and UBS Finance LLC, as Swingline Lender, that provided the Debtors with a $105 million revolving credit facility (the "Prepetition Revolving Credit Facility"). Borrowings under the Prepetition Revolving Credit Facility are secured by substantially all of the Debtors' assets. As a result of defaults under the Prepetition Revolving Credit Facility associated with the Debtors' financial performance leading up to the Petition Date, the Debtors were not permitted to borrow under the Prepetition Revolving Credit Facility. There are no amounts outstanding under the Prepetition Revolving Credit Facility.

CHI-1804345v1

## IV.B.    Senior Unsecured Notes

The Debtors had approximately $58 million in principal amount of Senior Floating Rate Notes due March 1, 2012 and approximately $140 million in principal amount of Senior Fixed Rate Notes due March 1, 2013 (collectively, the "Senior Notes") outstanding as of the Petition Date.  A single indenture (the "Indenture"), dated February 25, 2005, governs both series of Senior Notes, for which Wells Fargo Bank, N.A. is the indenture trustee.

The Senior Notes represent unsecured obligations of Harry and David and are guaranteed by each of the other Debtors.  The Senior Floating Rate Notes accrued interest at a rate per annum equal to LIBOR plus five percent calculated and paid quarterly.  The Senior Fixed Rate Notes accrued interest at an annual fixed rate of nine percent, with semiannual interest payments.

The Debtors issued the Senior Notes in 2005 in connection with the Debtors' recapitalization.  As described more fully in the Indenture and the accompanying Offering Memorandum dated February 25, 2005, $159.6 million of the net proceeds of the offering of Senior Notes were used to repay a second lien term loan in its entirety, $13.9 million of the net proceeds were used to make a distribution that permitted the repayment of a loan relating to certain net operating losses relating to the acquisition of Harry & David Operations, Inc., and $82.6 million of the net proceeds were used for a return of capital to Wasserstein and Highfields.

In 2008 and 2009, the Debtors repurchased approximately $34.8 million of the then outstanding Senior Fixed Rate Notes and $11.8 million of the then outstanding Senior Floating Rate Notes.  The Debtors officially cancelled $22.2 million of the repurchased Senior Fixed Rate Notes and $2 million of the repurchased Senior Floating Rate Notes, and the Debtors hold the remaining repurchased notes.  These amounts are in addition to the $198 million of outstanding Senior Notes noted above and are not deemed to be outstanding for voting purposes.  In addition, pursuant to the Plan, the Senior Notes held by the Debtors will be cancelled on the Effective Date, and the Debtors will not receive any distribution under the Plan on account of their ownership of Senior Notes.  As of the Petition Date, Wasserstein owned approximately $35.2 million in principal amount of Senior Notes.

## IV.C.    Pension Obligations

Harry and David sponsors the Harry and David Employees' Pension Plan, a defined benefit pension plan (the "Pension Plan") that was "frozen" (i.e., eliminated future benefit accruals) as of June 30, 2007.  The Pension Plan is one of the Debtors' largest debt obligations.  As of January 1, 2011, the total unfunded liability for the Pension Plan on an actuarial basis is estimated to be $23,600,000.  To preserve liquidity, the Debtors did not make their minimum required contribution to the Pension Plan due on April 15, 2011 in the amount of $704,000 and in respect of the 2011 plan year.  The Debtors project that minimum required contributions to the Pension Plan totaling approximately $420,300 and $4,739,200 remain to be paid in respect to the 2010 and 2011 plan years.  The Debtors do not intend to make these contributions (as and when such obligations become due).  Over the next five years, the minimum total required contributions under the Code and ERISA is estimated to be $24,228,200.  As discussed more fully below in Section VI.H, by motion dated May 9, 2011, the Debtors are seeking a distress termination of the Pension Plan.

### IV.D.    Unsecured Trade Debt

In the ordinary course of operating their direct marketing and retail business, the Debtors have historically purchased raw materials and other goods and services from over 1,400 vendors. Significant raw materials the Debtors purchase from third party vendors include paper for the Debtors' catalogs, corrugated paper for delivery needs, and chocolate, butter, cheese and certain fruit that the Debtors do not produce or grow themselves. In addition, the Debtors outsource some of their products, including selected fresh produce, meats, certain confections, snacks, condiments and tabletop, entertaining and home décor accessories. The Debtors estimate that the total amount of General Unsecured Claims is between $25 and $45 million.[4] However, this estimated range of claim amounts may be materially different than actual claim amounts.

### IV.E.    Lease Obligations

The Debtors operate approximately 69 stores in leading outlet and lifestyle centers, specialty malls and other high traffic shopping areas throughout the United States. In addition, as of the Petition Date, the Debtors were responsible for lease payments with respect to 53 other store locations where the Debtors' ceased operations prior to the Petition Date. The Debtors rejected the leases for these store locations as of the Petition Date pursuant to the Order (I) Authorizing the Debtors to Reject Certain of the Dark Store Leases and (II) Granting Certain Related Relief, entered on April 27, 2011 [Docket No. 227]. The Debtors also lease storage or warehouse space at approximately 10 locations. Prior to the Petition Date, the Debtors' annual expense for leased properties was approximately $19 million.

## V.    EVENTS LEADING TO THE DEBTORS' CHAPTER 11 FILING

For nearly 75 years, the Debtors thrived as an industry leading catalog retailer. Over the course of the last several years, however, various external market factors diminished the Debtors' competitive advantages and, correspondingly, revenues and profitability. Specifically, the Internet allowed numerous additional direct competitors to enter the Debtors' market. Unlike the Debtors, who manufacture approximately 85 percent of their own products, these new entrants typically outsource non-proprietary products from cost-advantaged manufacturers. As such, these new entrants generally possess lower overhead costs than the Debtors.

"Big box" retailers also began to sell products that compete with those of the Debtors. Similar to the Debtors' new direct competitors, the "big box" retailers possess certain cost advantages over the Debtors, and the addition of the "big box" retailers have further increased competition for the Debtors, placing more downward pressure on pricing.

Recognizing the existence of an emerging number of low cost competitors, the Debtors placed even more focus on the quality of their products over the course of the past several years. Consumers, however, became extremely price conscious following the 2008 recession, and this consciousness continues to impact materially the Debtors' ability to maintain higher selling

---

[4]     Pursuant to certain of the orders granting the relief sought in the Debtors' "first-day" motions, the Debtors were authorized to pay up to approximately $9.7 million in prepetition trade claims, including certain claims of essential suppliers, foreign vendors, PACA vendors and distribution network vendors.

prices.  The Debtors' financial performance over the past three years is a reflection of this trend, as consumer price consciousness caused the Debtors to discount their products more significantly than they had expected previously.  Additionally, during the 2010 holiday season, the Debtors expected a significant increase in sales, which ultimately did not materialize.  In order to clear inventory purchases, the Debtors were forced to discount more heavily than anticipated.

As a result, the Debtors failed to generate enough cash flow during the 2010 holiday season to satisfy the minimum available cash covenant contained in their Prepetition Revolving Credit Facility, and the Debtors were unable to continue borrowing under their Prepetition Revolving Credit Facility.

After losing the ability to borrow under their Prepetition Revolving Credit Facility and facing a significant liquidity shortfall as a result of their 2010 holiday season results, the commencement of these cases became necessary to (a) address the Debtors' liquidity needs and (b) provide the opportunity to, among other things, implement operational improvements in the Debtors' business and deleverage the Debtors' balance sheet.

Prior to the Petition Date, in order to avoid a "free-fall" bankruptcy filing, and the resulting negative impact such a bankruptcy filing might have on the Debtors' business and core constituents — including their employees, vendors, customers and lenders — the Debtors engaged in discussions and negotiations with numerous potential lenders and investors.  These negotiations ultimately allowed the Debtors to finalize a pre-arranged chapter 11 filing that the Debtors and their major stakeholders believe maximizes the value of the Debtors' estates for the benefit of all of the Debtors' various creditor constituencies.  The Debtors' pre-arranged chapter 11 filing included the following components:

(a)      debtor-in-possession financing necessary to fund their business during chapter 11;

(b)      the agreement of the Noteholders (including Wasserstein) holding approximately 81 percent of the Senior Notes to support the structure of a plan of reorganization for the Debtors that included, among other things, (i) the conversion of the Senior Notes to equity in the Reorganized Debtors and (ii) a significant infusion of new equity into the Debtors upon emergence from chapter 11 in order to repay amounts borrowed during chapter 11 under one of their debtor-in-possession financing facilities and for working capital; and

(c)      a commitment for exit financing that is intended to provide necessary working capital funding for the Debtors after emergence from chapter 11.

## VI.      EVENTS DURING THE CHAPTER 11 CASES

### VI.A.      Commencement of Chapter 11 Cases

On March 28, 2011, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are administered jointly as *In re:  Harry & David Holdings, Inc., et al.*, (Case No. 11-10884 (MFW)).

**VI.B.    First Day Relief**

On the Petition Date, the Debtors filed a number of motions and other pleadings (the "First Day Motions"), the most significant of which are described below.  The First Day Motions were proposed to ensure an orderly transition into chapter 11.

The First Day Motions included:

(i)    Motions seeking to honor and pay various prepetition obligations, including (a) certain employee wage and benefit obligations, (b) certain insurance and workers' compensation obligations, (c) certain tax obligations, (d) claims of certain critical vendors and foreign vendors; (e) claims of certain distribution network vendors; (f) claims of PACA vendors; and (g) certain obligations to customers;

(ii)    A motion for an order confirming the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and services;

(iii)    A motion to establish procedures for determining adequate assurance for the provision of utility services;

(iv)    A motion relating to the continued use of the Debtors' existing cash management system, bank accounts, business forms and investment and deposit guidelines; and

(v)    Motions relating to case administration and the use of The Garden City Group as the Debtors' claims, noticing and balloting agent.

The First Day Motions were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee and other parties in interest.

**VI.C.    Debtor-in-Possession Financing**

In connection with their preparations for the commencement of the chapter 11 cases, the Debtors determined that they would need to obtain a commitment for postpetition financing to ensure sufficient liquidity to continue operations and to administer and preserve the value of their estates.  After conducting an extensive search for postpetition financing from financial institutions, hedge funds and alternative lenders, the Debtors obtained postpetition financing in the form of the following:

(i)    a senior secured, super-priority revolving asset-based credit facility with commitments in an aggregate principal amount up to $100 million, pursuant to that certain $100 million Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, by and among the Borrower (Harry and David), Harry & David Holdings, Inc., Bear Creek Orchards, Inc., and Harry & David Operations, Inc., as guarantors, the lenders party thereto, UBS Securities LLC, as lead arranger, UBS Loan Finance LLC, as a lender and as a swingline lender, UBS AG,

- 19 -

Stamford Branch, as issuing bank, administrative collateral agent and administrative agent for the lenders, and Ally Commercial Finance LLC, as collateral agent for the lenders, as documentation agent, and as a lender (the "DIP Revolving Loan Agreement"), the Debtors' existing prepetition lenders; and

(ii)     a super-priority junior debtor-in-possession notes facility in an aggregate principal amount of $55 million, pursuant to that certain Junior Secured Super-Priority Debtor-in-Possession Note Purchase Agreement, by and among the Debtors, Wilmington Trust FSB, as administrative agent, and each of the DIP Note Purchasers party thereto (the "DIP Notes Purchase Agreement" and collectively with the DIP Revolving Loan Agreement, the "DIP Facilities"), who are a subset of the holders of the Debtors' Senior Notes.

On March 29, 2011, the Debtors were authorized by the Bankruptcy Court to obtain credit and incur debt under the DIP Facilities on an interim basis. On May 10, 2011, the Bankruptcy Court entered a final order approving the DIP Facilities (the "Final DIP Order") [Docket No. 291].

### VI.D.     Appointment of the Creditors' Committee

On April 7, 2011, the United States Trustee appointed the Creditors' Committee. The current membership of the Creditors' Committee and the professional advisors to the Creditors' Committee are as follows:

Creditors' Committee Members

(i)     Pension Benefit Guaranty Corporation, Attn: Craig Yamaoka, 1200 K Street, NW, Washington DC 20005

(ii)     Convergys Customer Management Group Inc., Attn: David R. Wiedwald, 201     East Fourth Street, Cincinnati OH 45202

(iii)     RR Donnelley, Attn: Dan Pevonka, 3075 Highland Parkway, Downers Grove IL 60515

(iv)     American List Counsel Inc., Attn: Peter DeRosa, 4300 US Highway 1 CN-5219, Princeton NJ 08543

(v)     Simon Property Group, Inc., Attn: Ronald M. Tucker, 225 W. Washington Street, Indianapolis IN 46204

(vi)     Marich Confectionery Assoc., Attn: Roberty E. Bernosky, 2101 Bert Drive, Hollister CA 95023

(vii)     Wells Fargo, NA as Indenture Trustee for Senior Fixed Rate Notes, Attn: James Lewis, 45 Broadway 12th Floor, New York, NY 10006

CHI-1804345v1

Creditors' Committee Counsel

 (i)  Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068

 (ii)  Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801)

Creditors' Committee Financial Advisor

 (i)  FTI Consulting, Inc., 3 Times Square, New York, NY 10036

## VI.E. Exit Financing

The Debtors secured a commitment for exit financing in the form of a first priority senior secured revolving credit facility, in an aggregate principal amount of $100 million, from UBS AG, Stamford Branch, as issuing bank, administrative collateral agent and administrative agent, Ally Commercial Finance LLC (f/k/a GMAC Commercial Finance LLC) as collateral agent and documentation agent, UBS Securities LLC as arranger and the lenders thereto (the "Exit Facility").  The proceeds of the Exit Facility will be used by the Reorganized Debtors to repay the outstanding obligations under the DIP Revolving Loan Agreement, if any, and to fund general working capital and capital expenditure needs.  Pursuant to the Final DIP Order, the Debtors are authorized to enter into the Exit Facility upon emergence from chapter 11.

The general terms of the Exit Facility are as follows:[5]

| | |
|---|---|
| **Borrowers:** | Harry and David, an Oregon corporation ("H&D" or the "Borrower") |
| **Guarantors:** | (a) Harry & David Holdings, Inc., a Delaware corporation ("Holdings"), (b) Bear Creek Orchards, Inc., a Delaware corporation, (c) Harry & David Operations, Inc., a Delaware corporation, and (d) all future direct and indirect domestic subsidiaries of Holdings (collectively, the "Guarantors" and, together with the Borrower, the "Credit Parties") |
| **Administrative Agent:** | UBS |

---

[5] This summary is qualified, in its entirety by the provisions of final documentation that will be executed with respect to the Exit Facility.  Unless otherwise defined within this section, capitalized terms used within this summary shall have the meanings ascribed to them in the DIP Revolving Loan Agreement, which is attached to the Debtors motion for an order authorizing them to obtain post-petition financing and exit financing, filed on March 28, 2011 [Docket No. 17].

| | |
|---|---|
| **Collateral Agent:** | Ally Commercial Finance LLC ( f/k/a GMAC Commercial Finance LLC, "<u>Ally</u>"), as collateral agent for the lenders party to the Exit Credit Facility (in such capacity, the "<u>Collateral Agent</u>"). |
| **Issuing Bank:** | UBS |
| **Lenders:** | The lenders under the DIP Revolving Loan Agreement. |
| **Exit Facility:** | A first priority senior secured revolving credit facility (the "<u>Exit Credit Facility</u>") in an aggregate principal amount of $100,000,000, with a sublimit for letters of credit as set forth below (the "<u>Exit Facility Amount</u>"). |
| **Use of Proceeds:** | The proceeds of the loans under the Exit Credit Facility (the "<u>Exit Loans</u>") shall be used by the Borrowers (a) to repay the outstanding obligations under the DIP Revolving Loan Agreement and (b) to fund general corporate working capital and capital expenditure needs including, without limitation, payment of interest and fees under the Exit Credit Facility and cash collateral for letters of credit of the Credit Parties. |
| **Maturity Date:** | 3 years from the closing date. |
| **Availability and Eligible Collateral:** | Up to the lesser of:  (a) $100,000,000 minus any applicable reserves and (b) the borrowing base calculated (including with respect to advance rates) as provided for in the DIP Revolving Loan Agreement minus any applicable reserves. The "Borrowing Base," "Eligible Accounts," "Eligible Equipment," "Eligible Inventory," "Eligible Real Property," "Reserves" and related definitions shall be consistent with the Prepetition Revolving Credit Agreement.  Upon the closing of the Exit Credit Facility, reserves will be no more restrictive than the reserves under the Prepetition Revolving Credit Agreement in effect as of the Petition Date. |
| **Miscellaneous Borrowing Conditions:** | <u>December Paydowns</u>:  The Borrower shall be required to make mandatory payments of all outstanding loans during the month of December as required by the Prepetition Revolving Credit Agreement.<br><br><u>Minimum Available Cash</u>:  The Credit Parties shall be required to maintain minimum Available Cash (as defined in the Prepetition Revolving Credit Agreement) as required by the Prepetition Revolving Credit Agreement. |

CHI-1804345v1

| | |
|---|---|
| **Letter of Credit Sublimit:** | $8,000,000. |
| **Interest Rate and Payment of Interest:** | LIBOR plus 3.75%; Base Rate plus 2.75%, payable monthly per the terms of the Prepetition Revolving Credit Agreement. |
| **Default Interest:** | 2.00% per annum plus the rate otherwise applicable. |
| **Unused Line Fee:** | 1.00% per annum, calculated and paid per the terms of the Prepetition Revolving Credit Agreement. |
| **Letter of Credit Fees:** | The Borrowers will pay to the Issuing Bank, (a) letters of credit fronting fees equal to 0.25% per annum on the undrawn amount of all outstanding letters of credit and (b) letter of credit participation fees equal to 3.75% per annum on the issued and outstanding letters of credit. In addition, the Borrowers shall also pay upon demand to the Issuing Bank customary issuance, amendment and other fees. |
| **Other Fees:** | Payable pursuant to the terms of a separate fee letter with the Administrative Agent and the Collateral Agent. |
| **Security:** | The Exit Credit Facility will be secured by first priority perfected liens (except as provided herein) on all assets of the Borrowers and the Guarantors (collectively, the "Collateral"). |
| **Cash Management** | The cash management system to be used by the Credit Parties shall be satisfactory to the Administrative Agent and the Collateral Agent, and shall be consistent with the cash management system in use under the Prepetition Revolving Credit Agreement. |
| **Conditions Precedent:** | The definitive documentation for the Exit Credit Facility will include such conditions precedent as are usual and customary for financings of this kind, and consistent with the conditions precedent contained in the Prepetition Revolving Credit Agreement, including, but not limited to, (a) the confirmation of a plan of reorganization reasonably acceptable to the Lenders and the occurrence of the effective date of such plan of reorganization, (b) the repayment in full of the Debtors' obligations under the DIP Notes Purchase Agreement pursuant to an equity rights offering or the conversion to equity of any claims outstanding pursuant to the DIP Notes Purchase Agreement, (c) the conversion to equity of any claims outstanding on account of the Senior Notes, (d) completion of review of capital and corporate structures of reorganized Credit Parties, which structures |

- 23 -

shall be reasonably satisfactory to the Administrative Agent and the Collateral Agent (and which shall not include a "diligence out"), and (v) such other reasonable and customary conditions as may be required by the Lenders.

**Representations and Warranties:** The definitive documentation for the Exit Credit Facility will include such representations and warranties as are usual and customary for financings of this kind, and consistent with the representations and warranties contained in the Prepetition Revolving Credit Agreement (as modified to take account of current financial condition of the Credit Parties, and the exit from the Chapter 11 Cases, the longer term of the Exit Credit Facility and as may otherwise be required by the Lenders).

**Affirmative Covenants:** The definitive documentation for the Exit Credit Facility will include such affirmative covenants as are usual and customary for financings of this kind, and consistent with the affirmative covenants contained in the Prepetition Revolving Credit Agreement (as modified to take account of current financial condition of the Credit Parties, and the exit from the Chapter 11 Cases, the longer term of the Exit Credit Facility and as may otherwise be required by the Lenders).

**Negative Covenants:** The definitive documentation for the Exit Credit Facility will include such negative covenants as are usual and customary for financings of this kind, and consistent with the negative covenants contained in the Prepetition Revolving Credit Agreement (as modified to take account of current financial condition of the Credit Parties, and the exit from the Chapter 11 Cases, the longer term of the Exit Credit Facility and as may otherwise be required by the Lenders).

**Financial Reports:** The definitive documentation for the Exit Credit Facility will include financial reporting requirements as are usual and customary for financings of this kind, and consistent with the financial reporting contained in the Prepetition Revolving Credit Agreement (as modified to take account of current financial condition of the Credit Parties, and the exit from the Chapter 11 Cases, the longer term of the Exit Credit Facility and as may otherwise be required by the Lenders).

**Financial Covenants:** Consistent with financial covenants in the Prepetition Revolving Credit Agreement.

**Fee Reimbursement:** The Administrative Agent and Collateral Agent shall be entitled to prompt reimbursement of their reasonable fees and expenses of their counsel, arising from or related to the

|                     | Exit Credit Facility and as provided for in the Prepetition Revolving Credit Agreement. |
|---------------------|------------------------------------------------------------------------------------------|
| **Events of Default:** | The definitive documentation for the Exit Credit Facility will include such events of default as are usual and customary for financings of this kind, and consistent with the events of default contained in the Prepetition Revolving Credit Agreement (as modified to take account of current financial condition of the Credit Parties, and the exit from the Chapter 11 Cases, the longer term of the Exit Credit Facility and as may otherwise be required by the Lenders). |

### VI.F.    Plan Support Agreement

Prior to the Petition Date, the Debtors entered into the Plan Support Agreement with holders of approximately 81 percent the Senior Notes, including Wasserstein (the "Principal Holders"). As described more fully in Section VI.I, the Plan Support Agreement was amended on May 2, 2011 and May 9, 2011 in connection with the Plan Settlement. The Plan Support Agreement sets forth the terms and conditions pursuant to which the Principal Holders would agree to support and vote for the restructuring of the Debtors' prepetition obligations through the Plan.

### VI.G.    The Rights Offering and Backstop Agreement

The Plan Support Agreement, including the Plan Term Sheet attached thereto, contemplates the investment of $55 million of new equity capital in the Reorganized Debtors in the form of a rights offering (the "Rights Offering") to holders of Senior Notes. The Plan also includes the holder of the PBGC Claim as an additional claimant that, along with eligible holders of the Senior Notes, may participate in the Rights Offering (collectively, as defined in the Plan, the "Eligible Holders"). Pursuant to the Backstop Agreement, the Rights Offering will be backstopped by certain Principal Holders of Senior Notes that are also party to the Backstop Agreement (the "Backstop Providers"). The Backstop Providers have committed to purchase on the Effective Date, at the Subscription Purchase Price of $75.00 per share, all shares of Reorganized Holdings offered in the Rights Offering that are not subscribed for pursuant to the exercise of subscription rights (the "Subscription Rights") in the Rights Offering. The proceeds of the Rights Offering and purchase of HD Shares by the Backstop Providers pursuant to their commitments under the Backstop Agreement (the "Backstop Commitment") would be used to repay loans outstanding under the DIP Notes Purchase Agreement and to provide working capital for the reorganized Debtors.

On May 10, 2011, the Bankruptcy Court entered an order approving and assuming the Backstop Agreement and fee and indemnification provisions related thereto [Docket No. 290]. This order specifically approved the payment of a $1.1 million break-up fee to the Backstop Providers upon the occurrence of any of the following: (a) the occurrence of a Competing Transaction Event (as defined in the Backstop Agreement); (b) an order, in form and substance reasonably satisfactory to Requisite Backstop Providers (as defined in the Backstop Agreement),

confirming the Plan is not entered by the Court on or before September 12, 2011; (c) the effective date of the Plan has not occurred by the earlier of (i) October 1, 2011 and (ii) the 15th calendar day following the entry of an order confirming the Plan, in each case, unless the order confirming the Plan has not become a Final Order (as defined in the Backstop Agreement) prior to such date; or (d) the Debtors exercise their Fiduciary Out (as defined in the Backstop Agreement).

The terms and conditions of the Rights Offering and Backstop Agreement are described in further detail below and in the Rights Offering Procedures attached as Exhibit VI to this Disclosure Statement (the "Rights Offering Procedures"). Capitalized terms used in this section but not otherwise defined have the meanings assigned to them in the Rights Offering Procedures, attached hereto as Exhibit VI.

The description of the Rights Offering included herein does not constitute an offer to sell any securities or a solicitation of an offer to buy any securities. The Rights Offering is being made in a private placement only to Eligible Holders pursuant to Subscription Agreements and only to such persons and in such jurisdictions as is permitted under applicable law.

*Issuance of Subscription Rights.* Each Eligible Holder will be entitled to receive Subscription Rights entitling such holder to subscribe for its pro rata share of the 733,333 HD Shares to be offered in the Rights Offering (the "Rights Offering Shares"). Each Eligible Holder's pro rata share of Rights Offering Shares will be determined by the amount of such holder's Allowed Class 3 Claims compared to the aggregate amount of all Allowed Class 3 Claims held by Eligible Holders as of the Rights Offering Record Date, which was May 13, 2011. Eligible Holders have the right, but not the obligation, to participate in the Rights Offering.

*Subscription Period.* The Rights Offering will commence on the date on which Subscription Agreements are first sent to Eligible Holders and will end on the Subscription Expiration Deadline specified in the instructions to the Subscription Agreements. Each Eligible Holder intending to purchase Rights Offer Shares in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the instructions included with the Subscription Agreements on or prior to the Subscription Expiration Deadline. After the Subscription Expiration Deadline, the Rights Offer Shares that are not subscribed for pursuant to the exercise of Subscription Rights will be acquired by the Backstop Providers in accordance with and subject to the terms and conditions contained in the Backstop Agreement and the Plan.

*Subscription Purchase Price.* To validly exercise Subscription Rights, Eligible Holders must pay to the subscription agent for the Rights Offering, on or before the Subscription Expiration Deadline, the Subscription Purchase Price for each Rights Offering Share to be purchased by such Eligible Holder pursuant to the exercise of Subscription Rights. The Subscription Purchase Price may be paid (a) in cash by bank or cashier's check or by wire transfer of immediately available funds in accordance with the instructions included with the Subscription Agreement or (b) in the case of holders of DIP Note Claims, if such holder so elects, by submitting documentation to the subscription agent satisfactory to Holdings pursuant to which such holder irrevocably agrees to cancel on the Effective Date an amount of such

Claims that, when combined with the amount of any cash paid pursuant to clause (a) above, would equal such Eligible Holder's aggregate Subscription Purchase Price for such shares.

*Transfer Restriction; Revocation.*  The Subscription Rights are not transferable.  Any transfer or attempted transfer will be null and void, and no purported transferee will be treated as the holder of any Subscription Rights.  Once an Eligible Holder has properly exercised its Subscription Rights, such exercise will not be permitted to be revoked.

*Backstop Commitment.*  On the terms and subject to the conditions set forth in the Backstop Agreement, each of the Backstop Providers has agreed, severally and not jointly, to purchase on the Effective Date, at the Subscription Purchase Price, a number of Rights Offering Shares that are not subscribed for pursuant to the exercise of Subscription Rights equal to the amount of such Backstop Provider's Backstop Commitment divided by the Subscription Purchase Price.  The number of Rights Offering Shares to be purchased by each Backstop Provider will be determined in accordance with the Backstop Agreement.

Each Backstop Provider will deposit with the subscription agent cash or, at the election of such Backstop Provider, submit to the subscription agent documentation pursuant to which such Backstop Provider will agree to cancel on the Effective Date DIP Note Claims held by such Backstop Provider, in a combined amount equal to the amount of its Backstop Commitment.

*Commitment Fee Shares; Transaction Expenses.*  In consideration for the performance by the Backstop Providers of their Backstop Commitments, on the Effective Date, Holdings will deliver to the Backstop Providers, other than any Backstop Provider that may have defaulted on its obligations pursuant to its Backstop Commitment, a total of 50,000 HD Shares (the "Commitment Fee Shares").  The Commitment Fee Shares will be allocated among the Backstop Providers pursuant to and in accordance with the terms of the Backstop Agreement.  In addition, whether or not the transactions contemplated by the Backstop Agreement are consummated and except as set forth in the Backstop Agreement, the Debtors will reimburse or pay, as the case may be, specified expenses of the Backstop Providers and their advisors (the "Transaction Expenses") in accordance with the Backstop Agreement.

*Settlement of the Rights Offering and Distribution of Rights Offering Shares.*  On the Effective Date, the subscription agent will distribute the Rights Offering Shares purchased by each Eligible Holder that has properly exercised its Subscription Rights in accordance with the delivery instructions set forth in such Eligible Holder's Subscription Agreement.  Delivery of the Rights Offering Shares that are not subscribed for pursuant to the exercise of Subscription Rights and purchased by the Backstop Providers pursuant to their Backstop Commitments will be made on the Effective Date in accordance with instructions provided by the Backstop Providers.

*Indemnification of Backstop Providers.*  The Backstop Agreement provides that, whether or not the transactions contemplated by the Backstop Agreement are consummated, the Debtors will indemnify and hold harmless each of the Backstop Providers and their respective affiliates, stockholders, equity holders, members, partners, managers, officers, directors, employees, attorneys, accountants, financial advisors, consultants, agents, advisors and controlling persons from specified losses arising out of or related to the Backstop Agreement, the Backstop Commitments, the Rights Offering and/or any of the transactions contemplated by the Backstop

Agreement, the Backstop Commitments or the Rights Offering, or any breach by any Debtor of any of its representations, warranties and/or covenants set forth in the Backstop Agreement.

*Representations and Warranties*. The Backstop Agreement contains representations and warranties made by the Debtors and the Backstop Providers. The Debtors' representations and warranties relate to, among others, the following, and a breach of such representations and warranties could permit the Backstop Providers to terminate their commitments under the Backstop Agreement:

(i)      exemption of the issuance of Rights Offering Shares from registration under the Securities Act;

(ii)      title of intellectual property;

(iii)      absence of certain changes in the business of the Debtors' since the end of their last fiscal year;

(iv)      ownership of real estate;

(v)      preparation and compliance as to form of the Debtors' financial statements; and

(vi)      reports filed by the Debtors with the SEC.

*Conditions to Obligations of the Backstop Providers*.  The obligations of each of the Backstop Providers to subscribe for and purchase Rights Offering Shares that are not subscribed for pursuant to the exercise of Subscription Rights pursuant to their respective Backstop Commitments are subject to the satisfaction or waiver of various conditions prior to or on the Effective Date, including the following:

(i)      the Plan Support Agreement must remain in effect;

(ii)      the Plan, as confirmed by the Bankruptcy Court, must be consistent in all material respects with the Plan Support Agreement and the Backstop Agreement and otherwise ----reasonably acceptable to Backstop Providers holding in excess of 66 2/3% of the aggregate Backstop Commitment of all Backstop Providers ("<u>Requisite Backstop Providers</u>");

(iii)      the Disclosure Statement must be consistent in all material respects with the terms set forth in the Plan Support Agreement and the Backstop Agreement and otherwise reasonably acceptable to the Requisite Backstop Providers;

(iv)      the Bankruptcy Court must enter an order approving the Disclosure Statement and the order must be in form and substance reasonably acceptable to the Requisite Backstop Providers and must be a final order;

(v)      the Bankruptcy Court must have entered the Confirmation Order, the Confirmation Order must be in form and substance consistent in all material respects with the Backstop Agreement and the Plan Support Agreement and otherwise reasonably

acceptable to the Requisite Backstop Providers, and the Confirmation Order must be a final order;

(vi)     none of the Debtors may have breached the DIP Notes Purchase Agreement and specified representations and warranties of the Debtors in the DIP Notes Purchase Agreement must be true and correct in all material respects at and as of the Effective Date (except for representations and warranties made as of a specified date, which must be true and correct as of the specified date);

(vii)     the conditions to confirmation of the Plan and the conditions to the Effective Date set forth in the Plan must have been satisfied or waived in accordance with the Plan;

(viii)     the Effective Date may not be later than the earlier of (a) October 1, 2011, and (b) the fifteenth calendar day following the entry of an order confirming the Plan;

(ix)     the Rights Offering must have been conducted and consummated in accordance with the Backstop Agreement;

(x)     all documents relating to the Exit Facility and the organizational documents of the Reorganized Debtors, and all documents related to the Plan, must have been executed and delivered by the parties thereto, and such documents must be consistent in all material respects with the terms set forth in the Backstop Agreement and otherwise reasonably acceptable to the Requisite Backstop Providers;

(xi)     each of the representations and warranties of the Debtors in the Backstop Agreement must be true and correct in all material respects at and as of the Effective Date (except for representations and warranties made as of a specified date, which must be true and correct as of the specified date);

(xii)     each of the Debtors must have complied in all material respects with all covenants in the Backstop Agreement;

(xiii)     no portion of the Commitment Fee Shares may have been required to be repaid or otherwise subject to disgorgement to the Debtors or any other person;

(xiv)     the Debtors must pay all Transaction Expenses that have accrued and remain unpaid as of the Effective Date in accordance with the terms of the Backstop Agreement, and no Transaction Expenses may be required to be repaid or otherwise subject to disgorgement to the Debtors or any other person;

(xv)     subject to certain rights of cure, since the date of the Backstop Agreement, there must not have occurred any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a "Material Adverse Effect" (as defined in the Backstop Agreement);

(xvi)     no proceeding may be pending or threatened by any governmental body that alleges that the issuance of the Rights Offering Shares pursuant to the Backstop

Agreement are not exempt from the registration requirements of Section 5 of the Securities Act;

(xvii)   the Debtors must have entered into and consummated the transactions contemplated by the Exit Facility and the documentation related thereto must contain terms and conditions materially consistent with the Plan and must otherwise be in form and substance reasonably satisfactory to the Requisite Backstop Providers; and

(xviii)  Either (a) the Debtors must have obtained a Final Order of the Bankruptcy Court terminating the Pension Plan, which order must be reasonably satisfactory to the Debtors and the Requisite Backstop Providers, or (b) the treatment of the Pension Plan must otherwise be reasonably satisfactory to the Requisite Backstop Providers.

*Termination of the Backstop Agreement*.  The Backstop Agreement provides that the Backstop Agreement and the Backstop Commitments contemplated thereby will terminate automatically and immediately, without a need for any further action on the part of (or notice provided to) any person, upon the earlier to occur of (A) October 1, 2011 and (B) the date of termination of the Plan Support Agreement.

In addition, the Backstop Agreement and the Backstop Commitments contemplated thereby may be terminated and the transactions contemplated thereby may be abandoned at any time by the Requisite Backstop Providers upon the giving of three business days' written notice of termination to the Debtors at any time following the happening, the existence or the occurrence of:

(i)       a material breach by any Debtor of its obligations under the Backstop Agreement; or

(ii)      the occurrence of an Agreement Termination Event (as that term is defined in the Plan Support Agreement) without giving effect to any waivers of an Agreement Termination Event provided under the Plan Support Agreement.

The Backstop Agreement and the Backstop Commitments contemplated thereby may also be terminated at any time by the Debtors upon written notice to the Backstop Providers if the Debtors determine in good faith after consultation with counsel that doing so is necessary to comply with their, or their directors' or officers' fiduciary obligations under applicable law.

The Backstop Commitment of Wasserstein (which accounts for approximately 36.4 percent of the Backstop Providers' aggregate Backstop Commitment) may be terminated upon receipt of written notice from Wasserstein to the Debtors and the other Backstop Providers upon any amendment to the Plan Term Sheet attached to the Plan Support Agreement, or upon any term of any of the Restructuring Documents (as defined in the Plan Term Sheet) or the MSA being inconsistent, in specified manners adverse to Wasserstein, with the Plan Term Sheet.

In addition, the Backstop Agreement and the Backstop Commitments contemplated thereby may be terminated at any time by the Requisite Backstop Providers upon written notice to the Debtors:

(i)      upon the entry into by any of the Debtors of a binding agreement providing for, or the filing by the Debtors of a motion with the Bankruptcy Court seeking approval to pursue, specified competing transactions;

(ii)     upon the specific approval by the board of directors of Holdings of the entry into by any of the Debtors of a binding agreement providing for, or the filing by the Debtors of a motion with the Bankruptcy Court seeking approval to pursue, specified competing transactions; or

(iii)    if immediately prior to the Effective Date a Backstop Provider has defaulted on its obligations under the Backstop Agreement and such Backstop Provider's Backstop Commitment has not been assumed by other Backstop Providers or specified other third parties.

The foregoing summary of the terms of the Backstop Agreement is intended as a brief overview of certain provisions of the Backstop Agreement.  You are urged to review the definitive terms and conditions contained in the Backstop Agreement, which is attached to this Disclosure Statement as Exhibit VII.  In the event of any inconsistency between the foregoing summary or this Disclosure Statement and the Backstop Agreement, the terms of the Backstop Agreement will control.

### VI.H.     Termination of the Pension Plan

On May 9, 2011, the Debtors filed a Motion for an Order (A) Determining that the Financial Requirements for a Distress Termination of their Defined Benefit Pension Plan are Satisfied; and  (B) Approving a Distress Termination of the Pension Plan [Docket No. 278] (the "Pension Plan Motion").  Pursuant to the Pension Plan Motion, the Debtors are seeking an order from the Bankruptcy Court (a) determining that the financial requirements for a "distress termination" of the Pension Plan under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV) are satisfied and (b) authorizing the Debtors to terminate the Pension Plan under 29 U.S.C. § 1341(c)(2)(B) and section 363(b) of the Bankruptcy Code.  If the Pension Plan is not terminated, the Debtors would owe approximately $420,300 and $4,739,200 in contributions in respect of the Pension Plan for plan years 2010 and 2011, respectively.  Absent termination of the Pension Plan, for the years 2011-2015, the Debtors would be required to make minimum contributions to such plans in the aggregate amount of more than $24 million.

Moreover, the Plan Support Agreement and the commitment of the Backstop Providers to purchase stock in the Reorganized Debtors up to $55 million to help ensure that the Debtors have sufficient funds to exit bankruptcy are each conditioned on the termination of the Pension Plan.  If the Debtors do not terminate the Pension Plan, the Debtors may be unable to obtain the equity financing necessary to allow the Debtors to reorganize and emerge as viable entities.

### VI.I.      Plan Settlement

After the appointment of the Creditors Committee, the Creditors Committee objected to the Debtors' motion for approval of the DIP Facilities and motions related to the assumption of the Backstop Agreement and seeking approval of certain preliminary procedures related to the

proposed Rights Offering. The Creditors Committee also sought to negotiate revised terms under the Plan for general unsecured creditors in Class 4.

The Debtors' key stakeholders, including the Creditors Committee, Wasserstein and a steering committee for the Ad Hoc Committee, engaged in negotiations and ultimately reached a compromise between the parties that resulted in the Plan Settlement. Pursuant to the Plan Settlement, the Plan Term Sheet attached to the Plan Support Agreement was amended to provide the treatment of claims and interests as indicated in Section II.B, with the exception of the classification of the PBGC Claim. The Plan Settlement also resolved all objections of the Creditors Committee to the Debtors' DIP financing motion and motions related to the approval of the Backstop Agreement and certain preliminary procedures to the Rights Offering. As a result of the Plan Settlement, the Creditors Committee is committed to the Plan and fully supports the Plan, and the Debtors thus anticipate the Plan will be largely consensual.

### VI.J. Claims Process and Bar Date

On May 10, 2011, the Debtors filed their Schedules identifying the assets and liabilities of their Estates. In addition, pursuant to an order dated April 27, 2011 [Docket No. 233] (the "Bar Date Order") the Bankruptcy Court established the following bar dates for the filing of proofs of claims in these chapter 11 cases:

(i)     the general bar date (the "General Bar Date") for all claims, except as noted below, of June 13, 2011;

(ii)    a bar date for government units holding claims against the Debtors of September 26, 2011;

(iii)   a bar date for any claims arising from the rejection of an executory contract or unexpired lease pursuant to an order entered or applicable notice filed prior to the Confirmation Date the later of (a) the General Bar Date and (b) 14 days after the date of entry of the applicable rejection order or applicable notice of the executory contract or unexpired lease; and

(iv)    a bar date for Claims relating to an amendment to the Schedules is the later of (a) the General Bar Date and (b) 20 days after the date that a notice of an amendment or supplement to the Schedules is served on a claimant.

### VI.K. Management Services Agreement

In accordance with the Plan Term Sheet, the Plan provides that Wasserstein will provide the Reorganized Debtors full oversight and management services commensurate with those resources customarily dedicated to an actively managed portfolio company, as to be set forth in a management services agreement with the Reorganized Debtors (the "MSA"). Such management services will include:

(i)     providing assistance and oversight in the execution of the purchasing and vendor optimization, supply chain optimization, SKU rationalization, IT migration, outsourcing and other operational initiatives outlined in the Reorganized Debtors' business plan;

(ii)     providing assistance and analysis for preparation of budgets, forecasts and capital spending plans, and assess and monitor the Reorganized Debtors' performance against the Reorganized Debtors' business plan;

(iii)     assisting in management recruitment and compensation review;

(iv)     assisting in the preparation of reporting to constituencies; and

(v)     at the direction of the board of directors of the Reorganized Debtors, analytical and strategy assistance, including  identification, evaluation and execution of acquisition or divestiture opportunities, and debt financing / refinancing.

In consideration for the management services to be provided to the Reorganized Debtors after the Effective Date, Wasserstein will receive 50,000 HD Shares on the Effective Date (the "MSA Shares").  Following the Effective Date, Wasserstein will receive, in accordance with and subject to the terms and conditions of the MSA, an annual management fee.  The annual management fee paid will be a percentage of $625,000 (the "Base Fee"), based on the Reorganized Debtors' achievement of adjusted EBITDA targets as follows:

FY12: $21.03 million.

FY13: $26.28 million.

FY14: $32.09 million.

FY15: $39.16 million.

FY16: $45.68 million.

FY17 and thereafter, if necessary, to be determined by amendment to the MSA.

| Percentage of EBITDA Plan Target | Percentage of Base Fee Payable |
|---|---|
| 100% or more | 100% |
| At least 90% but less than 100% | 80% |
| At least 80% but less than 90% | 60% |
| Less than 80% | 0% |

Fifty percent of the Base Fee will be paid upon the closing of the books and records for the second quarter of each fiscal year (subject to a true-up adjustment at the end of the fiscal year), and the balance paid upon completion of the Reorganized Debtors' annual audited financial statements;  *provided*, *however*, that no fee shall be payable at any time for any period after Wasserstein (including its affiliates and investment funds and its/their limited partners who received HD Shares in a distribution) owns less than 90 percent of the HD Shares that Wasserstein receives on the Effective Date in connection with the Plan.

## VII. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### VII.A. Requirements of Section 1129(a) of the Bankruptcy Code

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

(i) the Plan otherwise complies with the applicable provisions of the Bankruptcy Code;

(ii) the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii) the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

(iv) disclosure regarding the Plan has been made that is required by section 1125 of the Bankruptcy Code;

(v) the Plan has classified Claims and Interests in a permissible manner;

(vi) the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Debtors have been made;

(vii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan;

(viii) the Plan has been accepted by the requisite votes of creditors and equity interest holders in impaired classes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code;

(ix) at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, without including any acceptance of the Plan by any insider;

(x) the Plan is feasible; and

(xi) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date.

### VII.B. Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as all of the other requirements for confirmation set forth in section

1129(a) of the Bankruptcy Code have been met and the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### VII.B.1.    Fair and Equitable

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

Secured Creditors.  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides:  (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (a) or (c) of this paragraph; or (c) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim.

Unsecured Creditors.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that:  (a) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of their existing interests.

Holders of Interests.  A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that:  (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled; (ii) the fixed redemption price to which such holder is entitled or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

In the event the Debtors do not receive sufficient votes in favor of the Plan from the holders of Claims in either Class 3 or Class 4 for such classes to have accepted the Plan, the Debtors reserve the right to seek confirmation through cramdown, modify the Plan or to determine, in their sole discretion, not to seek to confirm the Plan.  The Debtors will be seeking to confirm the Plan pursuant to the cramdown provisions of section 1129(b) of the Bankruptcy Code as to Interests in Class 7, if necessary.

CHI-1804345v1

### VII.B.2.    "Unfair Discrimination"

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, or any discrimination among the classes is determined not to be unfair by the Bankruptcy Court.

### VII.C.    Best Interests of Creditors Test; Liquidation Analysis

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class who has not voted to accept the Plan.  If an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

As noted above, Classes 3, 4 and 7 are impaired under the Plan.  To estimate what members of Classes 3, 4 and 7 would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the cash that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of a Debtor would consist of the net proceeds received from the disposition of the Debtor's assets plus any cash held by the Debtors.

The information contained in Exhibit II hereto provides a summary of the Liquidation Values of the Debtors' interests in property, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate each Debtors' properties and interests.  The Liquidation Values have been prepared solely for use in this Disclosure Statement and do not represent values that are appropriate for any other purpose.  Nothing in this analysis is intended to be or constitutes a concession by or admission of any Debtor for any purpose.

The Debtors believe that a chapter 7 liquidation of each of the Debtors' Estates would result in diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan.  Specifically, in a liquidation, the Debtors believe that holders of Claims in (i) Classes 3 and 4 would receive between [__] percent and [__] percent of the face amount of their Claims, compared to between 5.9 percent and 14.8 percent for holders of Claims in Class 3 and 10 percent for holders of Claims in Class 4 under the Plan; and (ii) holders of Interests in Class 7 would receive no consideration on account of their Interests.  Consequently, the Debtors believe that the Plan will provide at least the value that such classes would receive in a chapter 7 liquidation of the Debtors.

### VII.D.    Feasibility

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  The Debtors believe that the Reorganized

- 36 -

Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation.

To support their belief in the Plan's feasibility, the Debtors have prepared the projections for Reorganized Debtors, as set forth in Exhibit III attached to this Disclosure Statement (the "Projections")

The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants ("AICPA"), the Financial Accounting Standards Board (the "FASB") or the rules and regulations of the SEC. Furthermore, the Projections have not been audited, reviewed or subjected to any procedures designed to provide any level of assurance by the Debtors' independent certified public accountants.

While presented with numerical specificity, the Projections are based upon a variety of estimates and assumptions, which, while considered reasonable by management, may not be realized, and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors' management. Consequently, the Projections should not be regarded as a representation or warranty by the Debtors, or any other person, as to the accuracy of the Projections, or that the Projections will be realized. Actual results may vary materially from those presented in these Projections.

## VIII. RISK FACTORS

Prior to voting on the Plan, each holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Section XVII for a discussion of certain tax considerations and Section XVIII for discussion of federal and state securities law issues in connection with the Plan.

### VIII.A. Risks In Connection with the Chapter 11 Cases

#### VIII.A.1. Risk of Non-Confirmation of the Plan

Even if all impaired Classes accept or are deemed to accept the Plan, the Plan may still not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for Confirmation, requires, among other things: (a) that Confirmation not be followed by a need for further reorganization or liquidation (i.e., that the plan is "feasible"); (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Debtors otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtors believe that the Plan will meet all of the applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### VIII.A.2.    Milestones Imposed by the DIP Financings and Delays in Confirmation or Effective Date

The DIP Notes Purchase Agreement contains various Plan related "milestones" that the Debtors must meet throughout their chapter 11 cases.  The commitment of the Backstop Providers to provide up to $55 million under the Backstop Agreement also includes various Plan related conditions.  If the Debtors fail to satisfy such milestones and conditions in the DIP Notes Purchase Agreement and Backstop Agreement, the Debtors may potentially lose the access to funds provided therein.  In such a case, absent a waiver, the Debtors would not be able to meet the operating expenses necessary to the Debtors' ordinary course operations and their entire reorganization effort would be jeopardized. Further, any delay in Confirmation or the Effective Date could result in, among other things, increased Administrative Claims.  Increased Administrative Claims and any other negative effects of a delay in Confirmation or the Effective Date could endanger the ultimate approval of the Plan by the Bankruptcy Court.

### VIII.A.3.    Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if, excluding the acceptance of any "insider," at least one impaired Class has accepted the Plan and the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Plan.

The Debtors reserve the right to modify the terms of the Plan, as necessary, to seek Confirmation without the acceptance of all impaired Classes.  Such modification could result in less favorable treatment for non-accepting Classes of Claims than the treatment currently provided for in the Plan.  Further, in the event an impaired Class of Claims fails to approve the Plan, the Debtors may determine, in their sole discretion, not to seek Confirmation of the Plan.

### VIII.A.4.    Conditions Precedent to the Effectiveness of the Plan

Even if confirmed, the Plan may still not become effective if the conditions to effectiveness set forth in Section VIII.A and B of the Plan are not satisfied, or duly waived in accordance with Section VIII.C of the Plan.  See Section XIV to this Disclosure Statement for a description of the conditions to the effectiveness of the Plan.

### VIII.A.5.    Pension Plan

The Plan Support Agreement and the commitment of the Backstop Providers to provide $55 million in exit financing to help ensure that the Debtors have sufficient funds to exit bankruptcy are each conditioned on the termination of the Pension Plan.  If the Debtors are not able to terminate the Pension Plan or otherwise reach a resolution that is acceptable to the Requisite Principal Holders and Requisite Backstop Providers (as defined in the Plan Support Agreement), absent a waiver, the Debtors may be unable to obtain the equity financing provided therein.  There can be no assurance that the Debtors will be able to terminate the Pension Plan or otherwise reach a resolution with the PBGC that is acceptable to the Requisite Principal Holders and Requisite Backstop Providers.

### VIII.A.6.    Allowance of Claims

The Debtors' estimate of Claims is based upon the Debtors' books and records.  There can be no assurance, however, that the Debtors' estimates of the likely aggregate Allowed Claims will prove to be accurate.  After the Debtors have conducted a more detailed analysis of filed Claims, the Debtors' estimates may change.  If the aggregate amount of Class 4 distributions exceeds $4 million, any distributions to holders of Allowed Class 4 Claims in excess of $4 million in the aggregate will not be paid until the first Monday following the end of the Reorganized Debtors' fiscal August 2014.  In addition, the allowance of Class 3 Claims and Class 4 Claims in excess of the amounts expected by the Debtors could impair the value of HD Shares being provided to holders of Class 3 Claims. Further, an additional risk factor relates to the amount of Allowed Administrative Claims that may be asserted.  Increased Administrative Claims could have a negative impact on the feasibility of the Plan, and the Debtors ultimate ability to confirm the Plan, as well as the value of HD Shares being provided to the holders of Class 3 Claims if the Plan is confirmed and becomes effective.

In addition, given the sheer volume of Claims filed against the Debtors, the cost of administering such claims will be substantial and may also adversely impact recoveries for holders of claims in certain Classes.

### VIII.A.7.    The Debtors May Object to the Amount, or the Secured or Priority Status, of a Claim

The Debtors reserve the right to object to the amount, or the Secured or Priority status, of any Claim.  Any such Holder of a Claim will receive its specified share of the estimated distributions described in the Disclosure Statement only to the extent its Claim becomes an Allowed Claim.

### VIII.A.8.    Risk of Non-Payment to Holders of Claims in Class 4

The right of the holder of Allowed Class 4 Claims to receive distributions under the Plan starting in August, 2012 will represent an unsecured claim against the Reorganized Debtors not secured by any asset of the Reorganized Debtors and will be subordinated in payment to the secured claims of the lenders pursuant to the Exit Facility.  Furthermore, the right of holders of Allowed Class 4 Claims to receive distributions under the Plan starting in August of 2012 will not be transferable and will be evidenced only by the terms of the Plan.  As such, there are no contractual rights of such holders to payment beyond the express terms of the Plan.

**[Additional risk factor language to come]**

### VIII.A.9.    Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, even after Confirmation of the Plan, the Reorganized Debtors will retain and may enforce causes of action against creditors, other than Recovery Actions. Accordingly, a holder of a Claim may be subject to one or more such claims brought by the Reorganized Debtors, even if such holder has voted in favor of the Plan.

### VIII.B.    Risks Related to Securities Issued in Connection With the Plan

### VIII.B.1.    Risks Associated with Receipt and Ownership of HD Shares

On the Effective Date, each holder of an Allowed Class 3 Claim will receive (a) its pro rata share of the HD Shares in the Initial Share Pool (the "Initial Shares") and, (b)(i) if such holder is an Eligible Holder that held such Claim on the Rights Offering Record Date and participates in the Rights Offering, up to its pro rata share of the Rights Offering Shares and, (ii) if such holder held such claim on the Rights Offering Record Date but certifies to the Debtors that such holder is not an Accredited Investor, Non Accredited Investor Shares (to the extent the Non-Accredited Investor Distribution is made through the issuance of HD Shares).  As a holder of HD Shares, such holder of an Allowed Class 3 Claim will hold equity interests that are subordinate to all liabilities of Reorganized Holdings and its subsidiaries.  Therefore, the assets of Reorganized Holdings and its subsidiaries may not be available for distribution to any holder of HD Shares in any bankruptcy, liquidation or reorganization of Reorganized Holdings unless and until all indebtedness of Reorganized Holdings has been paid**.**

### VIII.B.2.    Holders of Rights Offering Shares, Commitment Fee Shares and MSA Shares Will Be Restricted in Their Ability to Transfer or Resell Their Rights Offering Shares

Reorganized Holdings will offer the Rights Offering Shares, Commitment Fee Shares and MSA Shares under an exemption from registration under Section 4(2) of the Securities Act and applicable state securities laws.  The Rights Offering Shares, Commitment Fee Shares and MSA Shares will not be registered under the Securities Act and will be "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act, and holders of such shares may only offer or sell the shares pursuant to an exemption from, or in transactions not subject to, the registration requirements of the Securities Act and applicable state securities laws or pursuant to an effective registration statement.

### VIII.B.3.    No Established Market for HD Shares

The HD Shares will not be listed on a national exchange or other established market and no established trading market will exists for the HD Shares, which may impact the liquidity of HD Shares and may have a negative impact on the value of the HD Shares.  There can be no assurance that any market for the HD Shares will develop or that holders will be able to sell their HD Shares at a particular time or that the prices that may be received will be favorable.

The valuation of the Debtors contained in Exhibit IV of this Disclosure Statement is not an estimate of the prices at which the HD Shares may trade.  The value of the HD Shares will depend, among other things, upon the number of outstanding HD Shares, conditions in the economy and the Reorganized Debtors' financial performance, none of which can be determined or predicted.  No assurance can be given as to the value of the HD Shares that will prevail following the Effective Date.

Reorganized Holdings is not expected to be a reporting company under the Securities Exchange Act of 1934, as amended, immediately following the Effective Date and there can be no assurance that it will become a reporting company at any time thereafter.  Reorganized

Holdings will not be required to provide the information required under Rule 144(c) of the Securities Act until one year after the Effective Date, so the ability to sell HD Shares pursuant to the Rule 144 safe harbor may be limited. ANY PERSONS INTENDING TO RELY ON THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 ARE URGED TO CONSULT WITH THEIR OWN COUNSEL AS TO THE REQUIREMENTS THEREOF AND WHETHER SUCH REQUIREMENTS ARE CAPABLE OF BEING SATISFIED AT ANY PARTICULAR TIME.

### VIII.B.4. Certain Holders of HD Shares Could Have a Significant Degree of Influence on Reorganized Harry & David Holdings, Inc. and Matters Presented to Shareholders

Certain Holders, including Wasserstein, are expected to acquire a significant ownership in Reorganized Holdings pursuant to the Plan. In addition, of Reorganized Holdings' five board seats, two will be selected by Wasserstein and two will be selected by the Requisite Principal Holders. Wasserstein also will provide to the Reorganized Debtors full oversight and management services in accordance with the MSA and will be compensated with 50,000 HD Shares on the Effective Date for such services. Thus, Wasserstein and/or several Noteholders may have a significant influence or control over the operations of Reorganized Holdings and matters presented to shareholders of Reorganized Holdings.

### VIII.B.5. Future Sales of Common Stock of Reorganized Harry & David Holdings, Inc. will Cause Holders to Incur Substantial Dilution

In the future, Reorganized Holdings may grant equity securities to its employees, consultants and directors under certain stock option and incentive plans, and Reorganized Holdings expects to issue equity interests under a management incentive plan to be in effect following emergence from chapter 11 that may comprise up to 10 percent of the outstanding equity interests of Reorganized Holdings after issuance. Furthermore, Reorganized Holdings may issue equity securities in connection with future investments, acquisitions or capital raising transactions. Such grants or issuances could constitute a substantial portion of the then-outstanding common stock, which may result in substantial dilution in ownership of common stock.

### VIII.C. Risks Related to Financial Projections

### VIII.C.1. The Reorganized Debtors May Not be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Reorganized Debtors have assumed in projecting their future business prospects. If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date or to pay in full all distributions required under the Plan on account of Class 4 Claims. The Projections represent management's view of the Debtors future operations based on currently known facts and various hypothetical assumptions. The Projections do not, however, guarantee the Reorganized Debtors' future financial performance.

### VIII.C.2. Financial Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions Used in Their Formulation

The Projections are based on numerous assumptions including: timely confirmation pursuant to the terms of the Plan; the anticipated future performance of the Reorganized Debtors; general business and economic conditions; and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Reorganized Debtors' operations. These variations may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to its obligations following the Effective Date. In addition, this Disclosure Statement does not reflect any events that may occur subsequent to the date of this Disclosure Statement. Such events may have a material impact on the information contained in this Disclosure Statement.

### VIII.D. Risks Related to the Reorganized Debtors' Business and Financial Condition

### VIII.D.1. Post-Emergence Business Projections

The Reorganized Debtors' projected financial results are based, in part, on a significant improvement in 2011 holiday gross margin as compared to the 2010 holiday gross margin. Because the Effective Date will occur prior to the 2011 holiday season, actual holiday results are unknown and, thus, the Projections cannot be relied upon as an assurance of the actual results that will occur. If the Reorganized Debtors do not achieve the projected revenue, margin or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.

### VIII.D.2. We Are Dependent On Our Management Team, and the Loss of Any Key Member of This Team Could Negatively Impact Our Ability to Implement Our Business Plan

Our success depends largely upon the services of our executive officers and other key personnel, including senior product development and design, marketing, operational, information technology, human resource, and finance personnel. Certain members of our senior management team, including our interim chief executive officer, interim treasurer and interim restructuring officers, are representatives of Alvarez & Marsal, a global professional services firm. If we are not able to appoint new chief executive and financial officers in a timely manner, retain key members of our management team or effectively manage the transition to new members of management, our business, financial condition, cash flows or results of operations could be materially and adversely affected.

### VIII.D.3. The Exit Facility Will Restrict Activities and Require the Reorganized Debtors to Maintain Certain Financial Ratios

The Exit Facility will contain a number of covenants and other provisions that will restrict the Reorganized Debtors' ability to engage in various financing transactions and operating activities. The Exit Facility also will require the Reorganized Debtors to maintain

- 42 -

certain financial metrics.  The ability of the Reorganized Debtors to meet their financial and other covenants may be affected by events beyond their control.  If the Reorganized Debtors default under any of these requirements, the lenders could declare all outstanding borrowings, accrued interest, and fees to be due and payable.  If that were to occur, there can be no assurance that the Reorganized Debtors would have sufficient liquidity to repay or refinance this indebtedness or any of their other debt.

### VIII.D.4.    Demand for Merchandise is Difficult to Gauge

Consumer spending patterns are difficult to predict and are sensitive to the general economic climate, the consumer's level of disposable income, consumer debt, and overall consumer confidence.  Declines in consumer spending could reduce the Reorganized Debtors' revenues, gross margins, earnings, and thus liquidity.  Forecasting consumer demand for merchandise is difficult given the nature of changing consumer preferences, which can vary by season and from one geographic region to another.  If the demand for merchandise is lower than expected, the Reorganized Debtors may be forced to discount merchandise at a greater level than planned, which reduces gross margins and earnings.  Inventory levels fluctuate seasonally, and at certain times of the year, such as during the holiday season, the Reorganized Debtors may maintain higher inventory levels and are particularly susceptible to risks related to demand for merchandise.  If the Reorganized Debtors elect to carry relatively low levels of inventory and demand is stronger than anticipated, the Reorganized Debtors may be forced to backorder merchandise or not have merchandise available for sale, which may result in lost sales and lower customer satisfaction.

### VIII.D.5.    The Majority of Sales and Net Earnings are Realized During the Holiday Selling Season from October Through December

The Debtors experience significantly increased sales activity during the holiday selling season, particularly between the Thanksgiving and Christmas holidays. If sales during this period are below expectations, there may be a disproportionate effect on revenues and expenses. Accordingly, changing economic conditions or deviations from projected demand for products during the holiday selling season could have a material adverse effect on financial results and liquidity for the full year.

In anticipation of the upcoming holiday selling season, the Reorganized Debtors likely will incur significant expenses.  In the event that actual sales during that calendar quarter are lower than anticipated, results of operations and profitability will be negatively impacted.

Disruption in operations in preparing for, or experienced during, the holiday season could result in decreased sales.  Such disruptions can result from interruptions or delays in telecommunication systems or the Internet that interfere with the order-taking process, and/or supply chain disruptions caused by an interruption in the information technology systems or at distribution centers.  These disruptions could impede the timely and effective delivery of products and result in cancelled orders, a delay in the circulation of holiday catalogs, or other problems with information technology or order-fulfillment operations.

- 43 -

### VIII.D.6.  Maintaining Relationships with Third Parties

The Reorganized Debtors' business is dependent on continued good relations with third-party vendors and suppliers for some of their products and services.  Outsourced products include some of the produce, meats, snacks and condiments, gift plants, and tabletop and home décor accessories.  The Reorganized Debtors do not directly control these vendors or the quality of their goods and therefore cannot control the selection, grading and shipping of some of these products.  If these vendors and suppliers do not fulfill orders to customers' satisfaction, including customers' expectation of quality, such customers may not purchase from the Reorganized Debtors in the future.

The Reorganized Debtors rely upon third-party carriers for product shipments, including shipments to, from and between their stores. Accordingly, they are subject to risks, including employee strikes and inclement weather, which may affect such third-party carriers' abilities to meet delivery needs.  Among other things, any circumstances that require the Reorganized Debtors to use other delivery services for all or a portion of their shipments could result in increased costs and delayed deliveries and could materially harm their business.  In addition, the Reorganized Debtors are subject to the risk that their service providers may increase the rates they charge, terminate an existing contract, decrease the rate discounts provided when an existing contract is renewed or that we may be unable to agree on the terms of a new contract, any of which could materially adversely affect operating results.

Increases in delivery rates or changes in the availability of rate discounts could have a negative impact on operating results to the extent that the Reorganized Debtors are unable to pass such increased costs on directly to customers or offset such increased costs by raising selling prices.  In addition, fuel costs are a significant component of product delivery costs. There is a risk of continued higher fuel costs, which, because of the inability of third-party carriers to absorb such increases, could result in higher delivery expenses. In the event that third-party carriers raise their prices to ship goods, customers might choose to buy comparable products locally to avoid delivery charges, which could negatively impact sales.

In addition to outsourcing materials and production for some products, the Reorganized Debtors also depend on third-parties for cold storage, telecommunications, maintenance of certain technology systems and shipment of products. The inability to acquire such services, or the loss of one or more key vendors, could have a negative effect on business and financial results.

### VIII.D.7.  Decrease in the Availability, or Increase in the Cost, of Raw Materials

Operations depend, in part, on the availability of various raw materials, including paper for catalog operations; corrugated paper for delivery needs; chocolate, butter, sugar and cheese used to produce some products, and fruit and produce that the Reorganized Debtors do not grow themselves.  The availability of raw materials may decrease and their prices are likely to be volatile as a result of, among other things, changes in overall supply and demand levels, and new laws or regulations.  Disruption in the supply of raw materials could temporarily impair the Reorganized Debtors' ability to manufacture some products or require the payment of higher

- 44 -

prices in order to obtain these raw materials from other sources.  In the event raw material costs increase, the Reorganized Debtors may not be able to pass these higher costs on to customers in full or at all.  Any increase in the prices for raw materials could materially increase costs and therefore lower gross margins.

### VIII.D.8.    Agricultural Risks

Business activities are subject to a variety of agricultural risks.  Extreme weather conditions, such as droughts, frosts, hail or other storms can cause unfavorable growing conditions that adversely affect the quality and quantity of the pears and peaches grown in the Reorganized Debtors' orchards.  Moreover, all of the Reorganized Debtors' irrigation rights are subject to and limited by adequate availability of irrigation water within a particular water shed system.  Seasonal circumstances such as lower annual rainfall or snow accumulation may negatively affect the availability of water and consequently, in such a year, the Reorganized Debtors may not receive their full allotment of water.  The loss or reduction of the supply of water to any of the orchards or farms as a result of a drought at a particular water shed could result in the Reorganized Debtors' inability to produce sufficient inventory.  Furthermore, weather conditions may also affect the availability and ripening of the fruit used in various programs and promotions, which in turn may shift sales between quarters on a comparable year-to-year basis.  Pests and crop diseases can also reduce crop size and quality.  If any of these factors affect a substantial portion of the Reorganized Debtors' production facilities in any year, they may be unable to produce sufficient crop inventory, resulting in lost sales, shifts in fruit sales between fiscal quarters, increased costs and/or lost customers.

### VIII.D.9.    Increased Competition

The U.S. gift, gourmet food gift and specialty foods industries are highly competitive. The market for specialty retail products has undergone significant changes and growth over the past several years as consumer spending levels have increased, leaving the industries in which the Reorganized Debtors compete highly fragmented and open to entry by new competitors.  The Reorganized Debtors compete with national, regional and local businesses and Internet retailers, as well as department stores and specialty stores, discount stores, big box retailers, supermarkets, club store chains and mass merchants, some of whom are also customers that offer goods substantially similar to those offered through the Reorganized Debtors' brands.  Some of the Reorganized Debtors' existing and potential competitors may have competitive advantages over them, including larger customer bases, more widespread brand recognition, a more developed Internet presence or greater financial resources. The Reorganized Debtors face a variety of competitive challenges, including:

• maintaining favorable brand recognition and achieving customer perception of value;

• anticipating and quickly responding to changing consumer demands better than competitors;

• developing innovative, high-quality products that appeal to their target customers; and

• sourcing, manufacturing, and distributing merchandise effectively.

CHI-1804345v1

If the Reorganized Debtors fail to effectively compete, they may have to reduce prices, resulting in decreased revenues and lower profit margins, loss of market share or increased marketing expenditures.

### VIII.D.10.  The Failure to Protect Intellectual Property Could Adversely Affect Brand

Patents, trademarks, service marks, copyrights, trade dress rights, trade secrets, domain names and other intellectual property are valuable assets that are critical to the Reorganized Debtors' success.  Success, competitive position and amount of potential future income also depend on the Reorganized Debtors' ability to obtain and maintain their brand name proprietary products.

The unauthorized reproduction or other misappropriation of intellectual property could diminish the value of brand names or goodwill and cause a decline in consumer confidence, resulting in a decline in sales.  Any unauthorized use of trademarks, such as Harry & David® , Fruit-of-the-Month Club®, Wolferman's®, Royal Riviera® or Cushman HoneyBells® by another party, in particular for use in connection with products of a lower quality than the products the Reorganized Debtors offer, may dilute the value of such products and damage their reputation as a producer of high-quality, proprietary goods.

The Reorganized Debtors cannot guarantee they will be able to adequately protect intellectual property or that the costs of defending intellectual property will not adversely affect operating results. The Reorganized Debtors also are subject to the risk of adverse claims and litigation alleging that their business practices infringe on the intellectual property rights of others.  Litigation to establish the validity of any intellectual property, to defend against infringement claims of others or to assert infringement claims against others, can be expensive and time-consuming even if the outcome is favorable.  If the outcome is unfavorable, the Reorganized Debtors may be required to pay damages, stop production and sales of infringing products or be subject to increased competition from similar products.

### VIII.D.11.  Unexpected Costs Associated With Environmental Compliance or Liability

The Reorganized Debtors' operations are subject to comprehensive federal, state and local laws and regulations relating to environmental protection.  Some of their operations require environmental permits and controls to prevent and reduce air and water pollution, or the risk of exposure to chemicals, and these permits are subject to modification, renewal and revocation by the issuing authorities.  The Reorganized Debtors will use pesticides, petroleum products, refrigerants and other hazardous materials in the operation of their business.  If they do not fully comply with applicable environmental laws and regulations or the permits required for operations, or if a release of hazardous materials occurs at or from one of the Reorganized Debtors' facilities, they could become subject to fines, penalties, or other sanctions as well as to lawsuits alleging exposure, personal injury or property damage.  The Reorganized Debtors could also be held liable for the cost of remedying the condition or incur costs related to retrofitting or upgrading facilities.  In addition, maintaining or achieving compliance with the existing and

increasingly stringent future environmental requirements could require the Reorganized Debtors to make material additional expenditures.

### VIII.D.12.  Product Liability Claims

The sale of food products for human consumption involves the risk of injury to consumers.  Injuries may result from tampering by unauthorized third parties, spoilage or product contamination, including the presence of foreign objects, substances, chemicals, other agents, or residues introduced during the growing, storage, handling or transportation process.  While the Reorganized Debtors will be subject to governmental inspection and regulations and believe their facilities and operations, as well as those of third-party growers, will comply in all material respects with all applicable laws and regulations, consumption of their products could cause a health-related illness or injury in the future and the Reorganized Debtors could become subject to claims or lawsuits relating to such matters.  Even if a product liability claim is unsuccessful or is not fully pursued, the negative publicity surrounding any assertion that such products caused illness or injury could adversely affect the Reorganized Debtors' reputation with existing and potential customers and corporate and brand image.  Moreover, claims or liabilities of this sort might not be covered by insurance or by any rights of indemnity or contribution that the Reorganized Debtors may have against others.  They maintain product liability insurance in an amount that is believed to be adequate.  However, such insurance may not continue to be available at a reasonable cost, or the Reorganized Debtors may incur claims or liabilities for which they are either not insured or indemnified, or which exceed the amount of insurance coverage.

If the Reorganized Debtors are required to recall a product because of a defect in the product or other reasons, the recalls may provide the basis for product liability claims against them.  In addition, recalls, whether or not the basis for a product liability claim against the Reorganized Debtors, could damage their reputation.

### VIII.D.13.  Natural Disasters, Terrorism, Acts of War and Retail Industry Conditions

The Reorganized Debtors retail stores, corporate offices, manufacturing facilities, distribution centers, infrastructure projects and catalog distribution, as well as the operations of vendors from which they receive goods and services, are vulnerable to damage from earthquakes, hurricanes, tornados, fires, floods, power losses, telecommunications failures, computer viruses, acts of terrorism, acts of war and similar events.  If any of these events result in damage to facilities or systems, or those of their vendors, the Reorganized Debtors may experience interruptions in business until the damage is repaired, resulting in the potential loss of customers and revenues.  In addition, the Reorganized Debtors may incur costs in repairing any damage beyond applicable insurance coverage.

Additionally, the continued threat of terrorism and related heightened security measures in the U.S. may disrupt commerce and the U.S. economy.  Any further acts of terrorism or a war may disrupt commerce and undermine consumer confidence, which could negatively impact sales revenue by causing consumer spending and/or shopping center traffic to decline.  Furthermore, acts of terrorism, acts of war and military action both in the United States and

abroad can have a significant effect on economic conditions and may negatively affect the Reorganized Debtors' ability to purchase merchandise from vendors for sale to customers.

Any significant declines or lack of improvement in general economic conditions, public safety concerns or uncertainties regarding future economic prospects that affect customer spending habits could have a material adverse effect on customer purchases of products.

## IX.    VALUATION OF THE DEBTORS

In structuring the transactions under the Plan, the Debtors, with the advice of Rothschild, Inc., their financial advisor, have determined that it is appropriate to estimate the Reorganized Debtors' going concern value post-confirmation.  The Debtors estimate the total enterprise value of the Reorganized Debtors to be approximately $121.4 million.  The value of the HD Shares on the Effective Date, which takes into account the total enterprise value less estimated net debt outstanding, is estimated to be $97.9 million.  Given the estimated total enterprise value and the estimated equity value of HD Shares, the estimated percentage recovery for holders of Allowed Claims in Class 3 on account of HD Shares and the ability to participate in the Rights Offering received under the Plan is between 5.9 percent and 14.8 percent.  The Valuation of the Debtors is more fully set forth in Exhibit IV.

THE VALUATION IN EXHIBIT IV IS BASED SOLELY UPON THE VALUE OF THE TRANSACTION IMPLIED BY THE RIGHTS OFFERING INVESTMENT CONTEMPLATED BY THE PLAN AND ASSUMES THAT SUCH TRANSACTION CLOSES.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUATION REFLECTED ABOVE WOULD BE REALIZED IF THE TRANSACTION CONTEMPLATED BY THE PLAN DOES NOT CLOSE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE CALCULATIONS OF VALUE SET FORTH REPRESENT IMPLIED VALUES AND ASSUME THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THE PLAN AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE VALUE STATED DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-EFFECTIVE DATE MARKET VALUE OF HD SHARES.  THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

# X. MEANS FOR IMPLEMENTATION OF THE PLAN

## X.A. Issuance of HD Shares/Rights Offering/Backstop Commitment

On the Effective Date, Reorganized Holdings shall issue approximately 979,278 HD Shares pursuant to the Plan. Any shares not necessary to satisfy obligations under the Plan shall have the status of authorized but not issued shares of Reorganized Holdings.

Reorganized Holdings shall raise $55 million in capital through the consummation of the Rights Offering and Backstop Commitment, pursuant to which Subscription Rights to acquire approximately 733,333 HD Shares shall be made available to all Eligible Holders that have complied with the Rights Offering Procedures, and HD Shares not purchased pursuant to the exercise of Subscription Rights will be acquired by the Backstop Providers in accordance with their respective Backstop Commitments, subject to and in accordance with the terms of the Backstop Agreement.

On the Effective Date, each of the applicable Reorganized Debtors will be authorized to and shall issue, as applicable, the HD Shares (including the Commitment Fee Shares, as defined in the Backstop Agreement) and the New Securities and Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any entity.

The issuance of the New Securities and Documents and the distribution thereof under this Plan, and distribution and exercise of the Subscription Rights, shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code and/or section 4(2) of the Securities Act, and/or any other applicable exemptions. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become, and the Backstop Agreement shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any entity (other than as expressly required by such applicable agreement).

## X.B. Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan (and subject to the Restructuring Transaction provisions of Section IV.C of the Plan), each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal Entity, with all the powers of a corporation or other applicable form of legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. Except as otherwise provided in the Plan (and subject to the Restructuring Transaction provisions of Section IV.C of the Plan), as of the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances and Interests. On and after the Effective Date, each Reorganized Debtor

- 49 -

may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges incurred on or after the Effective Date for the Principal Holder Fees and Expenses or Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Final Fee Applications) without application to the Bankruptcy Court.

### X.C.  Restructuring Transactions

### X.C.1.  Restructuring Transactions Generally

On or after the Confirmation Date, subject to Section XII.D. of the Plan, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors with the consent of the Requisite Principal Holders (at any time on or prior to the Effective Date) or the Reorganized Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses, to simplify the overall corporate structure of the Reorganized Debtors or to preserve the value of any available net operating losses and other favorable tax attributes and/or to maximize the value of the Reorganized Debtors, all to the extent not inconsistent with any other terms of the Plan. Such Restructuring Transactions may include one or more transfers, mergers, consolidations, conversions, restructurings (including the issuance of one or more series of Equity Interests in one or more of the Reorganized Debtors), dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors and the Requisite Principal Holders (at any time on or prior to the Effective Date) to be necessary or appropriate. The actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, conversion, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, conversion, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

### X.C.2.  Obligations of Any Successor Corporation in a Restructuring Transaction

Without in any way limiting Section IV.C.1 of the Plan, the Restructuring Transactions may include one or more transfers, mergers, consolidations, conversions, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors and the Requisite Principal Holders (at any time on or prior to the Effective Date) or the Reorganized Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights,

- 50 -

liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring entities, provided that such entities shall be able to satisfy such liabilities, duties and obligations of the Reorganized Debtors under the Plan. In each case in which the surviving, resulting or acquiring entity in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring entity will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan.

### X.D. Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs, Continuation of Certain Employee and Workers' Compensation Benefits, Special Provisions Regarding Insured Claims and Insurance Policies and Corporate Action

#### X.D.1. Certificates of Incorporation and By-Laws of the Reorganized Debtors

As of the Effective Date, the Certificates of Incorporation and the By-Laws (or comparable constituent documents) of Reorganized Holdings and the Reorganized Subsidiary Debtors will be as set forth in the Plan Supplement, with such changes as may be necessary to conform to the applicable law of the state of incorporation. The initial Certificates of Incorporation and By-Laws or similar constituent documents of each Reorganized Debtor, among other things, will prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date or the effective time of any applicable Restructuring Transaction, each such Entity may amend and/or restate its Certificates of Incorporation or By-Laws (or comparable constituent documents) as permitted by applicable state law, subject to the terms and conditions of such constituent documents.

#### X.D.2. Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial board of directors and the officers of each of the Reorganized Debtors will be identified in the Plan Supplement. The compensation to be disbursed to the directors, executives and officers serving for each of the Reorganized Debtors as of the Effective Date also will be disclosed in the Plan Supplement. The initial board of directors of each of the Reorganized Debtors will consist of five members: the WC Directors, the Principal Holder Directors, and the CEO Director; *provided, however*, in the event of an interim CEO, the CEO Director shall be a person acceptable to Wasserstein and the Requisite Principal Holders. On and after the Effective Date, the board of directors of each of the Reorganized Debtors shall serve the following staggered terms, or until his or her earlier death, resignation or removal in accordance with the terms of the Certificate of Incorporation and By-Laws (or comparable constituent documents) of the respective Reorganized Debtor and state law: (a) one WC Director and one Principal Holder Director shall serve terms of three years each; (b) one WC Director and one Principal Holder Director shall serve terms of two years each; and (c) the CEO Director shall serve a term of one year.

The Certificate of Incorporation of Reorganized Holdings shall provide for a staggered board as described above. The consent of four (4) of five (5) members of the new board of directors of Reorganized Holdings shall be required for actions requiring supermajority

approval, including, but not limited to, the following:

       a.         enter into a transaction for a sale of all or substantially all of the Reorganized Debtors' parent company or its subsidiaries by way of an asset sale, stock sale, tender offer, merger or other business combination;

       b.         declare or pay any dividend or any other distribution on, or repurchase, any of its Equity Securities; provided that any such distribution or repurchase shall be on a pro rata basis;

       c.         enter into transactions with affiliates (as defined in the Securities Act) involving the acquisition by any of the Reorganized Debtors of any entity controlled by an affiliate, the sale of material assets of any of the Reorganized Debtors to an affiliate or any entity controlled by an affiliate, or the payment of a fee to an affiliate for the provision of services to any of the Reorganized Debtors; *provided*, *however*, that this section shall not apply to the Management Services Agreement; and

       d.         take other material actions to be set forth in the By-Laws as shall be agreed upon by the Principal Holders and any other parties thereto no later than the Effective Date, including but not limited to new equity issuances, material acquisitions, material debt incurrence, and public/private decisions.

As of the Effective Date, Reorganized Holdings shall post on its website or otherwise make such information publicly available upon request, all information required under Rule 144A(d)(4) under the Securities Act for shareholders that are qualified institutional buyers, and, after one year from the Effective Date, all information required under Rule 144(c) under the Securities Act.

### X.D.3.     Employee Benefits

From and after the Effective Date, the Reorganized Debtors intend to continue (or continue as modified or replaced) their existing employee benefit policies, plans and agreements, (other than the Pension Plan), including but not limited to:  (a) medical, dental, vision, prescription drug, accident, life and disability insurance; (b) sick pay, short-term disability pay and long-term disability insurance; and (c) vacation and holiday pay.

### X.D.4.     Retiree Benefits

From and after the Effective Date, the Reorganized Debtors will be obligated to pay retiree benefits (as defined in section 1114(a) of the Bankruptcy Code), if any, and any similar health, disability, or death benefits, if any, in accordance with the terms of the retiree benefit plans or other agreements governing the payment of such benefits, subject to any rights to amend, modify or terminate such benefits under the terms of the applicable retiree benefits plan, other agreement or applicable nonbankruptcy law.

### X.D.5.     Workers' Compensation Benefits

From and after the Effective Date, the Reorganized Debtors may continue to pay valid Claims arising before the Petition Date under the Debtors' workers' compensation programs.

### X.D.6.  New Employment, Retirement, Indemnification and Other Related Agreements and Compensation Programs

As of the Effective Date, the Reorganized Debtors shall have authority, as determined by Reorganized Holdings' board of directors, to:  (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements (other than the Pension Plan) with their active and retired directors, officers and employees, subject to the terms and conditions of any such agreement; (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees; (c) enter into and implement the Management Incentive Plan; and (d) enter into the Management Services Agreement.

Pursuant to the Management Incentive Plan, up to 10 percent of the shares of common stock of Reorganized Holdings (or options to purchase such stock that would have the effect of diluting Reorganized Holdings' then existing common stock by no more than 10 percent on a fully diluted basis) will be reserved for management.  The terms of the Management Incentive Plan will be established by the board of directors of Reorganized Holdings.

### X.D.7.  Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law.  Nothing in Section IV.D.7 of the Plan shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses of the insureds or insurers with respect to the Insurance Policies and Agreements.  The rights and obligations of the insureds and insurers under the Insurance Policies and Agreements shall be determined under such policies and related agreements, including the terms, conditions, limitations, exclusions and endorsements thereof, which shall remain in full force and effect under their terms and under any applicable non-bankruptcy law.  Each of the non-Debtor counterparties to the Insurance Policies and Agreements reserves all its rights and defenses under the Insurance Policies and Agreements and applicable non-bankruptcy law, including any defenses to coverage.

### X.D.8.  Reinstatement and Continuation of Insurance Policies

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Section V.A of the Plan.

### X.D.9.  Corporate Action

Pursuant to section 1142 of the Bankruptcy Code and section 303 of the Delaware General Corporation Law and any comparable provisions of the business corporation law of any other state, the following (which will occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) shall be authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or any other person or entity: the Restructuring Transactions; the adoption of new or amended and restated certificates of incorporation or formation and by-laws or similar constituent documents for the Reorganized Debtors; the initial selection of directors and officers for the Reorganized Debtors; the Distribution of cash pursuant to the Plan; the entry into and performance under the Rights Offering Documents; the transactions contemplated by the Plan; the issuance of Subscription Rights and HD Shares pursuant to the Plan, including the issuance and sale of HD Shares pursuant to the Rights Offering and Backstop Commitment; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements, including the Management Incentive Plan; and other matters involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor.

### X.E. Obtaining Cash for Plan Distributions and Transfers of Funds Among the Debtors and the Reorganized Debtors

The Debtors with the consent of the Requisite Principal Holders (at any time on or prior to the Effective Date) or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain cash for funding the Plan. All cash necessary for the Reorganized Debtors to disburse cash payments pursuant to the Plan will be obtained through a combination of one or more of the following: (1) the Reorganized Debtors' cash balances and operations; (2) the Rights Offering and Backstop Commitment; (3) the proceeds of any tax refunds and other causes of action; and (4) any other means of financing or funding that the Debtors or the Reorganized Debtors and the Requisite Principal Holders (at any time on or prior to the Effective Date) determine is necessary or appropriate. The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.

### X.F. Preservation of Rights of Action; Settlement of Claims and Releases

#### X.F.1. Preservation of Rights of Action by the Debtors and the Reorganized Debtors

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtors shall retain and may enforce, and shall have the sole right to enforce, any claims, demands, rights and causes of action that any Debtor or Estate may hold against any Entity, other

than the Recovery Actions. The Reorganized Debtors or their successors may pursue, or not pursue, such retained claims, demands, rights or causes of action, as they deem appropriate in their discretion.

### X.F.2. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section IV.F.3 of the Plan, shall constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Claim, Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtors and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

### X.F.3. Releases

#### a. Releases by Debtors and Reorganized Debtors

**As of the Effective Date the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all Entities who may purport to claim by, through, for or because of them shall forever release, waive and discharge all Liabilities that they have, may have or had (whether known or unknown) against any Released Party. Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any Released Party in respect of any express written or contractual obligation of any such Released Party under the Plan or (ii) Liabilities determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud); it being understood that prospective or forward-looking guidance or projections prepared or released by such parties shall be deemed not to constitute gross negligence or willful misconduct (including fraud). Subject to the occurrence of the Effective Date, without limiting the generality or effect of the foregoing, the Debtors and the Reorganized Debtors release and waive all Recovery Actions as of the date of entry of the Confirmation Order.**

#### b. General Releases by Holders of Claims or Interests

**As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the cash, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan shall be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Reorganization Cases, the Estates, the Disclosure Statement, the Rights Offering or the Plan that such entity has, had or may have (whether known or unknown) against any Released Party, the Debtors, the Reorganized Debtors or any employees, agents or partners of the Debtors. Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a**

CHI-1804345v1

release, waiver or discharge of (i) any Released Party in respect of any express written or contractual obligation of any such Released Party under the Plan or (ii) Liabilities determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud); it being understood that prospective or forward-looking guidance or projections prepared or released by such parties shall be deemed not to constitute gross negligence or willful misconduct (including fraud).

c. **Injunction Related to Releases**

As further provided in Section X.B of the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any Liabilities released pursuant to the Plan.

**X.G.** **Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, the Prepetition Credit Facility, the Senior Note Indenture, the Senior Notes and existing Equity Interests in Holdings shall be cancelled and of no further force and effect, without any further action on the part of any Debtor or Reorganized Debtor, and the obligations of the Debtors and the Senior Note Indenture Trustee, if applicable, under such agreements, contracts, instruments and other documents shall be discharged; provided, however, that the Senior Notes and the Senior Note Indenture shall continue in effect solely for the purpose of (1) allowing the relevant holders of the Senior Notes to receive their Distributions hereunder, (2) allowing the Senior Note Indenture Trustee to make the Distributions to be made on account of the Senior Note Claims and (3) permitting the Senior Note Indenture Trustee to assert its Senior Note Indenture Trustee Charging Lien against such Distributions for payment of any unpaid portion of the Senior Note Indenture Trustee Fee; *provided, however*, that such Senior Note Indenture Trustee Charging Lien shall automatically terminate completely upon payment in full of all Senior Note Indenture Trustee Fees. The holders of or parties to such cancelled instruments, securities and other documentation shall have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; *provided, however*, that no Distribution under the Plan shall be made to or on behalf of any holder of an Allowed Claim evidenced by such cancelled instruments or securities, except for the Senior Notes, unless and until such instruments or securities are received by the applicable Disbursing Agent to the extent required in Section VI.H of the Plan. The Senior Notes will be cancelled immediately following the final Distribution made on account of Allowed Senior Note Claims.

**X.H.** **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document assumed, entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, all mortgages, deeds of trust, liens or other security interests against the property of any

Estate, other than those liens and security interests granted pursuant to the DIP Revolving Loan Agreement, shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

### X.I. Effectuating the Rights Offering

The Debtors may enter into and effectuate any Rights Offering Documents and take any actions appropriate or necessary to consummate the Rights Offering consistent with the Rights Offering Procedures.

### X.J. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The chief executive officer, chief restructuring officer, chief financial officer, secretary and treasurer of each Debtor or Reorganized Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The chief executive officer, chief restructuring officer, chief financial officer, secretary and treasurer of each Debtor or Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp, real estate transfer, mortgage recording, sales or use, or other similar tax: (1) the issuance, transfer or exchange of notes or equity securities under the Plan, including the Subscription Rights and the HD Shares issued pursuant to the Plan and the Rights Offering; (2) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (3) the making or assignment of any lease or sublease; (4) any Restructuring Transaction; or (5) the making or delivery of any deed or other instrument of transfer, sale or assignment under, in furtherance of or in connection with the Plan, including any merger agreements, agreements or other documents of transfer, conversion, consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any Restructuring Transaction pursuant to the Plan.

## XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### XI.A. Executory Contracts and Unexpired Leases to Be Assumed

#### XI.A.1. Assumption Generally

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall reject, in accordance with Section V.C of the Plan, each of its respective Executory Contracts and Unexpired Leases other than those listed on the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise assumed pursuant to an order of the Bankruptcy Court; *provided, however*, that the Debtors reserve the right, at any time prior to the Effective Date, to amend the Schedule of Assumed Executory Contracts and Unexpired Leases to: (a) delete, with the written consent of the Requisite Principal Holders, any Executory Contract or Unexpired Lease listed

therein, thus providing for its rejection pursuant hereto; or (b) add, with the written consent of the Requisite Principal Holders, any Executory Contract or Unexpired Lease to the Schedule of Assumed Executory Contracts and Unexpired Leases, thus providing for its assumption pursuant to Section V.A.1 of the Plan. The Debtors shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases. Nothing herein, including listing a contract or lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, shall constitute an admission by a Debtor or Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

### XI.A.2.    Assumption of Executory Contracts and Unexpired Leases

Each Executory Contract or Unexpired Lease assumed under Section V.A.1 of the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease. The Debtors reserve the right, at any time prior to the Effective Date, with the consent of the other party to the Executory Contract or Unexpired Lease **[and with the consent of the Requisite Principal Holders]**, to amend or modify any Executory Contract or Unexpired Lease listed on the Schedule of Assumed Executory Contracts and Unexpired Leases.

### XI.A.3.    Assignments Related to the Restructuring Transactions

As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or another surviving, resulting or acquiring corporation in an applicable Restructuring Transaction, shall be deemed assigned to the applicable Entity, pursuant to section 365 of the Bankruptcy Code.

### XI.A.4.    Approval of Assumption and Assumption Procedures

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section V.A.1 of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The procedures for assumption of an Executory Contract or Unexpired Lease are as follows:

a.     Within 14 days of the Effective Date, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of: (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

b.     Any entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section V.A.4.a of the Plan.

c.          If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (i) the proposed assumption of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtors in the notice shall be fixed and shall be disbursed in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

d.          If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

e.          If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection: (i) the Debtors or Reorganized Debtors may File a reply to such objection no later than 30 days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtors or Reorganized Debtors, as applicable, may designate the Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section V.C of the Plan and amend the Schedule of Assumed Executory Contracts and Unexpired Leases accordingly.

## XI.B.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or Reorganized Debtor assuming such contract or lease or the assignee of such Debtor or Reorganized Debtor, if any: (1) by disbursement of the Cure Amount Claim in cash on the Effective Date (which, pursuant to Section VI.A(1) of the Plan shall be disbursed no later than 30 days after the Effective Date) or within 14 days after such Claim becomes an Allowed Claim or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest. If there is a dispute regarding: (1) the amount of any Cure Amount Claim; (2) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the disbursement of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the

assumption. For assumptions of Executory Contracts or Unexpired Leases between Debtors, the Reorganized Debtor assuming such contract may cure any monetary default (1) by treating such amount as either a direct or indirect contribution to capital or Distribution (as appropriate) or (2) through an intercompany account balance in lieu of payment in cash. No sections or provisions of any Executory Contract or Unexpired Lease that purport to provide for additional payments, penalties, charges, rent acceleration or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the Reorganization Cases or the transactions contemplated by the Plan, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code and/or applicable case law.

**XI.C.** **Executory Contracts and Unexpired Leases to be Rejected and Rejection Procedures**

On the Effective Date, each Executory Contract and Unexpired Lease not listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be rejected pursuant to section 365 of the Bankruptcy Code. Each contract and lease not listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The appropriate procedures for rejection of an Executory Contract or Unexpired Lease are as follows:

1.      Within 14 days of the Effective Date, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such proposed rejection.

2.      Any entity wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section V.C.1 of the Plan.

3.      If no objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

4.      If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

5.      If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection the Debtors or Reorganized Debtors, as applicable, may File a reply to such objection no later than 30 days after the Filing and service of such objection and

ask the Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

### XI.D.  Bar Date for Rejection Damages

Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective successors or their respective properties unless a proof of Claim is Filed and served on the Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of the entry of the Confirmation Order or another order of the Bankruptcy Court, on the later to occur of (1) 30 days after the Effective Date or (2) 14 days after the date of entry of an Order rejecting such Executory Contract or Unexpired Lease.

### XI.E.  Obligations to Indemnify Directors, Officers and Employees

**[To Come]**

### XI.F.  Contracts and Leases Entered Into After the Petition Date

Notwithstanding any other provisions of the Plan, contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, any obligation to indemnify directors, officers and employees as set forth in Section V.D of the Plan and all directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date, shall be performed by the Debtor or Reorganized Debtor liable thereunder in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business. Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases, any obligation to indemnify directors, officers and employees as set forth in Section V.D of the Plan and all directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date) shall survive and remain unaffected by entry of the Confirmation Order.

## XII.  PROVISIONS GOVERNING PLAN DISTRIBUTIONS

### XII.A.  Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, Distributions to be made on the Effective Date to holders of Claims that are Allowed Claims as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 30 days after the Effective Date or (2) such later date when the applicable conditions of Section V.B of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section VI.D.2.a of the Plan (regarding undeliverable Distributions), Section VI.G.3 of the Plan (regarding compliance with Tax requirements) or Section VI.H of the Plan (regarding surrender of cancelled instruments or securities) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made pursuant to Sections VI.G.2, III.B.3 and III.B.4 of the Plan. Any Claim that is disallowed by order of the Bankruptcy Court (or any other court of competent

jurisdiction) prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the necessity for further Bankruptcy Court approval and the holder of any such Claim shall not be entitled to any Distributions under the Plan.

### XII.B.    Method of Distributions to Holders of Claims

Reorganized Holdings or such Third Party Disbursing Agents as Reorganized Holdings may employ in its sole discretion shall make all Distributions of cash and other instruments or documents required under the Plan.  Each Disbursing Agent shall serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan.  The Debtors intend that the Senior Note Indenture Trustee will serve as Third Party Disbursing Agent and will receive cash Distributions for the benefit of, and make cash Distributions to, holders of Allowed Senior Note Claims, as applicable.

### XII.C.    Compensation and Reimbursement for Services Related to Distributions

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan shall receive from Reorganized Holdings, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.  These payments shall be disbursed on terms agreed to with Reorganized Holdings and shall not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent.

### XII.D.    Delivery of Distribution and Undeliverable or Unclaimed Distributions

### XII.D.1.    Delivery of Distributions

Distributions to holders of Allowed Claims shall be made by a Disbursing Agent (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related proof of Claim; or (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

Notwithstanding anything in the Plan to the contrary, the distribution provisions contained in the Senior Note Indenture shall continue in effect to the extent necessary to authorize the Senior Note Indenture Trustee to receive and distribute to the holders of Allowed Senior Note Claims, Distributions pursuant to this Plan on account of Allowed Senior Note Claims, and shall automatically terminate completely upon completion of all such Distributions.

### XII.D.2.    Undeliverable Distributions Held by Disbursing Agents

a.        Holding and Investment of Undeliverable Distributions

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions shall be made to such holder unless and until the

applicable Disbursing Agent is notified by written certification of such holder's then current address. Undeliverable Distributions shall remain in the possession of the applicable Disbursing Agent pursuant to Section VI.D.2.a of the Plan until such time as a Distribution becomes deliverable. Undeliverable cash shall be held in segregated bank accounts in the name of the applicable Disbursing Agent for the benefit of the potential claimants of such funds. Any Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtors' investment and deposit guidelines.

**b.**        After Distributions Become Deliverable

On each Quarterly Distribution Date, the applicable Disbursing Agents shall make all Distributions that become deliverable to holders of Allowed Claims during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent, subject to the terms set forth in Section III.B.4 of the Plan.

**c.**        Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within six months after the later of (i) the Effective Date and (ii) the last date on which a Distribution was attempted to be made to such holder shall have its claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property. Unclaimed Distributions shall become property of Reorganized Holdings, free of any restrictions thereon, and any such Distributions held by a Third Party Disbursing Agent shall be returned to Reorganized Holdings. Nothing contained in the Plan shall require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

## XII.E.     Distribution Record Date

1.        A Disbursing Agent shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date and shall be entitled for all purposes of the Plan to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

2.        As of the close of business on the Distribution Record Date, the respective transfer or Claims registers for the Senior Note Claims, as maintained by the Debtors or the Senior Note Indenture Trustee, as applicable, shall be closed and any transfer of any Claim or interest therein shall be prohibited. The applicable Disbursing Agent shall have no obligation to recognize the transfer or sale of any Senior Note Claim that occurs after the close of business on the Distribution Record Date and shall be entitled for all purposes of the Plan to recognize and make Distributions only to those holders of Senior Note Claims who are holders of such Claims as of the close of business on the Distribution Record Date.

3.        Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes,

- 63 -

notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### XII.F.     Means of Cash Payments

Except as otherwise specified in the Plan, cash disbursements made pursuant to the Plan to holders of Claims shall be in U.S. currency by checks drawn on a domestic bank selected by Reorganized Holdings or, at the option of Reorganized Holdings, by wire transfer from a domestic bank; *provided, however*, that cash disbursements to foreign holders of Allowed Claims may be made, at the option of Reorganized Holdings, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### XII.G.     Timing and Calculation of Amounts to be Distributed

### XII.G.1.     Timing of Distributions Under the Plan

Any Distribution to be made by any Debtor or Reorganized Debtor pursuant to the Plan shall be deemed to have been timely made if made within 30 days after the time therefore specified in the Plan.  Except as otherwise provided in the Plan, no interest shall accrue or be disbursed with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

### XII.G.2.     Allowed Claims

On the Effective Date, subject to the treatment provided for in Sections III.B.3 and III.B.4 of the Plan, each holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  On each Quarterly Distribution Date, Distributions also shall be made pursuant to Section VI.D of the Plan to holders of Disputed Claims in any such Class that were allowed during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such quarterly Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

### XII.G.3.     Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, each Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distribution or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment

of any Tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other Tax obligations.

### XII.H.    Surrender of Canceled Instruments or Securities

As a condition precedent to receiving any Distribution pursuant to the Plan on account of an Allowed Claim evidenced by the notes, instruments, securities or other documentation cancelled pursuant to Section IV.G of the Plan, the holder of such Claim must tender, as specified in this Section VI.H of the Plan, the applicable notes, instruments, securities or other documentation evidencing such Claim to the applicable Disbursing Agent, together with any letter of transmittal required by such Disbursing Agent.  Pending such surrender, any Distributions pursuant to the Plan on account of any such Claim shall be treated as an undeliverable Distribution pursuant to Section VI.D.2.a of the Plan.

### XII.I.    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; *provided, however*, that neither the failure to effect a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and causes of action that the Debtor or Reorganized Debtor may possess against such a Claim holder.  Nothing in this Plan shall preclude any person serving as one of the Debtors' or Reorganized Debtors' directors, officers or employees prior to or following the Petition Date from asserting a right of recoupment of any kind against any debt, obligation or liability, and any such right of recoupment is expressly preserved.

### XII.J.    Allocation of Payments

Amounts disbursed to holders of Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess being allocated to interest that has accrued on such Claims but remains unpaid.

### XII.K.    Postpetition Interest

Except as otherwise provided in the Plan or as required by applicable bankruptcy law with respect to any Other Secured Claim, Postpetition Interest shall not be disbursed on account of any Claim.

### XII.L.    Fractional Plan Distributions

Notwithstanding anything to the contrary contained in the Plan, no Distributions of fractional shares or fractions of dollars (whether in cash or HD Shares) will be made.  Fractional

shares and fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

## XIII.  PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### XIII.A.  Prosecution of Objection to Claims

#### XIII.A.1.  Objections to Claims

Objections to Claims must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections shall be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection has not been Filed to a proof of Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or Schedules relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier.

#### XIII.A.2.  Authority to Prosecute Objections

After the Effective Date, the Reorganized Debtors shall have the authority to File (if applicable), settle, compromise, withdraw or litigate to judgment objections to all Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors may settle, compromise or otherwise resolve any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

#### XIII.A.3.  Liquidation and Resolution of Litigation Claims

Any unliquidated or disputed Litigation Claim that is a Timely Claim shall be Allowed or Disallowed in accordance with applicable law, in the Bankruptcy Court.  Section VII.A.3 of the Plan is without prejudice to any party's ability to liquidate a Litigation Claim that had not been filed as of the Petition Date in any applicable non-bankruptcy forum, and the injunction provided under Section X.B.1 of the Plan shall be deemed modified solely to the extent necessary to allow such parties to liquidate such Litigation Claims in any applicable court with jurisdiction. Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court shall retain jurisdiction relating to Litigation Claims, including the Debtors' right to have such Claims liquidated in the Bankruptcy Court pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.  Any Litigation Claim liquidated pursuant to a judgment obtained in accordance with this Section VII.A.3 of the Plan and applicable nonbankruptcy law that is no longer appealable or subject to review shall be deemed an Allowed Claim in Class 4 against the applicable Debtor in such liquidated amount upon the agreement of the parties or order of the Bankruptcy Court.  In the event a Litigation Claim is resolved pursuant to a judgment or order that (a) is obtained in accordance with this Section VII.A.3 of the Plan, (b) is no longer appealable or subject to review and (c) provides for no recovery against the applicable Reorganized Debtor, such Litigation Claim shall be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Reorganized Debtor's service of a copy of such judgment or order upon the holder of such Litigation Claim.  Nothing contained in this Section VII.A.3 of the Plan shall constitute or be deemed a waiver of any claim,

right or cause of action that a Debtor or Reorganized Debtor may have against any person or entity in connection with or arising out of any Litigation Claim.

### XIII.A.4.    Authority to Amend Schedules

The Debtors or the Reorganized Debtors shall have the authority to amend the Schedules with respect to any Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtor shall provide the holder of such Claim with notice of such amendment and such holder shall have 20 days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the Debtor or Reorganized Debtor may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

### XIII.B.    Treatment of Disputed Claims

Notwithstanding any other provisions of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

### XIII.C.    Enforcement of Bar Date Order

In accordance with the Bar Date Order and section 502(b)(9) of the Bankruptcy Code, any Entity that (i) failed to File a proof of Claim by the applicable Bar Date or (ii) failed to File a proof of Claim by the applicable Bar Date and was not otherwise permitted to File a proof of Claim after the applicable Bar Date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against the Debtors (i) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such Entity as undisputed, noncontingent and liquidated; or (ii) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.  All Claims Filed after the applicable Bar Date and for which no Final Order has been entered by the Bankruptcy Court determining that such Claims were timely Filed shall be disallowed and expunged.  Any Distribution on account of such Claims shall be limited to the amount, if any, listed in the applicable Schedules as undisputed, noncontingent and liquidated.

### XIII.D.    Indenture Trustee as Relevant Claim Holder

Consistent with Bankruptcy Rule 3003(c), the Debtors or Reorganized Debtors, as applicable, shall recognize a Proof of Claim filed by the Senior Note Indenture Trustee with respect to any Senior Note Claim; provided, however, such recognition in no way waives any of the Debtors' or Reorganized Debtors' rights against or defenses to such Claim.  When the Proof of Claim is filed by the Senior Note Indenture Trustee with respect to the Senior Notes, any Senior Note Claim for principal and interest, proof of which is filed by the registered or beneficial holder of a Senior Note Claim, shall be disallowed as duplicative of the Allowed Claim of the Senior Note Indenture Trustee, without further action by the Debtors or Reorganized Debtors and without further order from the Bankruptcy Court.

CHI-1804345v1

# XIV. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## XIV.A.     Conditions to Confirmation

The following shall be conditions to Confirmation unless such conditions shall have been duly waived pursuant to Section VIII.C of the Plan:

1.     The Confirmation Order, which shall be (i) in form and substance satisfactory to the Debtors and the Requisite Principal Holders, and (ii) with respect to any provision thereof which may have any impact or effect on the Exit Credit Facility, reasonably satisfactory to the Exit Facility Lenders, shall have been entered by the Bankruptcy Court;

2.     All documents filed with the Plan Supplement shall be (i) in form and substance reasonably satisfactory to the Debtors and the Requisite Principal Holders, and (ii) with respect to any document filed with the Plan Supplement which may have any impact or effect on the Exit Credit Facility, reasonably satisfactory to the Exit Facility lenders; and

3.     On or prior to the Confirmation Date, the Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Requisite Principal Holders, approving the Debtors' motion seeking a determination from the Bankruptcy Court that the Pension Plan meets the requirements of the distress termination reorganization test under section 4041(c) of ERISA.

## XIV.B.     Conditions to the Effective Date

The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions have been satisfied or duly waived pursuant to Section VIII.C of the Plan:

1.     The Confirmation Order shall have become a Final Order;

2.     The conditions to closing as set forth in Section 6 of the Backstop Agreement shall have been satisfied or waived in accordance with the terms of the Backstop Agreement and the Backstop Agreement shall be in full force and effect;

3.     All invoiced fees and expenses of the Principal Holders as set forth in the Plan Support Agreement, and the Backstop Providers as set forth in the Backstop Agreement, shall have been paid in full in cash (with the exception of the Backstop Commitment Fee, which shall be payable in HD Shares);

4.     The Exit Facility, including all documentation related thereto, shall each be in form and substance reasonably satisfactory to the Debtors, the Exit Facility Lenders and the Requisite Principal Holders, and shall have been consummated;

5.     The Pension Plan shall have been terminated under either section 4041(c) or section 4042 of ERISA, or the treatment of the Pension Plan shall otherwise have been satisfactory to the Requisite Principal Holders;

6.      All employment arrangements of senior management shall be reasonably satisfactory to the Requisite Principal Holders;

7.      All governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

8.      The Plan, the Plan Supplement, and all documents necessary to implement the Plan, shall be in form and substance reasonably satisfactory to the Debtors and the Requisite Principal Holders, and shall have been executed and delivered to the applicable parties.

### XIV.C.      Waiver of Conditions to Confirmation or the Effective Date

The conditions to Confirmation set forth in Section VIII.A of the Plan and the conditions to the Effective Date set forth in Section VIII.B of the Plan may be waived in whole or part in writing by the Debtors at any time without an order of the Bankruptcy Court and with the consent of the Requisite Principal Holders.

### XIV.D.      Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C of the Plan, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section VIII.D of the Plan, (1) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (2) nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

## XV.    DISCHARGE, INJUNCTION AND SUBORDINATION RIGHTS

### XV.A.      Discharge of Claims

1.      Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims, including any interest accrued on Claims from the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Effective Date discharge the Debtors from all Claims or other Liabilities that arose on or before the Effective Date and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim

based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan.

2. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of a discharge of all Claims, including any debts and Liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim.

### XV.B. Injunctions

**1. Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or Liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or Liabilities: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property, other than to enforce any right pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (d) asserting a setoff of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

**2. As of the Effective Date, all Entities that have held, currently hold or may hold any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of the following actions against any released Entities, including the Released Parties, or their property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff of any kind against any debt, liability or obligation due to any released Entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

**3. By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section X.B of the Plan.**

### XV.C. Subordination Rights

The classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

## XVI. MISCELLANEOUS PLAN PROVISIONS

### XVI.A. Dissolution of the Committee

On the Effective Date, the Creditors' Committee shall dissolve and the members of such committee shall be released and discharged from all duties and obligations arising from or related to the Reorganization Cases. The Professionals retained by such committee and the members thereof shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section III.A.1.g.ii.A of the Plan.

### XVI.B. Limitation of Liability

**1. The Debtors and Released Parties and their respective Representatives, employees, predecessors, successors, members and agents, acting in such capacity, shall neither have nor incur any liability to any Entity for any act taken or omitted to be taken in connection with, related to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement or any transaction proposed in connection with the Reorganization Cases or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions of Section XII.B.1 of the Plan shall have no effect on: (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability expressly provided under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud); it being understood that prospective or forward-looking guidance or projections prepared or released by such parties shall be deemed not to constitute gross negligence or willful misconduct (including fraud).**

**2. Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective Representatives agents, employees or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Released Parties or their respective Representatives, employees, predecessors, successors, members and agents, acting in such capacity, for any act or omission in connection with, relating to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, implementation, Confirmation or**

consummation of the Plan, the Disclosure Statement or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability expressly provided under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud); it being understood that prospective or forward-looking guidance or projections prepared or released by such parties shall be deemed not to constitute gross negligence or willful misconduct (including fraud).

### XVI.C. Payment of Fees and Expenses of Principal Holders

On the Effective Date, the Debtors agree to disburse to the extent not already disbursed, all Principal Holders Fees and Expenses, in each case, solely in connection with the negotiation, formulation, preparation, execution, delivery and consummation of this Plan, the Plan Support Agreement and plan term sheet attached thereto, the Backstop Agreement, the Disclosure Statement, the Rights Offering Documents, the schedule of Executory Contracts and Unexpired Leases the Debtors intend to assume, all organizational and charter documents for the Reorganized Debtors, all other documents related to the Reorganization Case and all transactions related thereto. None of such reasonable fees, costs and expenses shall be subject to Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. If the fees, costs and expenses of the Principal Holders or the Backstop Providers and their respective professionals are deemed unreasonable by the Reorganized Debtors, such fees, costs and expenses must be approved by the Bankruptcy Court. Copies of any such invoices shall be provided to the U.S. Trustee and counsel to the Creditors' Committee, as redacted to protect against the disclosure of privileged and/or confidential information.

CHI-1804345v1

### XVI.D. Distributions to the Holders of Equity Interests in Reorganized Holdings

Prior to the 2012 Payment, Reorganized Holdings shall not make any dividends or equity distributions to the holders of its Equity Interests on account of such Equity Interests. Simultaneously with or after the 2012 Payment, Reorganized Holdings shall be entitled to pay dividends or equity distributions to holders of its Equity Interests on account of such Equity Interests, in one or more dividends or distributions, in an amount not to exceed $10.5 million in the aggregate. Simultaneously with or after the 2013 Payment, Reorganized Holdings shall be entitled to pay dividends or equity distributions to holders of its Equity Interests on account of such Equity Interests, in one or more dividends or distributions, in an amount not to exceed $25.0 million in the aggregate (such $25.0 million to include the $10.5 million of aggregate dividends or distributions to the extent previously disbursed on the date of or following the 2012 Payment). Reorganized Holdings shall have no further restriction on the distribution of any dividend or equity distribution after the 2013 Payment (or to the extent applicable, the 2014 Payment) has been disbursed in full, provided, however, that this paragraph shall have no impact on and shall be subject in all respects to the terms of the Exit Facility.

### XVI.E. Payment of Fees and Expenses of Senior Note Indenture Trustee

On the Effective Date, the Reorganized Debtors shall disburse in cash the Senior Note Indenture Trustee Fee for all services rendered and all expenses incurred prior to or after the Petition Date. Following the Effective Date, the Reorganized Debtors shall pay all reasonable fees, costs and expenses incurred by the Senior Note Indenture Trustee in connection with the Distributions required pursuant to the Plan or in assisting in the implementation of the Plan, including, but not limited to, the reasonable fees, costs and expenses incurred by the Senior Note Indenture Trustee's professionals in carrying out the Senior Note Indenture Trustee's duties as provided for in the Senior Note Indenture. The foregoing reasonable fees, costs and expenses shall be disbursed by the Reorganized Debtors in the ordinary course, upon presentation of reasonably detailed invoices in customary form by the Senior Note Indenture Trustee and without the need for approval by the Bankruptcy Court, or the filing of a request for payment of an Administrative Claim, but any disputes concerning such fees, costs and expenses shall be resolved by the Bankruptcy Court. If the fees, costs and expenses of the Senior Note Indenture Trustee are deemed unreasonable by the Debtors, such fees, costs and expenses must be approved by the Bankruptcy Court.

### XVI.F. Administrative Consolidation

1.      The classification and manner of satisfying all Claims and Interests under the Plan take into consideration the rights of holders of Claims and Interests, whether arising under contract, law or equity, that a holder of a Claim or Interest may have against each of the Debtors. Holders of Claims or Interests against more than one Debtor are classified in consolidated classes of Claims against and Interests in all Debtors in Article II of the Plan for administrative convenience with respect to voting and the making of distributions on account of Claims and Interests. The Confirmation Order shall approve this administrative consolidation.

2.      Such administrative consolidation shall not affect: (a) the legal and corporate structures of the Debtors; (b) pre- and post-Effective Date guarantees, liens and security interests

that are required to be maintained (i) in connection with contracts or leases that were entered into during the Reorganization Case or Executory Contracts and Unexpired Leases that have been or will be assumed or (ii) pursuant to the Plan; (c) Interests between and among the Debtors; (d) distributions from any insurance policies or proceeds of such policies; or (e) the revesting of assets in the separate Reorganized Debtors. In addition, such administrative consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

3.      This Plan serves as a motion seeking entry of an order consolidating the Estates for administrative purposes only, as set forth above and the closing of the Reorganization Cases for the Subsidiary Debtors. Unless an objection to such consolidation or case closing is made in writing by any creditor affected by the Plan, filed with the Bankruptcy Court and served on the Debtors on or before the Plan objection deadline as established by the Bankruptcy Court, the consolidation and case closing order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto shall occur at or before the hearing on confirmation of the Plan.

## XVII.    FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

### XVII.A.    General

**A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE (THE "IRC"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.**

**THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND**

NON-U.S. TAXPAYERS.  IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER THE INTERNAL REVENUE CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN; AND (3) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### XVII.B.    U.S. Federal Income Tax Consequences to the Debtors

The Debtors estimate that, as of June 25, 2011, they will have consolidated net operating loss carryforwards ("NOLs") for U.S. federal income tax purposes of approximately $55.8 million.  As discussed below, the Debtors expect their NOLs to be eliminated and certain other tax attributes reduced as a result of the Plan.  In addition, an "ownership change" may limit the Reorganized Debtors' future use of any built-in losses.

### XVII.B.1.    Cancellation of Debt Income

Generally, the discharge of a debtor's debt for an amount less than its adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income.  Satisfaction of the Claims as provided in the Plan is expected to generate substantial COD income.

A bankruptcy debtor can generally exclude COD income from its taxable income if the related discharge is granted pursuant to a plan of reorganization approved by the court.  The Plan, if approved, will enable the Debtors to exclude their COD income on the basis of this exclusion.

If a bankruptcy debtor excludes COD income, however, it must reduce its tax attributes. Tax attributes subject to reduction include:  (a) NOLs; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's depreciable and nondepreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the debtor's liabilities immediately after the

discharge; and (e) foreign tax credit carryforwards.  A debtor may elect to avoid this prescribed order of attribute reduction and instead reduce the basis of certain property first.

In the case of affiliated corporations filing a consolidated return (such as the Debtors), the attribute reduction rules apply first to the separate attributes of or allocable to the particular corporation whose debt is being discharged, and then, if necessary, to certain attributes of other members of the group.  Accordingly, COD income of a particular Debtor would result first in the reduction of any consolidated NOLs and other attributes, including asset basis, attributable to such Debtor, and then, if necessary, of consolidated NOLs attributable to other members of the consolidated group, after use of any such NOLs to determine the consolidated group's taxable income for the tax year in which the debt is discharged.

It is expected that all of the Debtors' NOLs and a substantial portion of the Debtors' tax basis in their assets will be eliminated or reduced as a result of the implementation of the Plan.

## XVII.B.2.   Limitation on Tax Attributes

Section 382 of the IRC limits the amount of tax attributes such as NOLs and built-in losses a corporate taxpayer can utilize in the years following an "ownership change."  An ownership change generally is defined as a cumulative owner shift, among the corporation's 5 percent or greater shareholders, of more than 50 percentage points over a three-year testing period.  The satisfaction of the Class 3 Claims with HD Shares, and the issuance of HD Shares pursuant to the Rights Offering, is expected to cause an ownership change.

Due to attribute reduction as described above, the Debtors do not anticipate having any NOLs going forward to be subject to any limitation due to the expected ownership change.  If an ownership change were to occur as a result of the implementation of the Plan, and the Debtors have net unrealized built-in losses (i.e., losses economically accrued but unrecognized as of the date of the ownership change) in excess of a threshold amount, their ability to deduct any built-in losses recognized during the five years following the ownership change would be subject to an annual limitation on use equal to the product of Reorganized Holdings' stock value (with certain adjustments) immediately after the ownership change and the applicable "long-term tax-exempt rate" announced by the IRS (4.55 percent for ownership changes occurring in May 2011).  Any unused portion of the annual limitation generally would be available for use in subsequent years. It is not certain whether the Debtors will be in a net unrealized built-in loss position or whether they will subsequently recognize built-in losses for this purpose.

## XVII.B.3.   Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.

In particular, if a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT

purposes to reflect the fair market value of such assets as of the ownership change date. Accordingly, if the Debtors are in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

### XVII.B.4. Accrued Interest

If any of the consideration issued to holders of Claims pursuant to the Plan is treated as attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that such interest was not previously deducted.

### XVII.C. U.S. Federal Income Tax Consequences to Holders of Claims

### XVII.C.1. In General

The federal income tax consequences of the Plan to a holder of a Claim may depend, in part, on whether the Claim constitutes a "tax security" for federal income tax purposes, what type of consideration was received in exchange for the Claim, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year.

There is no precise definition of the term "security" under the federal income tax law. Rather, all facts and circumstances pertaining to the origin and character of a Claim are relevant in determining whether it is a security. Nevertheless, courts generally have held that a debt instrument having a term of less than five years will not be considered a tax security, while corporate debt evidenced by a written instrument and having an original maturity of ten years or more will be considered a tax security. It is unclear whether the Senior Notes will be considered securities for U.S. federal income tax purposes, and holders are advised to consult their tax advisors with respect to this issue.

### XVII.C.2. Holders of Class 3 Claims

Pursuant to the Plan, holders of Class 3 Claims that certify that they are Eligible Holders will exchange their Claims for HD Shares and Subscription Rights that entitle them to purchase HD Shares in the Rights Offering; and holders of Class 3 Claims that certify that they are not Eligible Holders will exchange their Claims for HD Shares and the Non-Accredited Investor Distribution, which may be in the form of additional HD Shares or the payment of cash in installments. The tax treatment of such exchanges is not clear. The holders may be treated as contributing their Claims to Reorganized Holdings in exchange for HD Shares and, if applicable, Subscription Rights or cash; or they may be treated as transferring their Claims directly to Harry & David and receiving in exchange HD Shares and, if applicable, Subscription Rights or cash. Alternatively, they may be treated as if they exchanged their Claims for stock of Harry & David

and then contributed that stock to Reorganized Holdings in exchange for HD Shares and, if applicable, Subscription Rights or cash. The first two characterizations are discussed in more detail below. The Debtors do not believe that the third characterization is likely, and accordingly it is not described further. Each holder of a Class 3 Claim is urged to consult its tax advisor regarding the tax treatment of the exchange of its Claim for HD Shares and, if applicable, Subscription Rights or cash.

a.        Exchange of Claims with Reorganized Holdings

*Exchange for HD Shares and Subscription Rights or Cash.* A holder of Claims that is treated as exchanging its Claims with Reorganized Holdings for HD Shares and either Subscription Rights or cash (in conjunction with the concurrent contributions of cash to Reorganized Holdings in exchange for HD Shares pursuant to the Rights Offering) should generally recognize gain, if any, but not loss, to the extent of the fair market value of the Subscription Rights (if any) or the amount of cash received, as applicable. In addition, as discussed further below in Section XVII.C.4.a, the holder may recognize interest income to the extent of accrued but unpaid interest on the Claims. The holder's tax basis in the HD Shares should equal the holder's tax basis in the Claims deemed to have been exchanged for them, increased by the amount of any gain recognized and decreased by the fair market value of the Subscription Rights or the amount of cash received, as applicable. The holder's holding period for the HD Shares received should include the holder's holding period for the Claims deemed exchanged and the holding period for the Subscription Rights should begin on the day following the issuance of the Subscription Rights. The tax basis of any portion of the HD Shares and Subscription Rights treated as received in satisfaction of accrued interest should equal the amount of that accrued interest, and the holding period for such portion should not include the holder's holding period for the Claims.

Any Eligible Holder that elects to participate in the Rights Offering should take a tax basis in the HD Shares received as a result of such participation in an amount equal to the amount of cash contributed by that holder on account of its participation in the Rights Offering plus the amount of any basis in the Subscription Rights pursuant to the exchange of the Claims for HD Shares and Subscription Rights, as described in the preceding paragraph. The holder's holding period in the HD Shares received upon exercise of the Subscription Rights would begin on the day following the exercise of the Subscription Rights. Upon any lapse of Subscription Rights received in exchange for Claims, the holder generally should recognize a loss equal to its tax basis in the Subscription Rights. In general, such loss should be a capital loss.

Interest received with respect to cash payments made in delayed installments pursuant to the Plan will be includible in ordinary income of the holder. In addition, a portion of any gain realized by a holder receiving delayed distributions may be deferred until the holder has received its final distribution in respect of its Claim. Holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

*Exchange for Solely HD Shares.* A holder that is not an Eligible Holder that is treated as exchanging its Claims with Reorganized Holdings solely for HD Shares should generally recognize no gain or loss on the exchange. However, as discussed further below in Section

- 78 -

XVII.C.4.a, the holder may recognize interest income to the extent of accrued but unpaid interest on the Claims.  The holder's tax basis in the HD Shares should equal the holder's tax basis in the Claims deemed to have been exchanged for them.  The holder's holding period for the HD Shares received should include the holder's holding period for the Claims deemed exchanged.  The tax basis of any portion of the HD Shares treated as received in satisfaction of accrued interest should equal the amount of that accrued interest, and the holding period for such portion should not include the holder's holding period for the Claims.

b.      Exchange of Claims with Harry & David

A holder of Claims that is treated as exchanging its Claims with Harry & David for HD Shares and, if applicable, either Subscription Rights or cash should generally recognize gain or loss on the exchange equal to the difference between (x) the holder's tax basis in its Claims and (y) the fair market value of the HD Shares plus, if applicable, either the fair market value of the Subscription Rights or the amount of cash received.  In addition, as discussed further below in Section XVII.C.4.a, the holder may recognize interest income to the extent of accrued but unpaid interest on the Claims.  The character of gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss would depend on a number of factors, including (i) the tax status of the holder, (ii) whether the Claim constitutes a capital asset in the hands of the holder and whether the holder has held such Claim for more than one year, (iii) whether the Claim was originally issued at a discount or was acquired at market discount, and (iv) whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.  The deduction of capital losses is subject to certain limitations under the IRC.  Following the taxable exchange, a holder should have a tax basis in the HD Shares and Subscription Rights (if any) received equal to the fair market value of such HD Shares and Subscription Rights on the date of the exchange.  The holder's holding period in such HD Shares and Subscription Rights will begin on the day following the exchange.

Any Eligible Holder that elects to participate in the Rights Offering should take a tax basis in the HD Shares received as a result of such participation in an amount equal to the amount of cash contributed by that holder on account of its participation in the Rights Offering plus the amount of any basis in the Subscription Rights pursuant to the taxable exchange of the Claims for HD Shares and Subscription Rights, as described in the preceding paragraph.  The holder's holding period in the HD Shares received upon exercise of the Subscription Rights would begin on the day following the exercise of the Subscription Rights.  Upon any lapse of Subscription Rights received in exchange for Claims, the holder generally should recognize a loss equal to its tax basis in the Subscription Rights.  In general, such loss should be a capital loss.

Interest received with respect to cash payments made in delayed installments pursuant to the Plan will be includible in ordinary income of the holder.  In addition, any loss and a portion of any gain realized by a holder receiving delayed distributions may be deferred until the holder has received its final distribution in respect of its Claim.  Holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

### XVII.C.3.   Holders of Class 4 General Unsecured Claims

A holder of Class 4 Claims that is treated as exchanging its Claims for cash should generally recognize gain or loss on the exchange equal to the difference between the holder's tax basis in its Claims and the amount of cash received.  In addition, as discussed further below in Section XVII.C.4.a, the holder may recognize interest income to the extent of accrued but unpaid interest on the Claims.  The character of gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss would depend on a number of factors (see the discussion above in Section XVII.C.2.b).  The deduction of capital losses is subject to certain limitations under the IRC.

Interest received with respect to cash payments made in delayed installments pursuant to the Plan will be includible in ordinary income of the holder.  In addition, any loss and a portion of any gain realized by a holder receiving delayed distributions may be deferred until the holder has received its final distribution in respect of its Claim.  Holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

### XVII.C.4.   Certain Other Tax Considerations for Holders of Claims

#### a.   Accrued but Unpaid Interest

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest upon receiving a distribution with respect to such interest.  A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan.  The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any accrued but unpaid interest on such Claim.  There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder is properly allocable to pre-Effective Date interest.  Each holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

#### b.   Reinstatement of Claims

Holders of Claims that will be reinstated generally would not recognize gain, loss or other taxable income upon the reinstatement of their Claims under the Plan.  Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement or if the reinstatement is considered for tax purposes to involve a significant modification of the Claim.

c.    Bad Debt and/or Worthless Securities Deduction

A holder who, under the Plan, receives on account of a Claim or Interest an amount less than the holder's tax basis in the Claim or Interest may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165 of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims and/or Interests, therefore, are urged to consult their tax advisors with respect to their ability to take such a bad debt or worthless securities deduction.

d.    Market Discount

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

To the extent that a holder's Claim is exchanged in a transaction in which gain or loss is not recognized for U.S. federal income tax purposes, any accrued market discount not treated as ordinary income upon such exchange should carry over, on an allocable basis, to any HD Shares received, such that any gain recognized by the holder upon a subsequent disposition of such HD Shares would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

e.    Information Reporting and Backup Withholding

All distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28 percent) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional U.S. federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

# XVIII. APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS

## XVIII.A.   Initial Shares and Non-Accredited Investor Shares

The Debtors anticipate that no registration statement will be filed under the Securities Act or any state securities laws with respect to the offer and distribution under the Plan of the Initial Shares or any Non-Accredited Investor Shares on the Effective Date.  The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the offer and distribution of the Initial Shares and any Non-Accredited Investor Shares under the Plan from federal and state securities registration requirements as discussed below.

### XVIII.A.1.  Initial Offer and Sale

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (b) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  Section 1145(a)(2) of the Bankruptcy Code exempts the offer of a security through any warrant, option, right to purchase or conversion privilege that is sold in the manner specified in section 1145(a)(1) and the sale of a security upon the exercise of such a warrant, option, right or privilege.  The Debtors believe that the offer and sale of the Initial Shares and any Non-Accredited Investor Shares under the Plan satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

### XVIII.A.2.  Subsequent Transfer

In general, all resales and subsequent transactions in the Initial Shares and any Non-Accredited Investor Shares will be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act, unless the holder thereof is deemed to be an "underwriter" with respect to such securities, an "affiliate" of the issuer of such securities or a "dealer." Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

> persons who purchase a claim against, an interest in, or a claim for administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

> persons who offer to sell securities offered under a plan for the holders of such securities ("distributors");

> persons who offer to buy securities from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) made under a distribution agreement; and

a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.  Under section 2(12) of the Securities Act, a "dealer" is any person who engages either for all or part of such person's time, directly or indirectly, as agent, broker or principal in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.  Whether or not any particular person would be deemed to be an "underwriter" or an "affiliate" with respect to any security to be issued pursuant to the Plan or to be a "dealer" would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any person would be deemed to be an "underwriter" or an "affiliate" with respect to any security to be issued pursuant to the Plan or to be a "dealer."

In connection with prior bankruptcy cases, the staff of the SEC has taken the position that resales by accumulators and distributors of securities distributed under a plan of reorganization are exempt from registration under the Securities Act if effected in "ordinary trading transactions."  The staff of the SEC has indicated in this context that a transaction may be considered an "ordinary trading transaction" if it is made on an exchange or in the over-the-counter market and does not involve any of the following factors:

> either (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

> the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto and documents filed with the SEC pursuant to the Exchange Act; or

> the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The Debtors have not sought the views of the SEC on this matter and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above.  Any persons intending to rely on such exemption are urged to consult their own counsel as to the applicability thereof to any particular circumstances.

In addition, for any "affiliate" of an issuer deemed to be an underwriter, Rule 144 under the Securities Act provides a safe harbor from registration under the Securities Act for certain limited public resales of unrestricted securities by "affiliates" of the issuer of such securities. Rule 144 allows a holder of unrestricted securities that is an affiliate of the issuer of such securities to sell, without registration, within any three-month period a number of shares of such

unrestricted securities that does not exceed the greater of 1 percent of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer. Reorganized Holdings will not be required to provide the information required under Rule 144(c) of the Securities Act until one year after the Effective Date, and therefore the ability to sell such HD Shares pursuant to the Rule 144 safe harbor may be limited.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE INITIAL SHARES OR ANY NON-ACCREDITED INVESTOR SHARES. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

### XVIII.A.3. Subsequent Transfers Under State Law

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the Initial Shares and any Non-Accredited Investor Shares.

### XVIII.B. Rights Offering Shares, Commitment Fee Shares and MSA Shares

### XVIII.B.1. Initial Offer and Sale

The Rights Offering Shares, Commitment Fee Shares and MSA Shares are being offered and sold pursuant to an exemption from the registration requirements provided by Section 4(2) of the Securities Act, including, where applicable, in reliance upon Rule 506 of Regulation D promulgated thereunder. The Rights Offering Shares, Commitment Fee Shares, and MSA Shares are exempt from federal securities registration and, in addition, involve a "covered security" under the National Securities Markets Improvement Act of 1996 ("NSMIA"). State regulation of such an offering (but not notice filings and fees) has been preempted by NSMIA.

### XVIII.B.2. Subsequent Transfers

The Rights Offering Shares, Commitment Fee Shares and MSA Shares have not been registered under the Securities Act or any other applicable securities law. Accordingly, such securities will be "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act and may not be offered, sold or otherwise transferred except in compliance with the registration requirements of the Securities Act or any other applicable securities law, or pursuant to an exemption therefrom or in a transaction not subject thereto.

As a purchaser of securities that have not been registered under the Securities Act, each holder of Rights Offering Shares, Commitment Fee Shares or MSA Shares should proceed on the assumption that the economic risk of the investment must be borne for an indefinite period, since

the securities may not be resold unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

Certificates evidencing Rights Offering Shares, Commitment Fee Shares and MSA Shares will bear a legend substantially in the form below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER APPLICABLE LAW EXCEPT FOR TRANSFERS THAT ARE EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR OTHER APPLICABLE LAW."

Any holder of a certificate evidencing Rights Offering Shares, Commitment Fee Shares or MSA Shares bearing such legend may present such certificate to the transfer agent for the HD Shares for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such times as (a) such shares are sold pursuant to an effective registration statement under the Securities Act or (b) such holder delivered to Reorganized Holdings an opinion of counsel reasonably satisfactory to Reorganized Holdings to the effect that the shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such shares may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE HD SHARES.

## XIX. ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.

## XX. RECOMMENDATION AND CONCLUSION

The Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors and the Creditors Committee urge all holders of Claims in Class 3 and Class 4 to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before **[5:00 p.m., Eastern Time, on July 28, 2011]**.

Respectfully submitted,

HARRY & DAVID HOLDINGS, INC, on its
own behalf and on behalf of each affiliate
Debtor


By:     /s/  Kay Hong _____
Name: Kay Hong
Title:   Interim Chief Executive Officer and
          Chief Restructuring Officer


COUNSEL

DANIEL J. DEFRANCESCHI (DE 2732)
PAUL N. HEATH (DE 3704)
RICHARDS, LAYTON & FINGER
One Rodney Square
920 North King Street
Wilmington, Delaware  19899
Telephone: (302) 651-7700

        - and -

DAVID G. HEIMAN
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

BRAD B. ERENS
MARK A. CODY
TIMOTHY W. HOFFMANN
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939

ATTORNEYS FOR DEBTORS

**DISCLOSURE STATEMENT EXHIBIT I**

**JOINT PLAN OF REORGANIZATION
OF HARRY & DAVID HOLDINGS, INC. AND ITS DEBTOR SUBSIDIARIES**

CHI-1804345v1

**DISCLOSURE STATEMENT EXHIBIT II**

**LIQUIDATION ANALYSIS OF THE DEBTORS**

CHI-1804345v1

## DISCLOSURE STATEMENT EXHIBIT III

## PROJECTIONS FOR THE REORGANIZED DEBTORS

**DISCLOSURE STATEMENT EXHIBIT IV**

**VALUATION OF THE DEBTORS**

CHI-1804345v1

**DISCLOSURE STATEMENT EXHIBIT V**

**HISTORICAL FINANCIAL STATEMENTS OF THE DEBTORS**

**DISCLOSURE STATEMENT EXHIBIT VI**

**RIGHTS OFFERING PROCEDURES**

**DISCLOSURE STATEMENT EXHIBIT VII**

**BACKSTOP AGREEMENT**

CHI-1804345v1